## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

GERTI MUHO,

                Plaintiff,

    v.

ALPHONSE FLETCHER JR., JAMIE DIMON, ERMANNO
UNTERNAEHRER, YVES BLOCH, PETER C. HARVEY,
DEBORAH H. MIDANEK, MARIANNE RAJIC, DENIS J.
KIELY, TODD R. HARRISON, NEAL BRICKMAN,
ROBERT FIEDLER, CHAD M. SHANDLER, ELIZABETH M.
RIORDAN, JANE METCALF, HENRY E. GALLAGHER, JR.,
FLOYD SAUNDERS, JAY SHAWS, IVONA SINOVIC, DAVID E.
WILKS, MICHAEL S. MEADE, ALEX WEINGARTEN, J.P.
MORGAN CHASE & CO., PATTON BOGGS LLP., MORRISON
& FOERSTER LLP., BRICKMAN LEONARD & BAMBERGER, P.C.,
CITCO GROUP LTD., PASIG LTD., KASOWITZ BENSON
TORRES & FRIEDMAN LLP., RICHARDS, LAYTON &
FINGER, P.A., FLETCHER ASSET MANAGEMENT, INC.,
PATTERSON BELKNAP WEBB & TYLER LLP, SOLON
GROUP, INC.,LAMPOST CAPITAL, L.C., OGIER LLP.,
CITIBANK N.A., WILMINGTON TRUST, N.A., WALKERS LLP,
WEILL GOTSHALL & MANGES LLP, WILKS, LUKOFF &
BRACEGIRDLE, LLC., MCDERMOTT WILL & EMERY LLP.,
WEINGARTEN & BROWN LLP., CONNOLLY GALLAGHER LLP.,
PINNACLE FUND ADMINISTRATION, FOX ROTHSCHILD LLP.,
PORZIO, BROMBERG & NEWMAN, P.C. CITCO TRADING, INC.

                Defendants.

_____/

FILED by _AJS_ D.C.

FEB 1 4 2014

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

Verified Complaint for Violations of Sections 1, 8 & 15 of the Sherman and Clayton Acts and For
Violations of the Civil Rights Act 42 U.S.C. Sections 1983 and 1985 For Injunctive Relief and Civil
Penalties.

    Gerti Muho, pro se, alleges the following:

INTRODUCTION.

1.      This case is about an agreement to erase competition. This is an Antitrust action.

2.      Plaintiff earned defendants wrath when he acquired the ability, the information, the right, and the incentive to threaten the following,:

i. JPMorgan Chase & Co. ("**JP Morgan**") profits yearly USD 30 billion. Much from arbitraging information about the financial instruments it creates.[1]

ii. JP Morgan executives earned very significant fees for their instrumental role in knowingly putting together instruments that could potentially have, and actually have been, blamed for causing the difficult recent experience faced by the worldwide economy.

iii. Jamie Dimon ("**Dimon**") did himself posses actual knowledge. In time, and should have been made aware of Plaintiff and his ability and goals by one of the many attorneys we shared—me unknowingly at all times. Mr. Dimon stated that the legal settlements JP Morgan entered into with both "sophisticated investors" and the U.S. Government were sort of hurried up and came earlier than expected—hitting earnings sooner. Why? I'm not claiming I'm the cause, for I only gave the government 300 gigabytes of relevant brand new data and Mr. Dimon's attorneys a heads up that the date was going to be reviewed. Actually I'd love to know if I am the cause for speedy settlements that the $8 billion dollar a year legal machine that is JP Morgan apparently had so mistimed. But to a good result for the enterprise as Mr. Dimon's recent raise suggests.

iv. Jaw Shaws, Fletcher Asset Management Inc.'s ("**FAM**") Chief Compliance Officer before he became around July 2012 a Senior Vice President as Citibank N.A. ("**Citibank**"), did

---

[1] A statement my mentor and defendant Alphonse "Buddy" Fletcher, Jr. told me once helps me understand how arbitraging of information about financial product one creates is so profitable but so wrong. That statement came while we were discussing a potential investment that I was advocating, and Buddy said: that is speculation; we don't speculate at Fletcher Asset Management, we make money.

Applying that statement to the Jersey (Corsair) USD 100 million issuance that JP Morgan, Citco, and Buddy put together in 2004, you have the three defendants ("Sellers") booking a profit the very instant they sell the allegedly guaranteed notes to the buyer of whatever information they, the seller, know that the buyer does not.

For example the sellers could know that the USD 20 million part of the guarantee is being provided by an entity that in the future will not be able to meet its obligations. That provider will fail to meet its obligations because it will have made an investment with the monies that in the future will turn out to be a complete loss.

The three Sellers are aware of the destiny of that provider by virtue of their knowledge of the complex multifaceted corporate relationships the Sellers have with the providers etc. To put differently, the Sellers will jump through all the corporate personas they need to jump to steal, or misappropriate the assets they sell. And that's how the Sellers are able to profit 20% the very instant the Sellers issue the notes. Note, that one is limited only by his imagination on how on, on when, and on where that loss results. A loss may have occurred by a provider that may not be booked, for example. The loss also may come from fees that are legally charged at many levels of different corporate personas that just are never recovered.

knowingly provide to the U.S. Securities and Exchange Commission ("**SEC**") untrue information in response to the SEC's requests for written information in connection with its investigation of FAM.

v. Peter C. Harvey, ("**Harvey**") the Attorney General of New Jersey before becoming a partner at Patterson Belknap Webb & Tyler LLP ("**Patterson**"), flagrantly violated SEC registration requirements[2] in his attempts to convince both the New Jersey Pension Funds and the Chicago Pension Funds to invest their money with FAM.

vi. Citco Group, Ltd. ("**Citco**") and FAM ran a ponzi scheme on sophisticated investors for years, as explained in the complaint for about USD 240 million in damages filed primarily against the two in the Northern District of California and incorporated herein in the form of Exhibit 00038. That complaint left out the two defendants instrument partner in the scheme—JP Morgan. Also, a court appointed, private actor, trustee, who had didly squat before I decided to help, wrote up a three hundred page report for the Bankruptcy court in the Southern District of New York claiming, according to media reports, that Fletcher essentially ran a ponzi scheme.

3. Denis J. Kiely, Michael Meade, Deborah H. Midanek, Michael S. Meade, Ogier LLP, and Wilmington Tust N.A.. complete the list of defendants whom I had ability, the information, the right, and the incentive to hold accountable, and (ii) who for the past nine months joined forces intending to deprive me of my ability, my right, my information, and my incentive.

4. Walkers LLP. and Weill Gotshall & Manges LLP. ("**Weill**") were attorneys I and FAM shared before I decided my obligations to the law and my obligations to my investors, both fiduciary and contractual, required me to end relations with FAM. FAM was and remains a very small investor, percentage-wise, in a holding entity that was twice removed from entities I served as Director and Executive. Both law firms decided to jump ship and help FAM & Co. to deprive me of my ability and my right to hold all aforementioned defendants accountable for their past misdeeds.

---

[2] 17 CFR 275.203A-2

5.      Neal Brickman, Todd R. Harrison, then at Patton Boggs LLP and now at McDermott Will & Emery LLP, Neal Brickman, David E. Wilks were attorneys I retained to aid me with my efforts but who jumped ship to help the other side—although Patton Boggs was both JP Morgan's attorney and mine, I learned after Neal Brickman dealt with all JP Morgan, Citco, and Wilmington Trust before he became my attorney, but more on Mr. Brickman and the two others below.

6.      Conolly Gallagher LLP, Morrison Forrester LLP, Kasowitz Benson Torres & Friedman LLP, and Porzio, Bromberg & Newman, P.C. are law firms who have knowingly aided and abetted the aforementioned defendants.

7.      Defendants, intentionally or by failing to take legally sufficient care, have caused damage to Plaintiff personally that if not mitigated is believed to far higher than the best possible low estimate given all imperfections of valuation of $333,333,333.01.

8.      Defendants joint actions represent a naked restraint of trade that is per se unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiff seeks an order prohibiting defendants from continuing with their efforts  and other relief.

**JURISDICTION AND VENUE**

9.      This court has jurisdiction of this cause under the provisions of the Sherman and Clayton Acts, specifically 15 U.S.C. §§ 1, 15, and 26.

10.      This court has further jurisdiction over the federal claim under 28 U.S.C. § 1343 because defendants' conspiracy has impeded, hindering, obstructed, and defeated the due course of justice. The Court furthermore has jurisdiction over the federal claims under 28 U.S.C. §§ 1331

and 1337. The Court has jurisdiction over the state claims under 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy.

11.. Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because defendants transacts business, committed illegal or tortious acts, and are found in this District, within the meaning and scope of 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c), and a substantial part of the events giving rise to the claims arose in this District.

12. The activities of the defendants, as described herein, were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.

**PLAINTIFF**

13. Plaintiff is the individual competitor targeted by Defendants actions. Plaintiff resides in Miami Florida.

**DEFENDANTS**

14. Lampost Capital L.C. is a brokerage located at 7777 W. Glades Rd., Ste. 213, Boca Raton, FL 33434.

15. Ogier LLP is a law firm located at Ritter House, Wickhams Cay II, PO Box 3170, Road, Town, Tortola, British Virgin Islands VG1110.

16. Wilmington Trust, N.A. is a national banking association located at 1100 North Market Street, Wilmington, Delaware 19890

17.     Walkers LLP (BVI) is a law firm located at 171 main street, PO Box 92, Road Town, Tortola, British Virgin Islands, VG 1110.

18.     Weill Gotshall & Manges LLP is a law firm located at 767 Fifth Avenue, New York, NY 10153.

19.     McDermott Will & Emery LLP. is a law firm located at 340 Madison Avenue, New York , NY 10173.

20.     Connolly Gallagher LLP. is a law firm located at 1000 West Street, 14th Floor, Wilmington, DE 19801.

21.     Pinnacle Fund Administration is located at 15720 John J. Delaney Drive, Suite 206 Charlotte, NC 28277.

22.     Fox Rothschild LLP is a law firm located at 2000 Market St., 20th Floor, Philadelphia, PA 19103.

23.     Porzio, Bromberg & Newman, P.C. is a law firm located at 100 Southgate Parkway, P.O. Box 1997, Morristown, NJ 07962.

24.     Alphonse Fletcher, Jr. (“**Fletcher**” or “**Buddy**”) is an individual residing at 188 Minna Street, Apt 23E, San Francisco, California 94105.

25.     Neal Brickman (“**Brickman**”) is an individual believed to reside in the State of New York, with his office located on 317 Madison Ave., 21st Fl., New York New York 10017. Brickman Leonard & Bamberger, P.C. is a law firm located at 317 Madison Ave., 21st Fl., New York New York 10017.

26.     Jay Shows is an individual resigned at 304 W105 St. 3B, New York, NY 10025.

27.     Floyd Saunders is an individual residing at 321 West 29th Street 6B New York, NY 10001

28.     Denis J. Kiely and Denis J. Kiely LLP are located at 17 Turkey Lane Cold Spring Harbor, New York, NY 11724

29.     Defendant Fletcher Asset Management, Inc. ("**FAM**")is a Delaware corporation with its main address at 48 Wall St. 4FL, New York, New York 10005.

30.     Defendant JPMorgan Chase & Co. ("**JP Morgan**") is a Delaware corporation located at 270 Park Ave., 38th Fl., New York, New York, 10017. JP Morgan is the parent entity of JPMorgan Chase Bank, N.A. ("**Chase**"), a federally-chartered national banking association headquartered in New York, New York and is a wholly-owned subsidiary of Defendant.

31.     Defendant Citibank, N.A. is a federally-chartered national banking association headquartered in New York, New York and is a wholly-owned subsidiary of Defendant Citigroup, Inc. (together "**Citibank**").

32.     David E. Wilks is believed to be a Delaware resident whose only known address is that of his firm, defendant Wilks, Lukoff & Bracegirdle, LLC., which is located 1300 N. Grant Avenue, Suite 100, Wilmington, Delaware 19806.

33.     Defendants Pasig Ltd. Citco Group Ltd., Citco Trading, Inc. (together "**Citco**") Ermanno Unternaehrer, and Yves Bloch are believed to share the same address at: c/o The Citco Group (Monaco) S.A.M. Monte Carlo Palace 7 boulevard des Moulins MC 98000 Monaco

34.     Defendant Richards Layton & Finger LLP. One Rodney Square, 920 North King Street, Wilmington, Delaware 19801

35.     Jamie Dimon, is an individual residing at 1185 Park Ave, Apt. 16L, New York, NY 10128.

36.     Peter C. Harvey is an individual residing at  3 Maak Ct. Somerset, NJ 08873.

37.     Deborah H. Midanek is an individual residing, and Solon Group, Inc. is a New York Corporation located, at 81 S. Church Street, Grenada, Mississippi 38901

38.     Marianne Rajic is an individual located at 171 main street, PO Box 92, Road Town, Tortola, British Virgin Islands, VG 1110

39.     Todd R. Harrison is an individual residing at 63 Donnybrook Dr. Deamarest, NJ 07627

40.     Robert Fiedler is an individual located at 1100 North Market Street, Wilmington, Delaware 19890.

41.     Chad M. Shandler is an individual residing at 223 Green Valley Road, Exton, PA 19341.

42.     Elizabeth M. Riordan is an individual residing at 829 Greenwood Ave. Apt. 2P, Brooklyn NY 11218.

43.     Jane Metcalf is an individual located at c/o Patterson Belknap Webb & Tyler 1133 Avenua of the Americas, New York, New York, 10036.

44.     Henry E. Gallagher, Jr. is an individual located at is a law firm located at 1000 West Street, 14th Floor, Wilmington, DE 19801.

45.     Ivona Sinovic is an individual located at 1 Broadway, New York, New York, 10005

46.     Michael S. Meade is an individual located at 7777 W. Glades Rd., Ste. 213, Boca Raton, FL 33434.

47.     Alex Weingarten is an individual located at 10866 Wilshire Blvd., Suite 500, Los Angeles, CA 90024.

48.     Weingarten & Brown LLP. is a law firm located at 10866 Wilshire Blvd., Suite 500, Los Angeles, CA 90024.

49.     Patton Boggs LLP. is a law firm located at 1185 Avenue of the Americas, New York, NY 10036.

50.     Morrison & Foerster LLP. is a law firm located at 425 Market Street San Francisco, CA 94105.

51.     Kasowitz Benson Torres & Friedman LLP. is a law firm located at 1633 Broadway New York, NY 10019.

52.     Patterson Belknap Webb & Tyler LLP is a law firm located at 1133 Avenua of the Americas, New York, New York, 10036.

**TRADE AND COMMERCE**

53.     Asset managers deal in returns. High returns are chased, low returns are kicked to the curb. Managers who provide higher returns, who beat others, are copied. The weak become directors or leave. Investors suffer when weak managers use yet weaker directors to yield them lower returns. Ideally stronger directors than the weak manager who have the power to remove the manager would replace the manager and improve returns, increase assets, and benefit everyone. This rarely happens. Plaintiff showed directors how to do it, if they chose to do it.

54.     Banks and custodians deal in a commoditized product. Banks and custodians compete to provide products and services that meet all customer needs and foster a long term banking relationship. This is especially true in the more profitable relationships they have with their business customers. Providing fair, legitimate, and reasoned services to customers is an effective method of competing for customer accounts.

55.     Law firms deal in specialized services. They compete to provide clients with legal services that allow clients to enforce their rights or protect them from being infringed by others. This is especially true in the in the highly profitable services law firms provide their business customers. Winning cases for their clients is an effective way lawyers compete.

56.     The overarching agreement to obstruct Plaintiff from competing eliminated competition between the parties to provide fair, legitimate, and reasoned services to customers. The specific agreement Wilmington, M&T Bank., Neal, etc. to take from Plaintiff and to give to those to whom it did not belong

57.     The agreement to cover up the defendants obstruction harmed the public. Weak managers stayed and the benefits of the stronger manager didn't flow to investors—statewide and

worldwide, and didn't lead to directors in other funds throughout commerce to copy and continue to increase over all benefits while decreasing the over-compensation of the weak managers who usurp market imperfections to remain in power.

58.    Investor money in Leveraged and in other funds that have been effected comes from all over commerce. It's next to impossible to define borders, for investor money flows in commerce statewide and worldwide without pause and every dollar is presumed to have flowed and to continue to flow from national and international commerce. Investment made similarly are made wherever they appear in the world.

### THE MOTIVE TO BREAK THE LAW

**I. JP Morgan, Citco, and FAM.**

59.    JP Morgan, Citco, and FAM began issuing guaranteed securities in the late nineties via special purpose vehicles (SPVs). They formed Ottowa Company Limited in Jersey in the Channel Islands ("**Ottowa**"). Ottowa sold investors $55 million in five year, face value notes in 1999. In 2004 the Ottawa the notes were repaid in cash, about $35 million, or kind, $20 million in guaranteed notes issued by Corsair (Jersey) ("**Corsair**" or "**Jersey**").

60.    Corsair was another SPV formed by JP Morgan, Citco, and FAM. In 2004 Corsair issued a total of $100 million in guaranteed ten year notes to investors. Investors were told the $100 million was going ($~40 million) to be invested in Fletcher International Leveraged, a hedge fund without a loosing quarter, or ($60 million) used to shore up the guarantee.

61.    In no time Corsair dissolved. Sort of. Corsair remained a going concern but it sold all of its assets and all of its liabilities to an entity known as Global Hawk, Ltd. ("**Global**"). In no

time Jersey's investors became investors in Global. Whether they liked it or not. But what they didn't know wasn't going to hurt them, regardless.

62.     Citco and FAM founded Global to frustrate Jersey's direct promise to investors to keep $60 million locked up in T-bills.[3] Unlike Jersey, Global wouldn't keep $60 million in T-bills to secure repayment to investors of the $100 million, due in 2014. Global guaranteed repayment concerns to JP Morgan via a different form of asset. The word of Global's founders, and their propensity to commit crime as needed, that Global would indeed repay Jersey's obligations. Their word was just as good an asset. JP Morgan thought it sufficed, after all.

63.     Fast forward to 2008[4] and the scheme collapses. Sort of. The Royal Bank of Scotland ("**RBS**") is owed $106 million or so that Jersey had guaranteed, Global had assumed, FAM, Citco, and JPM had siphoned as "fees" or as "failed investments," that a few of the funds I manage had collateralized, and that my investors ultimately repaid, by force. Technically, my investors were sold $140 million in assets that Global Hawk, Ltd. owned. None remains today.

---

[3] Note that $20 million from Ottowa were rolled over into Jersey. If another $60 million were put aside as promised to investors, that would leave less than $10-15 million to invest in Fletcher International Leveraged (after fees). You don't create an SPV, issue $100 million in debt for a measly $10 million. Not if you can help it. And FAM, Citco and JP Morgan could help it, and did help it.

[4] In 2008 RBS requested that FAM provide it information about Global's investments—i.e., Jersey's assets, since Global bought not just Jersey's liabilities, but its assets too. RBS even offered a 20% haircut if FAM gave it what RBS was *entitled* to receive by contract. FAM and Citco then managed my funds assets. It took them very little time to decide that my investors were going to be paying it all.

However, the whole deal went into limbo for two years after FAM refused payment of Citco's "unwritten fee." Citco was Global's trustee and Global could not have been forced just yet to pay for Jersey's assets and liabilities. Yes, FAM, Citco, and JP Morgan expected Global to buy the liabilities pursuant to their unofficial agreement, but the trustee could refuse. The trustee had many reasons to refuse. He could have easily refused a written agreement to buy Jersey's junk, not an unwritten one. But the trustee wasn't trying to be a martyr. The trustee just wanted its "unwritten fee." Citco's fee.

When Citco received its fees, Global used my investors cash and paid off years of fees that had gone to Citco, FAM, and JP Morgan.

64.     Was is illegal? Yes. All sorts of U.S. and international laws were flouted—money laundering laws, banking laws, securities laws, anti-corruption laws, employment laws, and more. What's most important is that FAM, Citco, and JP Morgan's operations required them to break one rule, more than others.  At all times and at all costs, that rule they could never follow.  One rule cuts through the heart of the entire scheme and halts it dead in its tracks. That rule is the registration requirement rule of the Investment Advisers Act.

65.     They put together a house of cards as a corporate structure, cut the hedge funds into as many pieces as necessary inside it, shuffled and reshuffled corporate identities and managers, ignored investors and investors demands, all for one purpose—to hide responsibility.

66.     The registration requirement of the Advisers Act requires those with discretionary authority over investors assets to (i) list the assets the investment adviser has discretionary authority over, (ii) list the ultimate decision maker within the investment advisory firm who decides how clients asset are invested, (iii) list transactions that may have posed a conflict of interest between the investment advisers and his clients, and (iv) list where the investment adviser's records are kept so that the SEC can check to verify the veracity of the answer given by an adviser in his registration form.

67.     Neither Jersey, Global, Ottowa, nor any of the funds I now manage were registered with the SEC under their former managers. Registration would have forced them to disclose the myriad of transactions between them, themselves and their alter egos. Their fun names aren't the only reason for creating SPVs. SPVs are managed by an independent-sounding trustee. Since JP Morgan, FAM, and Citco cannot control the SPV without the trustee's consent, they do not manage the SPV. If they don't manage it, they don't register it. It's quiet simple.

68.     The independent-sounding trustee is usually a Citco employee—trustee(s), using the plural at all times is preferred for it gives the trustee an out should he ever be questioned about his decisions by allowing him to blame certain decisions on the other trustee(s). The trustee tends to be a well paid senior member of Citco to ensure the Trustee does nothing crazy like the right thing. The trustee's past involvement and earnings from the common scheme tend to ensure the trustee doesn't surprise everyone by becoming an honest trustee, without reason.

69.     See, as an investor, if you don't know who is making decisions with your money, if you don't know who to hold accountable for what happens to your money, you don't know if you have any money. FAM, JP Morgan and Citco forced this state of sad ignorance on my investors—telling them nothing about their money.

70.     Investors can speculate about just who manages their money[5], they can scream they want their money back, they can even fly to the U.S. to meet Denis J. Kiely, who they know as the person answering their e-mail but whose unexpected trip to Texas or wherever, unfortunately, meant he was out of town. Next time the investor flies out from Switzerland Denis will be here, of course.[6]

---

[5] Investors did records to even FAM could have been their manager. No records about the sale of management from Citco to FAM were provided to the funds investors. None. Informing investors that Citco had sold management of their money to FAM was avoided for it gave investors proof about the parties—both Citco and FAM, who controlled their funds.

[6] An investor took the trip from Switzerland here after his threats over e-mail went unanswered. Denis J. Kiely failed to answer his phone throughout that week and send an e-mail to the investor explaining his absence resulted from an unexpected trip to Texas.

71.    Sue? Your manager is with the dirtiest[7] and the largest[8] litigants in the world. And you will accuse the wrong party no matter who you claim is you manager. Guaranteed. For management will have changed "As of _____" fill in a date that fits the story.

72.    Was it a mortal sin similar to Wilmington's interpleader? Well, No. I showed the directors had a choice. They didn't have to listen. They're more likely more to blame than the managers.

**Others.**

73.    FAM and Citco. Since 1996 had worked together to benefit themselves at their investors expense.

74.    FAM, Ogier. New Wave Fund SPC had been created to swap worthless illiquid management fees paid for worthless illiquid highly valued assets, in Euro from Fletcher International Leveraged, once it became denominated in Euro, with cash from the same Merged Entities that had paid the fees in connection with the worthless assets in the first place under the guise of "hedging foreign exposure risk."

75.    Deborah H. Midanek. Set up FAM with John Rogers at Ariel leading to a series of frauds from Vanquish to New Wave etc. in exchange for votes that kept Mrs. Midanek at the Board of HCC.

---

[7] They themselves used the terms above to describe one another after their relationship grew cold over the unwritten fee Citco wanted and FAM refused, at first.

[8] JP Morgan spent about $8 billion in legal fees last year alone.

76.     Citibank, Jay Shaws. Had **knowingly** provided the SEC and other governmental bodies with untruthful answers for years on behalf of FAM.

77.     Michael S. Meade. Got paid $1.5 million before the Plaintiff took over, increasing Richcourt Holding, Inc.'s liabilities to $2.5; had been instrumental in FAM, Citco's, and JP Morgan's theft of hundreds of millions of dollars from the Merged Entities; had allowed FAM to create false trading statement for Vanquish etc.

### THE UNLAWFUL COMBINATION IN RESTRAINT OF TRADE

78.     Early am on April 29, 2013, Plaintiff calls Buddy's attorney to tell him Buddy has lost all say over the funds and the funds managers. Informs him that Buddy was removed from all remaining boards of directors for four fund-manager-companies that managed the sixteen or so hedge-fund-companies[9] and also from the boards of the hedge-fund-companies[10] themselves (the two dozen entities all now merged into surviving Leveraged Hawk, Inc., hereafter, the "**Merged Entities**" or "**Leveraged**").

79.     Later that day, around 6 pm Miami time, the same attorney sends Buddy and Plaintiff an email with a letter attached. I remember the letter started with: we learned last Friday... we advised them to  contact the SEC ... we believe you have committed a bankruptcy

---

[9] The four manager corporations also owned all issued and outstanding voting stock of the the sixteen or so funds they managed. The four manager corporations had bought the voting stock for a nominal price before the funds were marketed to outside investors—who received only non-voting stock.

[10] There's been an effort by FAM primarily to fudge the funds and the fund managers corporate identities. FAM attempts to portray the funds and the fund-managers as if they were not corporations, but as if they were something like a partnership, but less than a partnership. FAM has been portrayed as the "member" of the companies. The true owner, if you will. Plaintiff has been portrayed as non-member, employee director, and Buddy as member, owner director. Nothing can be further from the truth. The funds and fund companies were the equivalent of what in Delaware they refer to as corporations and what in New York they call companies. The directors were not employees, but trustees of the shareholders if the funds were solvent and of the stakeholders, if the funds were insolvent.

crime. I stopped reading at that point. I already knew what they had learned, where they advised me to go, and that stealing money to pay off the debt you owe to the trustee is a crime. I began worrying the letter would distract me from the pressing needs I, the Merged Entities, and Leveraged had, including the making of the payments to Baker Hostetler LLP and Crowell & Moring LLP.

**The Conspiracies start: Against Trade, Sherman 1, and against Civil Rights, 42 U.S.C 1985.**

80.     The attorney told Buddy he had advised the person to go to the SEC Friday. He did. And I told him that I was a fiduciary the investors. The only one they have ever known. I couldn't let the funds crash and burn for a cut of the SEC recovery fee. I didn't care about the bounties offered to whistleblowers. I liked my trade and had no intentions of leaving. And 33% for 'telling' in this case would have made me the biggest beneficiary of the entire scheme—and all without me lifting a finger. A horrible life indeed, I thought. Honestly money is boring without trade.

81.     About a quarter of an hour later Buddy sends an e-mail to Floyd Saunders asking him or Gerti to complete the changes to the fund manager companies boards of directors "today or tomorrow." Buddy copies Denis J. Kiely and me on that e-mail.

82.     Buddy's e-mail makes apparent that corporate actions were still needed to prevent Buddy's loss of control over the Merged Companies after Leveraged had purchased the Merged Companies.[11] The lawyer's letter informed Buddy of his need to protect the Merged Entities, which then spurred the e-mail above.

---

[11] The way the fund companies were structured there were only two ways to undermine Buddy's authority—or illusory authority over the funds, outside of court. Both ways required someone who was a director of, or at least authorized to represent, the fund managers. See Affidavit 0200020 depicting past and present structures of the funds, the fund managers, and operating and holding companies.

83.     The e-mail also was a withdrawal letter. It told Buddy why a good, honest law firm prepaid up to $125 thousand or so found it necessary to quit. Specifically it told Buddy that he appears to have broken bankruptcy rules was his illicit control over the Merged Entities that mattered to Buddy. The incomplete, unprotected fund managers were the concern.

84.     Buddy's email misleads. Its contents are wholly motivated by, and directed to future litigation.[12] But Buddy's e-mail also shows that Buddy, Floyd, and Kiely, at least, knew the fund managers were not safe. And if the fund managers, and derivatively, the funds, were not safe after Leveraged bought them, they couldn't have been safe at the time Leveraged bought them.

85.     It isn't known what passed over e-mails that night. I never read them. I didn't think it was fair. But it wasn't meant for the enemy, and it wasn't meant to become public. It

---

[12] You cannot complete what you have **not** started. Buddy treats every writing as to-be-evidence in existing or arising litigations. As something others will one day see—whether a judge in a privilege fight or the public at large. This regularly leads to Buddy having long e-mail conversations with himself.

Buddy, for example, ended every one of the e-mails on the topic that  he sent to Denis J. Kiely and others at FAM asking what Israel Englander meant by debt is not equity. Continuing with: how can debt be equity.  I don't understand. (Note: Mr. Englander manages a larger asset management firm and he is a redeemed minority investor in the Holding Company. The Holding Company, Richcourt Holding, Inc. sold the Merged Entities to Leveraged April 29, 2013 and remains a satisfied Class A stockholder of Leveraged.)
Did Buddy understand the issue. Yes. Did he want an answer. No. Buddy knows how to get answers when he wants them. Did Buddy believe the Debt is Equity issue was poised for litigation. Yes.

Where there's danger, there's opportunity. And Buddy takes full advantage of the danger written corporate records pose in litigation. His long winded soliloquies in certain e-mail threads are anything but. They're statements that seek to pre-establish the truth that they assert: that Buddy did **not** use debt as equity in the example above. A true expertise in privilege law and a tight grip on all information allow Buddy to fully exploit the young lawyers investigating his documents.

So Buddy in his e-mail asking Floyd (or me) to complete changes at the fund manager companies, first of all, is not asking Floyd to do a thing. Floyd doesn't write resolutions. He doesn't make changes to Boards. And he doesn't follow unclear directions like those found in the e-mail. Floyd couldn't even carbon copying his own resignation correctly. Buddy instructions were meant for me. Buddy wanted me to write up the agreements that would protect the fund managers.

But Buddy writes "complete" the changes. It is clear who complete is written for. Complete is entirely for future litigation purposes—i.e., to establish the truth of what is asserts: that the changes had begun. But no change had begun. None. Denis J. Kiely had last brought up the fund manager companies directors. I simply reminded Buddy of the problem puppets could cause as they had at the Fletcher bankrupt fund, and Buddy quickly agreed and forgot about it.

wasn't aimed at the two lawyers either, even if addressed to Floyd Saunders—and it should be noted that Floyd is an "attorney by trade" and not a practicing one. And the e-mail appears to direct—not question. Regardless of whether the e-mail would be privileged, the e-mail would have never seen the day of light

86.     Plaintiff's lack of participation must have been noticed as the rate with which e-mails my phone slowed. This allowed me to once more talk to Boise Schiller LLP and also allowed me to move forward on retaining an independent director for Leveraged—my law school professor who had experience in these matters.

87.     The next morning, around 8am Miami time, Plaintiff sends to Marianne Rajic at Walkers among other things a merger agreement between the two dozen entities that merged into Leveraged and Leveraged and resolutions removing Solon Group Inc. from the boards of directors of the fund companies. Plaintiff asks Ms. Rajik to ensure the merger complies with all local laws offshore. Plaintiff doesn't ask Ms. Rajik for her opinion on the merger. Doesn't ask her to review the documents.[13] And definitely doesn't ask her to inform FAM or FAM's agents about the merger. Plaintiff simply asks Ms. Rajik to do her job—ensure the merger complies with offshore requirements.

88.     Ms. Rajik replies back in minutes and says she will take a look at the documents and get back to me. Ms. Rajik in her reply copies her colleague at Walkers and also Deborah H. Midanek. This was a problem. Walkers represented Leveraged at this point. Not Fletcher. And Ms. Midanek had by then proven herself to be one of Fletcher's minions.

---

[13] Ms. Rajik had prepared the merger documents for the Plaintiff.

89.     It isn't known whether Ms. Rajik was contacted by Fletcher beforehand and told to alert Fletcher if it turned out the lawyer had been correct and the funds companies and the fund managers companies had been sold to Leveraged. Considering how quickly Ms. Rajik responded to Plaintiff's e-mail that early am and had her colleague at Walkers and Mrs. Midanek ready to add to her response, it is highly likely that she was contacted by Fletcher beforehand and was doing what she had been told. Plaintiff had a long history of exchanging e-mails with Ms. Rajik and this was the first time Ms. Rajik had copied anyone to her e-mail response ever.

90.     Mrs. Midanek writes back "WOW."

91.     Wow indeed. Plaintiff responds to Mrs. Midanek directly and informs her while Solon Group Inc. through which Mrs. Midanek served as fund company director had been removed as director of the fund companies, Plaintiff was happy to discuss having Mrs. Midanek join the board of Leveraged directly.[14] Plaintiff further informs her that Plaintiff hopes to have a law professor from Berkeley Law and a banker from TPG join the board of Leveraged.

92.     Mrs. Midanek, a few minutes later, follows up with: "We have some wires crossed. It is my understanding that Stewart and Floyd, per the Bermuda Registry, are the directors of RPGP, and Buddy and George being appointed to [Richcourt Holding, Inc.].[15][16] Have you tendered your resignation from MCs yet? I believe both Floyd and Buddy are looking for that," before finishing with: "At this point, [Ms. Rajik] cannot take further interactions from you, so do not be surprised."

---

[14] Delaware, unlike the offshore jurisdictions, prohibits corporations from serving as directors of Delaware corporations.

[15] Owner of the four fund-management-companies. Owner of Leveraged Class A shares.

[16] See Exhibits 133 & 137.

93.     But there were no crossed wires.[17, 18] Leveraged bought the "MCs" or the fund-management-companies and Leveraged bought control of the funds. This conflicted with Fletcher & Co. who wanted to continue treating the fund-companies as their personal piggy-bank. Mrs. Midanek was doing Fletcher & Co's dirty work—trying to bully management of the fund-companies away from the Plaintiff.

94.     Deborah H. Midanek of Solon Group, Inc. Not the hoped for veteran, independent, non-management, career director.

95.     I then e-mailed Buddy and everyone else. I told him that Leveraged buying the fund-management-companies and control of the funds was no change at all.[19] That the insider, hostile takeover labels that were being used were really unnecessary. I told him that Class A shares of Leveraged gave him a permanent seat on Leveraged's Board, and that I welcomed him on the board. However I told him, the restructuring was required of me as a fiduciary of the investors, and that I needed to undertake the restructuring in order to meet my obligations to the Internal Revenue Service ("IRS") and the funds obligations to the SEC.

96.     I write to the bank moments after I wrote to Walkers and inform them that (i) Floyd Saunders had been removed as signatory on all of Leveraged's account, and (ii) that should

---

[17] Mrs. Midanek's lies happen to also be a testament of how far I had brought the fund-companies. People lying in their attempts to remain in control of the fund-companies, where many months before Mrs. Midanek showed up on the scene, Stewart, who she calls a director of RPGP, was so worried about the liability he bore as a director that he circulated his resignation from RPGP almost daily so that everyone—insiders and outsiders—knew he had resigned from RPGP etc.

[18] Defendants have since taken positions contradictory to the ones above as necessary to achieve their goal—steal the fund-companies from Leveraged and from Plaintiff.

[19] Buddy had himself wanted to undertake a similar transaction. That's why Ms. Rajik from Walkers had already put together paperwork for a sale of the management companies. No-one had executed the sale because they were afraid of the liability associated with serving as director to Richcourt Holding, Inc.

Mr. Saunders or anyone from Fletcher attempt to move any funds from Leveraged's accounts their attempt would not be authorized and the Bank should immediately inform the authorities.[20]

97.     I never got a call from Mrs. Midanek, and we never discussed her joining the board of Leveraged. Floyd called a few times; we talked; he needed my signature to process two wire out of a Fletcher fund's Wilmington Trust N.A. account—the same bank I had informed earlier that day that Floyd had been removed from Leveraged's account—not the Fletcher accounts. I signed them both.

98.     Denis Kiely kept calling. Mr. Kiely had been Buddy's right hand man until sometime in 2012. On Buddy's advise I had retained Mr. Kiely's law firm for the fund managers s fund-companies in early 2013. I told Denis to call me after 6pm. He did. And he went straight to his bullying, saying: what is this, what, I don't understand, why are you doing this…. "Why did Kirkland quit?"[21] I asked Denis. And Denis's response signified why I had to force Fletcher's illegal influence off the fund-companies and the fund-management-companies, saying: Kirkland quit??? Denis said, feigning ignorance usual. Everyone at the fund-companies pleaded ignorance over all that's bad.

99.     I was done with pretend ignorance; pretend ignorance didn't work when investors looked at me for answers. Not when I had IRS and SEC obligations to meet. And ignorance was all I had received ever since I took over the fund-companies and the fund-management companies. The only responses I received from those I found there were: "I don't know" or "that may have been [name]" or "that's not my job." Stewart Turner pleaded ignorance over the documents he

---

[20] More on the bank ahead.

[21] What made Kirkland's recusal special.

had signed. Floyd Saunders pleaded ignorance over everything; ignored the $2.5 million in employment liabilities I learned was outstanding. If anything was bad, wrong, or potentially illegal,  complete ignorance prevailed throughout.[22]

100.     Denis then began trying to just bully me for information. But it didn't work well. Ultimately we didn't discuss much for Denis was set on bullying and knew nothing to offer me in return unfortunately. It became apparent that there was no playing nice. Fletcher, Solon Group, Inc., Deborah H. Midanek, and Denis Kiely didn't care about the new value Leveraged provided FAM. They didn't care about lower liabilities. They didn't care that Leveraged would return the fund of fund structure to solvency.

101.     They wanted the funds assets—the investors' monies.[23] They wanted management so as to settle away their past deeds, including the three Louisiana pensions funds, Ariel, the votes that put Mrs. Midanek on public companies boards etc. In private they admitted such.

102.     The next day I e-mailed Ms. Rajik at Walkers once more. I provided Ms. Rajik with even more paperwork. I really wanted to take away every excuse I feared Walkers was looking for so that it could refuse my instructions—my instructions to simply ensure the merger complied with local laws. Walkers was Leveraged's only attorney. And I already had my work cut out with

---

[22] The prevailing ignorance meant great effort spent duplicating what was lost, and greater effort spent fitting the new into the old. Simple tasks could take weeks. Worse still this 'ignorance' almost led to Plaintiff creating corporate documents that unlawfully would have given shares of Richcourt Acquisitions, Inc. to RPGP, Ltd., as per Buddy's suggestion. It required enormous work to avoid the pitfalls that lay everywhere, and all because of the prevailing ignorance at FAM and, previously, at the fund-companies and at the fund-management companies.

Plaintiff found the complete lack of personal responsibility not only inefficient, but cowardly. The truth was within an arms reach, after. And Plaintiff liked stretching his arms, I would say.

[23] I wanted to maximize the funds assets for my investors. Chase past misdeeds where profitable—i.e. not Fletcher, etc. FAM's desire to take the assets also placed it in direct conflict with what I saw as my competitive advantage against Plaintiff, Ariel Asset Management, JPMorgan Asset Management etc., or that I would give the investors a bigger cut than my competition and would work with the investors to hit my competition where it was weakest—its longstanding greed.

both Denis and Mrs. Midanek solidly behind FAM—neither of them seizing the opportunity Leveraged offered their individual interest.[24]

103.     Ms. Rajik finally replies to Plaintiff saying simply that Walkers had chosen not to recognize any of the documents I had provided them, and that it would be inappropriate for her to discuss the matter with me further. She didn't say why.

104.     I needed Ms. Rajik to (i) update corporate records held by the companies registered agents and (ii) strike off the entities survived in Delaware by Leveraged; some of the entities had been struck off the corporate registry for nonpayment of fees.

105.     To put it another way, I didn't need Walkers. I wanted Walkers. I wanted them to first and foremost do the job they had been paid to do. Second I wanted Walkers to remove from the corporate registry the entities still listed there. The islands were just too removed from the entities center of interests, and had been too far for too long.

106.     Having the 2/3 or so of the merged entities remain listed in the islands wasn't just unnecessary and expensive—it exposed Leveraged to frivolous attacks by those wishing it evil. I guess I got what I paid for. But I did not get what I paid for. And that is a problem.

107.     Leveraged by operation of law was the client, and Walkers its law firm. Leveraged paid Walkers $500 or so per hour for its services. And I had found Ms. Rajik helpful and easy to deal with, and I intended to increase my use of Walkers going forward. I didn't take control to waste my investors money and time fighting Fletcher & Co. I took control to deliver to my investors what they had been promised but not received. I expected to be offshore for some time. I

---

[24] I didn't know yet just how involved Denis and Mrs. Midanek had been with FAM et al.

offered Walkers the better deal going forward—by far.[25] But market forces didn't appear to influence decisions here.

108.    Two days later, on May 1st around 4pm Miami time, Floyd Saunders sends me an e-mail with a letter attached to it. The letter is on FAM's letterhead and alleges I am being terminated from FAM, Richcourt Holding, Inc., RF Services LLC, and Asset Holding Company 5 ("**AHC5**")[26]. The letter is signed by Floyd Saunders, Secretary.

109.    Floyd Saunders and FAM with the termination letter are openly attempting to commit corporate identity theft (of Richcourt Holding, Inc.'s four MCs or the fund-management companies, and of the fund-companies which had been sold to Leveraged two days before the letter was written). I was in control of Richcourt Holding, Inc. on May 1st. I was a director of Richcourt Holding, Inc. I had removed Floyd Saunders from the position of Corporate Secretary of Richcourt Holding, Inc., and I had informed FAM that it no longer had authority over Richcourt Holding, Inc.[27] So FAM and Floyd Saunders, notwithstanding whatever authority they purport to have had over the other named entities, had no authority over Richcourt Holding, Inc. Despite knowing that they lacked any authority over Richcourt Holding, Inc., FAM and Floyd Saunders list Richcourt Holding, Inc. as one of the entities they are terminating me from.

110.    Also the entities that merged into surviving Leveraged in Delaware were formed offshore. While corporate law offshore may not equal Delaware corporate law, it is still based on

---

[25] Buddy had just had Ritch & Connolly LLP replace Walkers as attorney to Fletcher International Leveraged.

[26] This letter serves no legitimate purpose for I had no employment relationship with FAM; I had no employment relationship with Richcourt Holding, Inc.; I had a consultancy position with AHC5 where I was still senior to Floyd; and I had no employment relationship with RF Services LLC.

[27] See Affidavit 0100010. Note that it Richcourt Holding, Inc. only owned shares of Leveraged. It no longer owned the four MCs or fund-management-companies or the control rights over the fund-companies previously held by the four MCs and held by Leveraged as of April 29, 2013.

common law principles and has developed to mirror Delaware corporate law. With that said there is no special Secretary position that exists in any of the offshore jurisdictions or in any of the offshore entities that Floyd Saunders occupied. Floyd Saunders served as Corporate Secretary before I, as director, together with the second director at Richcourt Holding, Inc., jointly as the Board of Directors of Richcourt Holding Inc. removed Floyd Saunders from his position as Corporate Secretary April 29, 2013.

111.    On May 10 Walkers sends me an e-mail containing a letter that says: I had resigned from the "Richcourt funds" by way of letters dated April 3, 2013, and I had not since been reappointed. "On behalf of our client" they write, if I continued to "exercise any powers or function of a director in respect of the Richcourt funds" action would be taken against me without further notice. About thirty additional parties are sent a copy of the e-mail with the letter included simultaneously. The parties copied on the e-mail include two banks, Wilmington Trust N.A. and HSBC Bank USA, about twenty or so law firms, the Cayman Islands Monetary Authority, and the British Virgin Islands Financial Services Commission.

112.    A Walkers associate named Elliot Douchey sent the letter. I didn't know then and I don't know now who Elliot Douchey is, and I had never had any contact with him before that e-mail. The letter was signed by Walkers—no individual signee but the word Walkers was written using a signature looking font. Go figure. I replied to Mr. Douchey's e-mail copying the court-appointed Trustee for the Fletcher fund in Chapter 11 bankruptcy, the Trustee's attorney, and for

the first time Andrew Calamari, who heads of the NY office for the SEC. I would have copied everyone Mr. Doucbey had copied but I didn't have everyone's e-mail handy.[28]

113.    I asked Mr. Douchey, on behalf of the same "Richcourt funds" I told him represented, for the names of the individuals that had instructed him to send the letter to me. I further told him that the Richcourt funds couldn't justify continuing to pay for Walkers to work for FAM, and asked that he and Walkers stop working until further notice.[29]

114.    The following day, on May 11th, George Ladner sends me an e-mail on for two of the four fund-manager-companies merged into Leveraged, or MCs, asking me to resign from the MCs. One would think a termination letter and a cease and desist letter would have been enough to fire a mere employee. They would have, maybe. But I was never an employee. The letter on the 11th was sent on behalf of the MCs that had been formed in Bahamas. I guess it took them until the 11th—or thirteen days after the merger—before they realized that Bahamas law allowed a director to be removed from office by virtue of the rest of the Board requesting that the director resign. There was only one problem with this letter: before April Buddy and I had been co-directors of the same Bahamas MCs and I had removed Buddy accordingly before I had executed the sale to Leveraged April 29th, and George Ladner had never been appointed to any MCs, or had any business with the Merged Entities.

115.    On May 3rd—four days after the merger—I sent Cohen & Gresser LLP a letter by e-mail asking that law firm to essentially stop working. They did shortly after. That same day, later

---

[28] I viewed Walkers' letter as an attestation of the validity of the merger of Leveraged and the merged entities (the four MCs, or management companies, and the fund companies). Walkers was best positioned to attacked the merger on its merit and had all the documents to available to it. That Walkers didn't attack the merger on the merits but chose to resort to scare tactics to scare me showed they couldn't attacked the merger and had to instead try to steal control of the merged entities.

in the afternoon I sent Denis J. Kiely a short e-mail asking that he too stop billing under the agreements he had with the Merged Entities. Denis and I had left off on the 30th with him bullying me for information and with him not knowing anything about anything. Denis apparently had learned a thing or two for Denis said that the Boards of Directors of the Richcourt funds had informed him that I had been terminated and was no longer authorized to act on their behalf. Too bad Denis too didn't say who these people on these 'boards of directors' were. He then suggested I get an attorney. I replied to Denis and told him on whose authority I acted, asked once more the he stop billing, and lastly reminded him that he was the fund-companies attorney and now my attorney.

116.    Denis was right, I needed an attorney who could represent me, Leveraged, the fund-management-companies and the fund-companies. And I did have two law firms that had agreed to taking me on as a client: Baker Hostetler LLP and Crowell & Moring LLP. But I couldn't fund neither agreement because I did not take advantage of the unlimited payment authority I had over the Merged Entities accounts before FAM hacked my online password and blocked me from making payments.[30] Wilmington Trust refused payments, didn't help with the hacked account, and then later hired Crowell & Moring LLP for itself to block me from hiring them for a second time when I could have paid Crowell from accounts from another bank some months later, and hired Crowell itself knowing Crowell & Moring LLP was one of the very few law firms that had agreed to help me. Wilmington knew about Crowell as I copied my attorney at Crowell to my e-mails with Wilmington.

---

[30] Ms. Rajik at Walkers by copying Mrs. Midanek to her reply to my e-mail alerted FAM which then used must have used my login to hack the account.

117.     I did hire an attorney. On May 1st I hired defendant Neal Brickman to serve as my attorney. Neil agreed to be my attorney over a phone call, and we spoke little if at all before he agreed to represent me.[31] He never asked for names for any conflicts either.[32] Having an attorney allowed me to feel less worried about FAM getting a default judgment against me in some remote destination, as FAM had every ability to do. Plus, I quickly saw that Neal was a really good attorney.

118.     I immediately noticed a few things about Neil that I found outside the norm from my experience with attorneys until then. Neil spent a lot of time on the phone, or so I was told every time I tried to contact Neil. I barely got to speak with Neal once every week or so.

119.     Also Neal and WT were talking without my knowledge or authority. Neal was talking with WT even before I had confirmed he represented me. And Neal did not comment on the advisability of actions I myself took in the case. Neither of these were an issue at the time but the experience was certainly outside the norm I was aware of.

120.     Yet Neal was interested and learned all the intricate details of the complicated four-part April 29 transaction. At first he even appeared willing to take Wilmington Trust to court. That was on May 7th.

121.     But his willingness disappeared thereafter. I would call him almost daily. His secretary would always take my same cell phone number for Neal to call me back—yet he never

---

[31] Neal had ties to the Board of the Dakota co-op that Buddy sued for racial discrimination. He said he had been told to take care of me so he was taking me on as a client.

[32] My understanding of Neal at all times was that he was my attorney. That he would act in his best economic interest, which I assumed was aligned with mine. I would pay him and he would represent me as needed. It's sad but I didn't feel like I had the choice to openly request of Neal that he observe all attorney-client privileges. I hoped he would and I hoped that if he wouldn't observe all attorney-client privileges that Neal at least would not go behind my back and sell me to the highest bidder. I was after all willing to pay him accordingly—even a split fee.

would. I got to speak to Neal about every Friday or so. And on every weekly call he would ask me about what was happening and about the merger's details, and about what new actions I was taking. I'd happily provide him with all answers. And I would ask him, over and over, every time we spoke if he would sue WT or someone—anyone. And he'd say NO every time, or let's talk about it again next week.

122.    He said NO so many time that by the end of May I began discussing with Neal how I planned to register with the SEC as a sole proprietor for the purpose of gaining standing to appear for Leveraged in court by myself, as I was not an attorney.

123.    He would listen and say "Ok, Gerti, let's talk next week and discuss a master plan on how we are going to go about bringing this suit." And next week he would disappear.

124.    The first week of June, I remember being told Neal was in court every day that week. I sent him an e-mail June 6th asking him to ensure WT complied with my request, and he failed to reply or even do anything.

125.    I called him later to tell him I had spoken with WT's general counsel and that I was disgusted with the Mr. Fiedler's answer that it was too much money and WT wasn't going to take any action without seeing a court order first.

126.    I remember I called Neal all excited after my call with Robert Fiedler of WT saying that we gotta go to court—it'll take nothing short of that. Enough is enough, and that I would go myself if Neal wouldn't. I had asked Neal since May 7th and re-asked him every week, and Neal was simply stringing me along.

127.     Until June 10th or so that was my understanding—that I would sue myself. On the 10th, I was in Fort Lauderdale already writing the complaint against WT. It didn't appear very complicated. Delaware law was dead on point—one simple rule was decisive on the issue, and I thought it simple enough that even I could do it. I was finished with my IRAC in no time.[33]

128.     Then Neal calls me. But this wasn't Neal.[34] No the Neal that called me this time wasn't the cocky laid back Neal who would just listen to me only to find a quick reason why he couldn't just yet file my suit—always brushing me off in a second or so. No this was super-interested Neal who was so so interested to hear every little detail I had already told him a million other times. It was as if he wasn't even alone. It was extremely strange. This Neal was so surprised at how I was ready to file myself, replying that he'd love to do it for me. Not a problem. I'll file it, Neal said.

129.     Boy was I happy. Finally, after months of looking for lawyers, and after having begged Neal a million times to file the suit unsuccessfully—to the point that I decided to registered with the SEC as a sole proprietor investment advisory firm instead of a company, I had found a lawyer to file it for me. And a good one at that too.

---

[33] It should be noted that I had no idea what a lawsuit looked like at this point. But I thought I could put together a Issue Rule Analysis Conclusion and that would suffice for it was that clear: an effective merger certificate gave Leveraged all rights to all accounts. Period. No ifs, no buts. The merger certificate had been effective since the June 3rd and it had not been challenged by a suit in the allotted time, which ended June 9th. FAM had lost. Plus I was the only one registered with both the SEC and IRS as the party legally responsible for all accounts. FAM had never even listed any of the Funds—never.

Also the contracts were clear. I had opened the account under my name and I had given the bank notice on April 30th that Floyd Saunders was removed from his position as Secretary as of April 29th. It was irrelevant that Secretary Floyd Saunders, who was the only other name on all contracts, disputed the authority of the director, who had opened the accounts.

At the time I did not know that the accounts were actually under my own name and only titled under the offshore funds' names.

[34] But I didn't care. I assumed Neal's interests were aligned with mine, plus I just needed someone-anyone to take the pressure of doing a lawsuit away from me, for I had no idea what I was doing.

130.    I booked a flight out of PBI for NY the next day, and wednesday as scheduled I went to Neal's office.

131.    I had a visitor's pass when I walked into Neal's office. This was the first time I met Neal in person also. As I walk in I find a confident Neal who immediately says to me: take that visitor's pass off, you're family. No problem. And then Neal tells me how I had taken this and how I had "flipped the flop" on them. Flipping the flop was an expression that came from a Russian friend of Neal's and it meant that I had won.

132.    Then Neal went into: why are you doing this. What are you getting out of this, he says.[35] The management fees and the performance fees, I replied. And I got the book rights to this, I followed.

133.    When I said "book rights," Neal gave me this look which said everything I needed to know. His look was one of pity over me, I would say, basically saying: you fool, if you think this is going to become a book, you're dumber than I thought.

134.    He jumped to another topic immediately after he gave me his pitiful look when I said book rights, and never even commented on "book rights." We left off in the end with him requesting two things: (i) the custody agreements, and (ii) wire payments that FAM had made.[36]

---

[35] At this point it had become clear that the $5 million in preferred Leveraged stock that the fund-companies had bought was not "for me" as FAM and Deborah Midanek had fabricated but that it was money that Leveraged would use to fund the recovery of what turned out to be hundreds of millions of dollars that FAM, Citco, and JP Morgan had taken from the funds.

[36] Neal also asked me why you, as in why not let a ordinary liquidator takeover. I replied saying that I had seen E&Y spend millions with no results for two years at Fletcher International Leveraged and that the Chapter 11 court appointed trustee at Fletcher International Ltd. had known nothing for almost a year before I decided to turn on Fletcher—and god knows how much he had charged. Plus I had proved myself that I could go toe to toe with them and win—and do it all better for the investors.

135.    Neal said he would do the suit "on the house," but I refused, and said I would pay him half of all past due management fees—about $150 thousand for the suit. We parted with him saying he'd file it the next day if I got him the custody agreements that day. But before I left I told him: (i) that I had received eviction notices out of my NYC apartment (ii) that I was in Florida for my safety, and (iii) that I couldn't pay for the July Bar Exam fees. Neal responded in a way that was almost like he was about to offer me cash for the above, but I stopped him before he even said anything, and I told him that it was fine, that everything was fine, and I just wanted the suit filed.

136.    I did send him the custody agreement. That very Wednesday I e-mailed him all agreements and also a whole bunch of wire payments, which, in retrospect, I assume Neal requested as a way to excuse himself for not filing by saying something like I didn't get him enough wire payments or something, for I saw no other need for him to request the wire payments. I resent everything again and again. *See Affidavit 03. Key Events Leading to Leveraged Hawk, Inc. Surviving the Richcourt Funds and the Richcourt Management Companies. Timeline Chart Included.*

137.    Neal did not file. He never wrote back in reply to my e-mails. He was supposed to file Thursday. No filing. Friday, no filing. I, always the optimist, assumed he was busy. Sunday I started to fear the worst—that Neal was going to disappear again.

138.    Sunday I began working on the complaint myself, once more. Worked through the night that Sunday and sent Neal another e-mail reminding him of the need to file.

139.    Neal replies Monday around 10am Miami time saying he's not filing because he cannot prove irreparable harm—continuing with we can file a contract suit, and, if you win, "the

money is all yours".[37] At this point I had all the proof I needed Neal was a crook. I had told him on Wednesday that I was afraid for my safety, that I was being evicted, couldn't pay for bar exam fees, on top of everything else—how I was fighting Weill, Walkers, Cohen & Gresser, Ritch & Connolly, Denis J. Kiely LLP, Fletcher Asset Management, Deborah H Midanek, all well-funded, and I, all broke and all by myself.[38]

140.     I just tried to continue writing my complaint. I expected to finish it that night and file it in Delaware the next day.[39] I even began planning logistics on how I was going to get to Delaware without my car—which I had left at PBI's parking lot in my rush to fly to Neal. I assumed I could've borrowed my mother's car for Tuesday, so I just continued to work.

141.     And then around 4pm I receive another e-mail from Mr. Neal Brickman. Neal writes: here's the interpleader by WT. They gave it to me. I don't know what to do with it but here it is.

142.     Defendant Chad Shandler of defendant Richards Layton & Finger P.A. had put together a special sort of interpleader and Neal e-mails it to me that afternoon—stopping me dead in my tracks.

---

[37] As if I had not told him on Wednesday I was doing it for fees—not investor's money. As if he had not asked me on Wednesday why I was doing this since I wasn't getting the money myself. As if I had not just told him that I was happy with getting just the book rights as a profit. As if I had not just registered with the SEC and made myself the only legal representative—ever, for all funds' investors, for FAM, for past employees and for all others to sue.

[38] No irreparable harm: I, one year out of law school, had successfully wrested control of a hedge fund of funds out of Buddy Fletcher's hands, wouldn't face irreparable harm. I assume, according to Neal, I could have just hopped on to the next Buddy Fletcher and done the same thing again. Wait, that would have made me two years out of law school. Plus there wasn't another Buddy Fletcher. Plus no-one like Buddy Fletcher—few as they may be, if any—would want me because of what I had done to Buddy. A fool could have proved irreparable harm. Even I could have proved irreparable harm. And Neal was no fool. Neal had fooled me for his true clients—whoever they were. Also Neal could've at least filed a suit too.

[39] I thought I could only sue WT in Delaware.

143.    I am shocked! I e-mail it to my contact at the FBI and I e-mail it to Josh Barbanel at the Wall Street Journal.[40] Josh hadn't written anything until then because "there had been no filing yet." Josh hasn't written anything since and there's been plenty of filings, but he may still be waiting for the right filing. Anyway, Mr. Barbanel replies with: "do you have a stamped copy?" I replied "No," and forgot about it for the moment.

144.    Fast forward for the moment to my meeting with defendant JP Morgan's attorney, defendant Todd R. Harrison and Mr. Harrison too keeps asking for a stamped copy.

145.    Two months later Mr. Harrison confirmed to me that the interpleader had not been filed at the time of our first in person meeting—about a week **after** I received the unstamped interpleader complaint from my attorney Neal Brickman that Monday, June 17, 2013.

146.    Neal further said: I shouldn't 12b6 the interpleader,[41] (*I most certainly should have*); I couldn't file another suit again the bank, (*I could have*); I couldn't file a suit against a different bank (*Of course I could have*); I couldn't file a RICO against FAM et al. (*Of course I could have*); that if I won the interpleader, I would win forever (*Not true, Mr. Shandler had filed a civil interpleader and not an equity interpleader, and the ruling would only bind the parties in the interpleader in that case*); that we needed to talk it out (*when I told him that the only way I could explain how a registered investment adviser to $122 million in assets was answering the*

---

[40] I had been talking exclusively to Mr Barbanel. Mr. Barbanel had written extensively on Buddy. And he had gone as far as to repeatedly e-mail the Louisiana Pension Funds asking they redeem their investment in Buddy's Fletcher International Leveraged before Buddy was even news.

When I asked Mr. Barbanel for a "favor" in return of me exclusively providing him with the details at no cost with the favor being for Mr. Barbanel to ask WT the Friday before the interpleader was filed why WT was refusing my instructions even though I had everything in my favor, Mr. Barbanel refused by telling me that his journalistic code prevented him from taking sides, unfortunately.

[41] Motion to dismiss for failure to state a claim.

*interpleader pro-se in crayons was that his attorney had conspired against him*); that I should

work with the court appointed chapter 11 trustee of the Fletcher fund to repatriate funds held at

HSBC Private Bank (Monaco) and not sue HSBC Private Bank (Monaco) as I wanted, (*this plus*

*other facts I'm leaving out don't bode too well for the court appointed trustee*).

147.     I returned to Neal for the last time—for I sadly had no other attorney—when I

received Mrs. Midanek's answer to the interpleader, and I was told to stop calling by the secretary

who answered as always.

*148.*     Defendant Chad Shandler of defendant Richards Layton & Finger P.A. served the

interpleader on Leveraged Hawk, Inc. July 1st, thirteen days after he sent me the un-filed version

via 'my' attorney. I wasn't served for I wasn't named in the interpleader, despite me making 4/5

claims for myself and the investment adviser. They knew I had the audacity to appear pro-se, and

I had told Mr. Fiedler myself that I had registered as a sole proprietor in order to appear in court

pro-se on behalf of the investment adviser of Leveraged and the funds. This of course meant that

the four or so requests for funds I made on behalf of the investment adviser were ignored, and the

interpleader included only the one requests I made for Leveraged.

149.     So Mr. Shandler claimed double vexation yet failed to include the primary vexator

—the investment adviser. He listed the offshore funds and Leveraged, leaving out the effective

certificate of merger filed with the Secretary of State of Delaware that WT had been provided

with, over and over.

150.     And Mr. Shandler and WT only listed 1/3 of the accounts WT had opened for the Merged Entities[42]—leaving two thirds out without explanation. Failed to inform the court about the requests of the investment advisor, and basically worked hard to make me appear as a thief—while listing Leveraged and not me.

151.     Furthermore Mr. Shandler knowingly failed to file in the proper court—filing in the Complex Civil Litigation Court[43] in Delaware and not in Chancellery even though Chancellory has exclusive jurisdiction in Delaware over Fraud on the Court matters and Fiduciary matters, and though Chancellory would have been the only court that would have provided WT with relief from Vexation—should WT have been vexed at all. And again, if failed to list all accounts as required in interpleader, and it failed to list all claimants—even though it attacked the claimant it did not list.

152.     Lastly, Mr. Shandler by listing actions I had taken in his interpleader but by suing only Leveraged suggests that Leveraged was my tool for stealing from WT, and that Leveraged and I were interchangeable. Yet piercing the corporate veil is another one of those area where Chancellery has exclusive jurisdiction. Mr. Shandler attacks Leveraged's corporate veil by using actions I had taken, yet fails to either file in the proper court, or name the party causing the need for the veil piercing—his goal being at all times that Leveraged would have no voice—as it didn't.

153.     And Mr. Shandler and WT were in complete possession of all the information they needed to know that they should have filed in Chancellory for there were fraud on the court issues

---

[42] Interpleader requires a listing of all accounts.

[43] For a long time I thought the Court of Complex Civil Litigation was a part of Chancellery. I was that ignorant of procedure. But that's why I was retaining attorneys. I didn't need help in cross border transactions. And my weakness was exploited at every turn.

—basically FAM and Mrs. Midanek had I later learned re-written resolutions that now contradicted directly resolutions I had provided all and the facts of case and history of communications, and that this case was marred with fiduciary issues for I served as director and FAM was an indirect minority shareholder. WT had all this information in its possession, yet chose to file in civil court and name unrepresented Leveraged—not me.

154.    Plus, they sent me the un-filed copy to thwart me from filing against them first. Also, as I mentioned earlier, WT hired Crowell & Moring LLP knowing Crowell had agreed to represent me—and it would have had WT funded my agreement with Crowell. In September this conflict made Crowell unavailable to me and Leveraged when I offered to pay them up to $1 million.[44]

155.    I learned from the interpleader that Walkers and Weill[45] had constantly called WT for FAM and had even provided a written opinion for some of the offshore funds based on information available to them from registrars etc.[46]—not all, couldn't proviso for all funds to get a written opinions, just some.

156.    WT did not fulfill its fiduciary role—but then again this had become the norm in that section of the world.

---

[44] As WT itself saw no harm from me whatsoever, whereas I had offered to forego the $7 million in potential liabilities WT had incurred for FAM's behalf, WT's actions are likely to have been taken on behalf of another party. Especially considering Neal's part whereas Neal is part of the 'banking group' at the Dakota, and considering Robert Fiedler a week before WT sent me the interpleader said: they needed a court action telling them what to do. Mr. Fiedler's statement is more in line with reasonable expectations of a third party without a stake in the fight. Given RLF's regularly used by JP Morgan, it is most plausible that WT's took its most harmful acts towards me on behalf of that bank—funded by that bank, and incurred that much liability needlessly for that bank. Alternatively Citco is commonly thought to be dirtier than even JP Morgan in litigation, and it's almost as plausible that Citco lay behind WT's most damaging acts.

[45] *See also Exhibit 001.* Deposition of Plaintiff on Fletcher bankruptcy case. Weill claims to be working for Deborah.

[46] Note that Walkers had itself refused to register documents I provided it April 30 without explanation.

157.     Defendant Pinnacle Fund Administration failed to inform investors as requested by the only registered investment adviser of the changes that had occurred—that a new adviser would begin meeting five year old demands for redemption and that FAM and Citco—whom the investors abhorred—had lost the ability to control the funds.[47] *See Exhibits to Affidavit 03. Key Events Leading to Leveraged Hawk, Inc. Surviving the Richcourt Funds and the Richcourt Management Companies. Timeline Chart Included.*

158.     Then in early July, out of the blue, I receive a call from Deborah H. Midanek. At first I thought Deborah had remembered about the call she said she was going to give me 3pm Miami time April 30th to discuss her joining the board of Leveraged.

159.     I felt awkward. I had made the offer to Deborah in hopes that she would act as an independent actor—not spend three months depriving me of my counsel (Walkers), falsely dispute my authority (making false statements about my authority), or make false statement to WT to obstruct me from accessing Leveraged's accounts (claiming I had been fired, knowing I removed Floyd before his false letter).

160.     Over the past three months she and Buddy with help by Walkers, Weill, Denis J. Kiely LLP. and more had succeeded in depriving me and Leveraged of our rights and had caused us to become entangled in a mess bigger than I ever expected with WT, Neal, and the Dakota. I really feared the worse with Deborah. Even Buddy had called her a big ego, and nothing was unexpected. But my worries about Deborah wanting to discuss her joining the board of Leveraged went away as soon as Deborah spoke.

---

[47] Investors in one of the funds had offered to buy out Fletcher a year earlier—but Fletcher had refused.

161.     Mrs. Midanek excitedly began speak and said she too had removed Buddy. I removed Buddy from the BVI fund, she continued, referring the the funds originally formed in the British Virigin Islands and part of the Merged Entities. George Ladner's got the Cayman fund.

162.     Wait, so you don't recognize what I did, but you did the same thing and you recognize that, am I right? Correct, she said. Documents? I assume ... none!

163.     Deborah continued saying and I recall specifically these three statements of hers which I noted down immediately after: Deborah said (a) she did it in order to stop having to manage the funds in a manner that would meet Buddy's approval (b) to be a manager the BVI funds with "just $25 million in assets"[48], and (c) that "[she] too, a non-lawyer like I was, was working so hard herself" to deal with WT's interpleader filing.

*164.*     Deborah's call was to convince me to let her have them. If I just could give her control of those funds, she would save them for she had begun Cayman liquidation proceedings.[49] Ok, I said let me "google it" for I was just shocked.

165.     Deborah answers the interpleader first—without FAM, for she had allegedly removed Buddy from the BVI fund. Deborah does not answer by herself, however, as Deborah claimed on the phone call with Plaintiff. No the BVI funds answer the interpleader with counsel. Counsel however was not Walkers, Weill, Kirkland, or anyone that ever worked, under any

---

[48] This is blatantly false and refuted by all previous statements exchanged with with the actual investors, auditor KPMG, HSBC, Pinnacle, and WT, and outside suitor providers like Deutchse, US Bank, etc. The value relevance only to the extent that $25 million coincides with requirements for managers to investment funds like the Richcourt funds to register with the SEC under 15 U.S.C 80b-3.

[49] Secret proceedings to liquidate New Wave Fund SPC, which hid the combined dirt for her, Ogier's, and FAM.

contract—or was ever paid by the funds.[50] Deborah's counsel was defendant Connolly Gallagher

LLP. Mr. Connolly claims Leveraged has no rights to the accounts—none of the BVI accounts, and

that by virtue of Mrs. Midanek's resume alone, the Delaware court should give control to Mrs.

Midanek. Furthermore Mr. Connolly claims I was a disgruntled employee who, as WT makes

pretty clear in its complaint, was looking to go out with a $5 million severance no matter the harm

I was causing to Mrs. Midanek and the funds who were busy with 2009 Audits and would have

completed them had I not caused mayhem.[51]

166.    With regards to the Cayman funds, Mr. Connolly states that the BVI funds don't

really have much of an interest and comments that while Mr. Fletcher was a controversial figure

(for paying three Louisiana pension funds with $137 million in worthless notes), I too was

controversial, for I had ... a history of causing mayhem in Manhattan, based on a newspaper

article that said I had been DUI—but not actually DUI—since I wasn't over any limits, but worse

for I had sped, drank, tried to get away from police causing a high speed chase, and all in a, well,

less than half a mile. And the jury had found me ... well, actually, the jury had not, and I hadn't

been convicted of anything just yet—had actually refused an offer of pleading guilty to a driving

while impaired (and that's it) and may have been .... Didn't matter. I was a drunkard who was

reckless and therefore as controversial as the man who had put a hole where 10% of the Louisiana

pension funding had once been. And none mattered for I did not have the biography of Mrs.

---

[50] It is unknown who paid for Deborah's and FAM's new counsel. Presumably part of the $2.4 million I advanced to Kirkland & Ellis LLP, which they couldn't have used in a month, was funneled to support Weill and Ritch & Connolly and Walkers, at first—who at least had contracts with the funds, and the new counsel later—who never had dealt with the funds before—ever. And some of the new counsel were actually adverse to the funds. See Affidavit 04 Exhibit 24.

[51] But Unsigned 2009 audits already existed—which FAM and Mrs. Midanek were getting redone so as to hide away certain details about related investments—the same details they hid from the SEC by claiming they had no control over the funds management, employees, etc.

Midanek—which Mr. Connolly reminded the court in every other line was just spotless—and truly deserving of control.

167.     I read the entire answer once. The thievish audacity made me sick to my stomach. I had spent two weeks helping every alphabet soup agency and trustee with information without charge and had lost my chance to file my complaint to my lawyer, and now I had to play word games with this poser who recklessly disregarded basic justice, and had filed his answer without bothering to even establish his legitimacy for submitting anything at all to the court—i.e., standing.

168.     And of course I drove fast. One year out of law school I executed the perfect hostile takeover of a historic fund of funds. I had done everything right. I had gone 7 days and nights without sleep—risked it all. Now this stranger charging my funds $1000 an hour to violate the law —for he was careful to avoid the topic of SEC registration completely, was going to cause me so much harm. Forget the great resume Mrs. Midanek held as her life's accomplishment, these two should have just staked every interpleader filed in civil court and made a killing taking other people's money—as they were doing here.

169.     I answer second. Although I couldn't use the file and serve system—as I was not a lawyer—so I just circulated my filing to all the attorneys. I filed a 12b6. I didn't know the procedural tricks then so I just listed the usual: (i) no standing (ii) no double vexation (iii) unclean hands (iv) failed to list all accounts (v) contracts in violation of public policy void. My answer never reached the court, however. But it was enough to cause Fletcher to file his.

170.     Not to be outdone by Mrs. Midnanek, Fletcher has two new law firms representing the Cayman funds and the BVI funds.[52] They are defendants Patterson Belknap Webb & Tyler LLP and Fox Rothschild LLP. And they attack one person: me.

171.     I was an employee.[53] A thief caught before he could do real harm. A drunk driver (police report included—as unbiased as it gets! Not.) who had been fired for drinking and driving, and causing mayhem. Floyd Saunders caught me. Saw me stealing supplies.[54] Locked in his office, headphones on, Facebook wide-open, Floyd Saunders, the Secretary, had saved the funds in time. The Secretary removed the Director. Why not. Pink elephants are flying if no-one says otherwise.

172.     And not that they needed to provide proof that I the director-mere-measly-employee was an employee, but since they had nothing else to print in their 1000+ sheet document dump answer, they had proof that I had filed for unemployment benefits. Fired and living it up on unemployment, yet I still wanted more. The nerve. There's no need to tell the judge that my employment benefits as a principal came from FAM and only FAM—not Richcourt. Tomatos, tomâtos.[55]

173.     So if the termination letter had been true—as me filing for unemployment proved, then case closed. Summary judgment is in order. Defendant Peter Harvey asks for Summary

---

[52]Fletcher claims Mrs. Midanek does not represent the BVI funds, but doesn't focus much more than that on Mrs. Midanek.

[53] It doesn't matter that for years FAM claimed Richcourt had no employees. Noone cares about employment law when the house is burning down.

[54] I'm actually so peculiar about supplies that I have receipts for thousands of dollars of Lamy CP1 pens that I bought almost weekly ($70 each) and notebooks delivered by a Florida speciality paper company. But false statement are only false if someone disputes them, and I wasn't a party and Leveraged had no lawyer.

[55] I filed for unemployment benefits when I had exhausted all my other sources—including borrowings, in June. Not in May when I had been terminated from FAM. No, I didn't run to file until I had hit every wall. I received four checks starting June 22—52 DAYS after I had first became eligible for benefits, I applied and received my first benefit. Also FAM never paid me for the last month either.

Judgment for there was no possible factual dispute. None. Good termination letter. Yet See Exhibit 129 among many where Deborah claims the role of the director, as the true March resolutions suggest, decimating the new documents created with April appointments that mean everything to FAM and Solon. Everything.

174.     Now that the termination letter—if good—was good only for FAM, and was knowing corporate identity theft for Richcourt Holding, Inc., again, not in dispute. Couldn't be.

175     As Judge Vaughn in Delaware confirmed in the conference I attended, I wasn't a party, and couldn't file things for Leveraged. Yes everyone was attacking me—ignoring Leveraged which was the only party with standing and legitimately the owner of the accounts. No, it was the drunk thief. Me.

176.     But Judge Vaughn appeared understanding. He asked that I file a motion to intervene. Easier said than done, but its a privilege not a Due Process Right guaranteed by the Fourth and Fourteenth to respond to your accusers in open court. Actually that's wrong, but a conspiracy isn't demonized without cause.

177.     No-one mentioned anything about registration.  No-one mentioned the court lacked jurisdiction. No-one mentioned Peter Harvey was part of Fletcher's crew and had caused the funds $140+ million in damages. No-body cared. Our common law system assumes the market works and there is another side. Out market system doesn't work when JP Morgan spends $8billion in legal fees yearly, commits crime without care, and joins forces to choke anything threatening it. And joins forces, worse still, with two of the most feared dirty litigants in the

finance industry.[56] Mr. Connolly tells Judge Vaughn in the conference that Mrs. Midanek—the director who stood up to Buddy Fletcher, will be making a filing in BVI that would help Judge Vaughn decide. This is in August. Four months after Leveraged bought control, and four months after no challenge had been posed. But together they had turned the tide on me. I was loosing.

178.    Ogier sues me July 31st in BVI for Mrs. Midanek and the BVI funds. So much for Neal's win here and win for good. The same game is played in BVI. Ogier files for a TRO claiming there is no dispute as to the facts and that the documents Mrs. Midanek was presenting the court were un-contradicted. The court is confused and it too questions the filing under a theory that no dispute as to the facts exists. The TRO is denied August 1st.

179.    Ogier sends an e-mail to me by mistake and reveals that Mrs. Midanek was representing others. Ogier asks me if they were mad. I answer thinking 'they' referred to the FBI. Then Ogier retracts saying it wasn't meant for me. It was meant for Mrs. Midanek, asking whether Fletcher et al. were mad.

180.    Mrs. Midanek doubles up on the lies, even claiming her Mr. Muho could have filed over these months if he had any rights. Walkers—the Merged Entities only law firm—had completely disappeared. She didn't even show the court the letter I had sent her May 28th. The court somehow finds out and Mrs. Midanek excuses herself and says the letter is of no use as it is confusing.

---

[56] And this is not from newspaper articles, but court opinions. Chancellor Strine described just how dirty FAM fights in court in his recent ruling issued in December 2013. Over 100 law firms turned me down. A personal friend at Richards Kibbe & Orbe LLP was ready to help me when she thought I was looking for a job but didn't even answer my e-mails when she learned what I wanted.

181.     Yes the letter had become confusing as the letter had caused Mrs. Midanek and FAM to change all the facts around. To address the letter, which destroyed Mrs. Midanek's role completely. New facts had made the letter confusing. Not sure how Judge Vaughn was helped by this charade however.

182.     They filing caused them to hire the thug who terrorized me in late August, and they got more TRO's after they drove me out of NYC. Never a ruling on the merits. Never.

183.     Ogier and Mrs. Midanek and Buddy send a thug on this case so I got the message. But they start liquidating one of the Merged Entities in complete and total secret.[57]

184.     Ogier allegedly for one of the BVI funds had sued in Cayman Islands to liquidate one of the Merged Entities. Ogier had sued to liquidate New Wave Fund SPC. Yet unlike the noise Ogier made over the BVI proceedings, Ogier was proceeding with the liquidation of New Wave Fund SPC in complete secret.

185.     But why New Wave Fund? It had no assets left. That New Wave had no assets sort of answered my question as to why New Wave. New Wave had been formed *after*[58] Global Hawk had taken the $140 million from the Merged Entities in 2010 to bleed the rest of the entities dry.

186.     New Wave had offered the rest of the Merged Entities protection from foreign currency fluctuations. See after Fletcher International Leveraged had no more cash left in 2010 and still had assets valued at $200 million or so FAM, Ogier, and Mrs. Midanek and her friends, put together a nice little scheme. First they changed the denomination of the Merged Entities

---

[57] What's interesting is that liquidating any of the Merged Entities has no legal consequence in the U.S. for Leveraged survives all the rights of all Merged Entities as of June 3.

[58] See Exhibit 140.

holding in Fletcher International Leveraged from Dollar to Euro. This allowed FAM to charge it's $4 million in fees in Euros. Unfortunately there was no cash of any currency at Fletcher International Leveraged. So FAM took the $4 million Euro and put it into New Wave Fund SPC, which then traded with the Merged Entities and allowed them to buy for actual cash foreign currency exposure protection (which they now needed) in the form of New Wave shares.

187.    See FAM dumped the management fees it charged but did not deserve into New Wave and then had New Wave sell the dumped fees back to the entities that had paid the undeserved fees for cash.

188.    And Ogier? Ogier was New Wave's counsel of record. It had formed New Wave and paraded it as a New Hedge Provider knowing it held junk. So the moment I took control they became terrified because a new private party they couldn't buy had the ability and the incentive to hold them accountable for their false profits.[59]

189.    So Ogier had sued to liquidate its own client quickly before I took over the accounts. Again, this is largely irrelevant for New Wave SPC as part of the Merged Entities is survived by Leveraged and the survival predates all liquidations (many by Citco worldwide popped up after I sued them, See Exhibit 38).

190.    Which makes Leveraged unwanted. And me a pest they cannot legally escape because I would have the assets, the information, the rights, and the incentive to go after them. Buddy used to say he could destroy Citco, and JP Morgan too. But he couldn't. He was in on it. But I wasn't in on anything.

---

[59] I wonder if the court appointed trustee who issued the recent 300 page report on Fletcher International Ltd. in an unexpected rush touched on the currency hedging New Wave was providing. I'm gonna go with he didn't. I have not looked at the report.

191.     I came after, I saw and learned after, and conquered the opportunity to threaten

them all, for profit. So that's why a thug was sent to bypass security and scare me away from NYC

at midnight, leaving papers similar to those I had received via my attorney in BVI (comes later),

in the BVI case, but I was told nothing of the other proceedings worldwide. As Neal said fight this

interpleader and you win for good (this interpleader only and nothing else, he failed to add). An

interpleader that bound only those listed and that truly only bound the funds away from their

correct use by keeping them away from me in proceedings going on without me. Ridiculous.

192.     HSBC Private Bank (Monaco) was the second bank I knew of. The third was Citco

itself. HSBC Private Bank (Monaco) and HSBC's Swiss office reviewed the documents I provided

them at length. They take banking seriously there, I guess. They complied with my instructions

and transferred about $2 million to Leveraged's account at Citibank. This opened a pandora box

of problems I still am unsure how to deal with. Also by this time GM Capital was owed about $1

million in fees. Leveraged still $4 million. I had provided the Merged Entities about $3 million in

value alone. I had averaged about an hour of sleep per day over five months. At $1,000 an hour it

came at about $3 million. But E&Y charged more than that and they provided 1/10 the value.

Notwithstanding, I raise the issue because I could have blown the $2 million on ___ and ___ and it

would have been fair consideration. I didn't but Mr. Harvey get an illegal judgment against me in

NYC after they drove me away by bringing up in addition to my DUI (almost)  $20,000 or $30,000

that I blew in Atlantic City, if even that.[60] And now he's brought exhibit the Ferrari I bought as if it

---

[60] Mr Harvey and FAM do have a remedy I wish they would use should they be concerned with how I manage
Leveraged. It's called a double derivative and it would save a lot of trouble and expense and there could be a
judgment on that issue there—as would be appropriate. Discussing those issues here is wholly irrelevant.

was the nail on the coffin. I told him I should have bought 20 of them.[61] That way Jay Shows at

Citibank wouldn't have blocked all account two days after Buddy asked him to.[62]

193.    So with money in the account—even though temporarily for I feared Citibank

more than anything, I set out to hire attorneys. Offered Crowell $750,000. Rejected. Offered

$1,000,000 to a top notch Delaware firm. Rejected. I even tried Wachtell, as I did not know just

how adverse its client JP Morgan was to me just yet. Luckily I found Conyers in BVI and they

agreed at first for I believe $75,000.  Then I found defendant David Wilks. Didn't screen him. I was

too tired. He asked for only $50,000, but I sent him double ensure our interests would remain

aligned.

194.    And at first he appeared ok. He filed a motion to stay the Summary Judgment

motion and spoke to Mr. Connolly on the phone. He told me and I foresaw trouble. Later that very

same night Mr. Havery sends Mr. Wilks a letter. For some reason speaking with Mr. Connolly

alerted Mr. Harvey, FAM's attorney.

195.    The letter contained errors and it was visible that it had been written in a hurry. In

it Mr. Harvey claimed HSBC had alerted FAM of the transfer six or seven days ago. Mr Havery

couldn't say he learned from Mr. Connolly for they were supposedly adverse. HSBC sends me a

---

[61] I clearly don't do this for my health for I've been barfing blood at times. People can't live without sleep. But I have had no choice. While I hate to explain business decisions, if a Ferrari is what it takes to motivate this fool (me) to keep going its well worth it. Lastly I tend to do my best thinking driving. Drove 40,000 last year alone, 16000 on the Ferrari—and I had nowhere to go. But funny enough I don't even remember last time I had a drink, for I stopped drinking even before the DUI* as it makes you drowsy.

[62] When the thug came by my door unexpected and all I saw was a no-neck gangster at my door holding my photo, I checked that NYC apartment for air vents I could escape out of even though I knew there were none, and I check my window for an escape although I knew from the thousand plus cigarettes only 400 feet of air were outside of it before the ground. Similarly I knew very well there was no Federal bank, but I looked and looked for one so I wouldn't be at the mercy of Jay Shows and Citibank but I found none.

letter two weeks later saying FAM had informed them I had stolen money, so, again Mr. Harvey's claim is ridiculously false.

196.    Mr. Harvey seems like a child on Christmas as he describes in the letter how Judge Vaughn had told me I couldn't represent Leveraged and I couldn't act pro-se. And then he goes on to say that the money had to be the source of payment for Mr. Wilks for I had no money and otherwise couldn't afford a firm of Mr. Wilks's stature other (Harvey had no clue how much if anything I was paying Wilks).

197.    Now, Mr. Harvey claimed to represent the Merged Entities here. But Mr. Harvey had no relationship with with any of the Merged Entities before he appeared out of nowhere. Mr. Harvey was actually part of FAM and had been part of the Global Hawk fiasco that cost the Merged Entities $140 million. He was the thief who was acting like the man the house. Yes, I had not bothered requesting he prove his payment source, but I thought representation was essential. I didn't want to win against Buddy unrepresented. That would have been a loss.[63] Also even if I had been the ex-disgruntled, thief, employee, Mr Harvey knew the Merged Entities were required under the indemnification agreements to pay for my counsel. But if Leveraged had counsel then Mr. Harvey's giddiness wouldn't be that of a child thrilled to hear he will win because he has deprived his opponent of basic Due Process.

198.    Wilks didn't mind the letter, I think. At first Wilks was fine. I gave him time to learn. He wasn't learning unfortunately. And he may have been learning from the wrong sources, for about a week later Wilks tell him he had agreed to allow Wilmington inter plead the funds. This drove me tears almost, but he had already agreed.

---

[63] This is also the reason I did not fire Skadden, which has been paid by the Merged Entities.

199.    And things went downhill from there. He had first promised a friend of his would be helping me with the California suit, but that was just forgotten.[64] I'd bring it up to silence as time wore on. On Citibank? Silent too.

200.    I fired him when I learned about the jurisdictional issue—where only chancellory had jurisdiction over fraud on the court matters, the night before the Summary Judgment motion was, in all likelihood, going to be granted for Harvey.

201.    The night before Wilks had wanted me to go all the way to Delaware to discuss how I came in control. This however was not even in dispute. It was wholly irrelevant. Meanwhile I had been screaming for weeks over and over and had provided proof by the barrel that the documents that had been shown to the Civil Court were false—a fraud on that court.

202.    About two weeks ago I came across Wilks's answer to the interpleader. I recall that following his answer my attorney at Conyers sent me an e-mail questioning what I had stated in Delaware. I knew then it was bad. I didn't know how bad though.

203.    I told Wilks that I had already done most of the answer to the interpleader and that he should use my almost complete answer and complete it answering in the manner I had answered my part I had done.  I include as *Exhibit 133* my answers and as *Exhibit 134* Wilks's answer.  Needless to say he did not follow my directions ad did a 180 degree change on every answer. At least I fired him before he would have allowed FAM to get a ruling on the merits because he simply refused to even bring up the fraud I was parading in front of him daily.

---

[64] I hope he did not mean defendant Alex Weingarten.

204.    A week or so later I asked if Judge Vaughn had become aware yet that the court lacked subject matter jurisdiction and Wilks replied that no one had brought up the matter yet.

205.    Lastly, Wilks did not want to return the remainder to me when I fired him but he did after the exchange got heated; unlike his friend, my new attorney who threatened to interplead the retainer advance and kept the advance "in trust" for almost two months after he quit saying "there was nothing left for him to do." Oh and he had promised me a RICO at the start. Things changed with him after he talked to Wilks and JP Morgan's attorney at Morrison & Forrester LLP.

206.    Shortly after I fired Wilks, the funds filed for Chapter 11 in the Southern District of New York. Defendant Porzio, Bromberg & Newman, P.C., a New Jersey firm, served as trustee. Citco sent in defendant Kasowitz acting for creditor defendant Pasig Ltd. who quickly filed for a Chapter 11 trustee, for clearly Buddy had mismanaged the funds as shown by the fact that I a disgruntled ex-employee as they called me had stole $2 million.[65] See *Exhibit 131*, Citco had misplaced and couldn't trace $50 million of the funds monies. But I guess that was between buddies. This was the enemy who had stolen $2 million. (Note that the funds are NOT INSOLVENT given neither FAM nor Citco's claims would be honored).

207.    A chapter 11 trustee was order. Delayed and never appointed. And then a motion to move the insolvency offshore was filed and granted. At the same time Morrison & Forrester I was told by interpleading-lawyer Alex Weingarten was involved in some sort of insolvency offshore. In

---

[65] Harvey filed suit in federal court against me for $2 million and got a judgment that has left me penniless for months. Ex parte and in blatant violation of Rule 30 I believe that requires lawyers to tell the court all material facts. That proceedings takes the lies that exhausted and multiplies them. Much more drunken behavior. More stolen supplies. Every irrelevant thing about me has been shoved down that court's throat. The Court has never been told that I am the only party legally entitled to represent the Plaintiffs. Never been shown Exhibit 24 Affidavit 04.

the process they robbed the funds off another $22 million dollars, with willing Wilmington Trust and RLF, all playing along (note under $25 million at all time as if 15 U.S.C. 80b-15(c) doesn't prohibit doing indirectly what is prohibited directly).

208.     Kasowitz sent me the filing. All parties were listed for notice. All expected one. The one party—the only party ever that registered the funds and made them legitimate and was ready and remains ready—if tired—to act for the funds investors for once: GM Capital, the Investment Adviser. Leveraged received notice as did Wilks. As did Defendant Michael Meade.[66] The only broker I assume was willing to take the dirty money and hold them for FAM. FAM and Co. Not the funds and not the funds investors. There's a mile long list of investors and requests for information

209.     Todd R. Harrison sort of helped me put everything together. I e-mailed Todd after I read about his trickery over Burford Litigation Finance Co. Todd was thrilled I e-mailed him, and couldn't believe I just found his name in legal news.

210.     I approached Todd when Wilmington filed the interpleader—uhm, when Neal send me the un-filed interpleader, which as I mentioned I took for the real thing. We went back and forth until we scheduled our first call.

211.     Todd answers the call and says to me: while we are not your attorney, everything you say here is for the purpose of establishing a attorney-client relationship and will not be disclosed. Translation: We didn't check conflict, and we want you to tell as everything without the

---

[66] Michael Meade is the reason why Richcourt Holding, Inc. was $2.5 million in negative equity instead of $1 million as Buddy forced the previous management of Richcourt to pay Michael Meade for having desecrated the funds for years the $1.5 million that Buddy owed Meade from a decade or so ago. Meade also has FINRA violations, and these are relevant for he cannot be trusted to safe keep the investors assets.

authorities finding out. I had already told the authorities everything. I guess Todd thought scaring me with criminal liability would make me open up more to him. He kept focusing on criminal liability when I wanted interpleader help.

212.    I offered Todd my whistleblower claims when I contacted him the first time—i.e., he gets paid by pursuing those claims and helps me with the interpleader without pre-payment.

213.    Over our one hour call told Todd everything he needed to know to schedule a meeting with me the next day or so. Anyway met with Todd over and over, and Todd destroyed me on JP Morgan's liability for past acts. He screamed, he belittled, and then he agreed (sort of why I have reason to believe the claims against them stick, so to say).

214.    In our first meeting, Todd told me that while he would love, just love to help me with the interpleader, and would do it in a heartbeat if I had money, because I was paying him after and I was offering whistleblowers, he needed to check with his higher ups to get it approved.[67]

215.    Anyways. Nothing came back. He didn't even tell me until August that his checks had showed the interpleader he was shocked was stamped hadn't been filed. But what was shocking, that after 10+ sessions, when I told him I had already hired two law firms and I was ready to hire my main law firm, Todd replied curtly: "are you saying you can put out $250,000 on

---

[67] His higher up turned out to be John Noona. Mayor financed almost wholly by JP Morgan according to his election finance filings, and who also was sued after I met with Todd for: failing to disclose to a new client that he represented another client with interests adverse to the new client, and messed up the later case. John left Patton Boggs shortly after the suit was file. Also note that it is almsot impossible to find out who Patton Boggs clients are. JP Morgan however was a listed client and Todd himself in 2012 had represented in a restructuring a JP Morgan owned company.

the spot right now?" Yes I said, and Todd walked off and never contacted me again. So much for would love to help....

**VIOLATIONS ALLEGED**

**I. VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

216.     Plaintiff hereby incorporates paragraphs 1 through 215 and Affidavits 1, 2 , 3, and 4.

217.     Defendants, whether FAM, Solon, Citco, JP Morgan and Corsair as asset managers, the barrage of law firms and legal service providers, and the banks as banks and custodians, are direct competitors in their industry. When they join together com competition is harmed. When they join together to destroy a fledging but able challenger whose success in becoming a competitor alone can further inspire more competition in the market all competition is being destroyed. As defendants did her. Harming [legal] investment returns for investors, harming the size of the investment pool, which grows with returns and investor confidence, and harming companies whose capital rates would have other wise decreased.

218.     Defendants agreement amongst them are per se unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1. No elaborate industry analysis is required to demonstrate the anticompetitive character of this agreement.

219.     For the purpose of forming and effectuating the alleged agreement, understanding, or conspiracy, conspirators and co-conspirators did those things that they combined and conspired to do, including, but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

a. prevented Plaintiff from maintaining control and restoring investor confidence; and

b. prevent Plaintiff from accessing the courts for justice.

220.    The combination and conspiracy has had, among other things, the following effects:

a. Suppressed competition between Citco, FAM, Corsair and JP Morgan, and Solon among asset managers and all their service providers;

b. Limited investor choice, as well as better investments, more legitimacy, and fairer results in all forms of competition.

221.    Plaintiff has been injured as a direct and proximate consequence of the acts of the Defendants, and will continue to be injured, in his business, property, reputation, and even freedom, potentially.

222.    Investors were injured, and the market current and future for asset managers was permanently harmed, for even if successful Plaintiff journey has been a nightmare.

223.    Plaintiff is entitled to an injunction against FAM Citco and Solon primarily, and all other defendants, preventing and restraining their violations alleged herein, as well as enjoining it from engaging in similar conduct in the future.

## II. 42 U.S. CODE § 1985 - CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS

224.    Plaintiff hereby incorporates paragraphs 1 through 223 and Affidavits 1, 2 , 3, and 4.

225.     This is an action for conspiracy to interfere with civil rights under 42 U.S.C.A. § 1985, for remedies for Defendants' deprivation of Plaintiff's civil rights.

226.     By this action, Plaintiff seeks all legal and equitable relief to which Plaintiff may be entitled, including, but not limited to compensatory and punitive damages, attorney's fees and costs, prejudgment interest, and injunctive relief against all Defendants.

227.     By reason of the Defendants' collusive conduct, Plaintiff was deprived of rights, privileges, and immunities secured to Plaintiff by the Constitution of the United States and laws enacted under that Constitution.

228.     Plaintiff has been deprived of liberty and property interests without the minimal protections of due process guaranteed to Plaintiff under the United States Constitution. The conduct of the Defendants, and each of them, was arbitrary and capricious, without notice or warning, taken in secret, and intended to deprive Plaintiff of rights and has, for now, destroyed Plaintiff's career and trade.

229.     As a proximate result of Defendants' actions against Plaintiff, as alleged above, Plaintiff has been harmed, in that Plaintiff has lost his trade, harmed his health, destroyed his reputation, and even threatened his freedom.

230.     All injury to Plaintiff has included emotional and mental distress, physical upset, and physical injury, all constituting general damages in an amount to be determined at trial.

231.     As a further proximate result of the actions of the Defendant attorneys, and Defendant attorneys' arbitrary, capricious, and intentional deprivation of Plaintiff's liberty, Plaintiff has suffered damage to Plaintiff's good name, reputation, honor, and integrity.

232.    The above actions of the Defendants, and each of them, in depriving Plaintiff of his constitutionally protected rights were done with evil motive or intent, or with reckless or callous indifference to Plaintiff's rights.

233.    Plaintiff is informed and believes, and therefore alleges, that Defendants, and each of them, will continue in their unlawful, unconstitutional conduct unless and until restricted by this court. If Defendants are not restrained, Plaintiff will suffer ongoing and irreparable injury, loss and damage, and the damages and losses described in this Complaint will continue. Therefore, Plaintiff requests injunctive and mandamus relief as set forth below.

### III. 42 U.S. CODE § 1983 - CIVIL ACTION FOR DEPRIVATION OF RIGHTS

234.    Plaintiff hereby incorporates paragraphs 1 through 233 and Affidavits 1, 2 , 3, and 4.

235.    This is an action for deprivation of constitutional rights under color of state law brought pursuant to the recodification section 1979 of the Civil Rights Act of 1971, 42 U.S.C.A. § 1983, for remedies for Defendants' deprivation of Plaintiff's civil rights.

236.    By this action, Plaintiff seeks all legal and equitable relief to which Plaintiff may be entitled, including, but not limited to compensatory and punitive damages, attorney's fees and costs, prejudgment interest, and injunctive relief against all Defendants.

237.    Defendants attorneys are, and at all times have been, officers of their respective courts, all public entities. In doing all of the things mentioned, the Defendants, and each of them, were acting under color of their authority and, as such, under color of the statutes, ordinances, regulations, customs, and usages of the respective District.

238.     By reason of the Defendants' conduct, Plaintiff was deprived of rights, privileges, and immunities secured to Plaintiff by the Constitution of the United States and laws enacted under that Constitution.

239.     Plaintiff has been deprived of liberty and property interests without the minimal protections of due process guaranteed to Plaintiff under the United States Constitution. The conduct of the Defendant law firms, and each of them, was arbitrary and capricious, without notice or warning, taken in secret, and intended to deprive Plaintiff of rights and has, for now, destroyed Plaintiff's career and trade.

240.     As a proximate result of Defendants' actions against Plaintiff, as alleged above, Plaintiff has been harmed, in that Plaintiff has lost his trade, harmed his health, destroyed his reputation, and even threatened his freedom.

241.     All injury to Plaintiff has included emotional and mental distress, physical upset, and physical injury, all constituting general damages in an amount to be determined at trial.

242.     As a further proximate result of the actions of the Defendant attorneys, and Defendant attorneys' arbitrary, capricious, and intentional deprivation of Plaintiff's liberty, Plaintiff has suffered damage to Plaintiff's good name, reputation, honor, and integrity.

243.     The above actions of the Defendants, and each of them, in depriving Plaintiff of his constitutionally protected rights were done with evil motive or intent, or with reckless or callous indifference to Plaintiff's rights.

244.     Plaintiff is informed and believes, and therefore alleges, that Defendant attorneys, and each of them, will continue in their unlawful, unconstitutional conduct unless and until

restricted by this court. If Defendants are not restrained, Plaintiff will suffer ongoing and irreparable injury, loss and damage, and the damages and losses described in this Complaint will continue. Therefore, Plaintiff requests injunctive and mandamus relief as set forth below.

**PRAYER FOR RELIEF**

*Plaintiff requests that:*

(A) The Court adjudge and decree that the agreement between defendants to prevent Plaintiff from carrying his trade constitutes an illegal restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act;

(B) The Court adjudge and decree that the agreement between defendants to manipulate the due course of justice and judicial proceedings intending to deprive Plaintiff of his property rights is in violation of 42 U.S. Code § 1985—Conspiracy to interfere with civil rights;

(C) The Court adjudge and decree that defendant officers of their respective courts acted under color of law to deprive Plaintiff's rights, privileges, or immunities as secured by the Constitution and laws of the United States in violation of 42 U.S. Code § 1983— Civil action for deprivation of rights;

(D) The Court adjudge and decree that Defendants pay:

(A) damages $333,333,333.01 trebled to $999,999,999.03;

(B) Plaintiff be awarded the costs of this action and reasonable attorneys' fees.

(E) Defendant be permanently enjoined and restrained from establishing any similar agreement unreasonably restricting competition for employees that enforce or adhere to existing agreements that unreasonably restrict competition for employees except as prescribed by the Court;

(F) Plaintiff be awarded such other relief as the Court may deem just and proper to redress and prevent recurrence of the alleged violation and to dissipate the anticompetitive effects of the unreasonable agreement entered into by Intuit; and

## JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

_____

Gerti Muho, Plaintiff

Sworn to and signed before me this _____ of February 2014

Gerti Muho
1100 Biscayne Blvd. 5303
Miami FL 33132

_____