# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

GERTI MUHO,

                                Plaintiff,

        v.

FILED by __AJS__ D.C.

FEB 1 4 2014

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

ALPHONSE FLETCHER JR., JAMIE DIMON, ERMANNO
UNTERNAEHRER, YVES BLOCH, PETER C. HARVEY,
DEBORAH H. MIDANEK, MARIANNE RAJIC, DENIS J.
KIELY, TODD R. HARRISON, NEAL BRICKMAN,
ROBERT FIEDLER, CHAD M. SHANDLER, ELIZABETH M.
RIORDAN, JANE METCALF, HENRY E. GALLAGHER, JR.,
FLOYD SAUNDERS, JAY SHAWS, IVONA SINOVIC, DAVID E.
WILKS, MICHAEL S. MEADE, ALEX WEINGARTEN, J.P.
MORGAN CHASE & CO., PATTON BOGGS LLP., MORRISON
& FOERSTER LLP., BRICKMAN LEONARD & BAMBERGER, P.C.,
CITCO GROUP LTD., PASIG LTD., KASOWITZ BENSON
TORRES & FRIEDMAN LLP., RICHARDS, LAYTON &
FINGER, P.A., FLETCHER ASSET MANAGEMENT, INC.,
PATTERSON BELKNAP WEBB & TYLER LLP, SOLON
GROUP, INC.,LAMPOST CAPITAL, L.C., OGIER LLP.,
CITIBANK N.A., WILMINGTON TRUST, N.A., WALKERS LLP,
WEILL GOTSHALL & MANGES LLP, WILKS, LUKOFF &
BRACEGIRDLE, LLC., MCDERMOTT WILL & EMERY LLP.,
WEINGARTEN & BROWN LLP., CONNOLLY GALLAGHER LLP.,
PINNACLE FUND ADMINISTRATION, FOX ROTHSCHILD LLP.,
PORZIO, BROMBERG & NEWMAN, P.C. CITCO TRADING, INC.

                              Defendants.

_____/

**Affidavit 04 GM Threatened Away From New York and Sued Ex-Parte Under False Oaths.**

I, Gerti Muho, having been duly sworn, depose and state as follows:

1.      I am the President of GM Capital Management, Inc., a Delaware corporation  d/b/a in Florida as GM Capital, Inc. ("**GM Capital**"). GM Capital manages private investment funds with $120 million in investor assets. GM Capital is registered and regulated by the U.S. Securities and Exchange Commission ("**SEC**"). I have overall management responsibility for GM Capital, including all investment decisions, strategic planning, and business development.

2.      In June of last year, I moved to Florida where I now reside in the Miami, Florida area. Since the end of August, I have not been in New York City at all; I have steered clear of New York to avoid confrontations like those that made me so afraid for my safety in August.

3.      Two incidents occurred in New York in August which led to my intentional boycott of the city.  Both incidents occurred after I had sued Fletcher Asset Management, Inc. ("**FAM**") and Citco Group, Ltd. ("**Citco**") for the return of $200 million owed to Leveraged's investors. A copy of the suit is enclose *Exhibit 00038*. The first incident occurred early in August when my secure, guarded New York City apartment was broken into and some electronic stolen. I found no signs of forceful entry; I only learned of the break in when I saw the TV was missing.

4.      The second incident occurred at the end of August. Alphonse Fletcher, Jr. and Deborah H. Midanek sent a thug to my apartment who somehow bypassed security completely; he showed up unannounced at midnight banging on my door with a blown up photo of  me and refused my pleas to leave. Mr. Fletcher and Mrs. Midanek succeeded in in scaring me away from New York.

5.      It is this absence from New York that led to my failure to answer the lawsuit against me in New York City months ago, in addition, of course, to having received no notice regarding this lawsuit until a few weeks ago in December.

6.      I was not in New York when Peter Harvey filed this lawsuit, nor was I in New York when the process server reports to have served me a copy of the complaint in person. I first learned about this judgment on December 12th, at which point I simply learned that a judgment existed against me.

7.      I became aware of this when I discovered that a legal hold had blanketed and blocked every bank account Wells Fargo kept for me and for entities associated with me. I, of course, immediately searched for the order on the website maintained by the Florida Secretary of State, but I found no judgment or legal order at all.

8.      I was rather surprised, and, needless to say, thought Wells Fargo's legal hold may be less than legal. I learned the details of this judgment a few days after that, around December 18th, when I visited the Wells Fargo branch near my Miami apartment where I had opened my account. The banker confirmed that a legal hold prevented me from accessing the accounts, and, for the first time, the banker gave me a copy of an order that said, in summary, that I had been found guilty, in civil court, of having stolen a large sum of money.

9.      I should have also learned about this judgment from Citibank. Citibank should have provided me with a notice that a legal order was preventing me from accessing my accounts in Florida, but it did not. In mid-December, a branch manager at a local Citibank in Florida, without providing me with any information, told me to leave and come back with a subpoena

should I want any information regarding any of the accounts. Before this suit was even filed, Citibank had been blocking accounts held in both my and Leveraged Hawk's name since late August. Citibank even been blocking the account it held in GM Capital's name since early September. Citibank, worst of all, never even provided me with an explanation for its actions. I include, as evidence, an e-mail I sent to Citibank demanding they provide me with information about my account in their response in the form of *Exhibit 00039*.

10.     I am unsure why opposing counsel failed to send me notice at my place of employment, at GM Capital. In August, I asked the attorney representing Leveraged Hawk, Inc. to inform opposing counsel in this case of the correct addresses for GM Capital, a location where Leveraged Hawk, Inc. and I would also receive notice. That attorney informed them as requested, and I also informed opposing counsel of the new addresses, but neither Leveraged Hawk, Inc. or I were ever served with a copy of this complaint. Yet, that counsel was able to use my grandmother's address to serve both myself and Leveraged Hawk, Inc.

11.     Aside from the address, I am aware that no suit has been issued against GM Capital in connection with the transfer that gave rise to this default judgment. However, in executing the transfer and taking all related actions, I did not act for my own benefit or that of Leveraged Hawk, Inc. I acted solely in the course of my employment with GM Capital—an entity whose addresses opposing counsel was aware of, but ignored.

12.     My employer, GM Capital, serves as investment adviser to private funds investing cash and kind in distressed companies undergoing restructuring. GM Capital's risk and legal arbitrage practice has turned heads in recent periods, catching the attention of even the largest of participants in the credit investment industry. GM Capital is an investment adviser registered

and regulated by the U.S. Securities & Exchange Commission ("**SEC**"). I was appointed last year as executive manager at GM Capital where I currently hold the same position.

13.      In its Investment Advisers Public Disclosure form ("**IAPD**"), GM Capital lists its investor assets under management to be roughly $120 million, but that figure is based on evaluations that are dated. New evaluations should show GM Capital's private investor assets under its management have increased exponentially and, today, may be as high as $500 million, according to some of the rosier evaluations GM Capital has chartered for its private use.

14.      GM Capital is intricately related to Fletcher Asset Management, Inc. GM Capital is, in a way, the investment adviser firm Fletcher Asset Management, Inc. failed to be. Soundview Elite, Ltd. is one of the private investment funds I have managed for a year and a half since August of 2012. GM Capital is its adviser—its only adviser. Soundview Elite, Ltd. ("**Elite**") is listed in GM Capital's IAPD as representing about 8% the private assets under GM Capital's management. This information is made readily available by the SEC website.

15.      On a technical level, it's hard to understand how Elite can sue its only registered investment adviser. It is its investment adviser's federal registration of Elite that gives it a license to operate, or even exist.

16.      To be clear, I have not authorized this suit; no one at GM Capital has authorized this suit. Elite cannot, and would not, sue its investment adviser; it has no reason to do so. Its adviser has led the growth in Elite's asset—a significant number in less than two years for Elite's investors and a fund with a history of losses.

17.     I have served Elite in multiple capacities and still do so. I, and GM Capital as its adviser, have delivered Elite quite the list of consideration—most bargained for, some we have provided as a consequential benefit—a good will of sorts.

18.     Elite paid for an honest manager and an honest adviser who could take the most reasoned risks and exploits the wildest of opportunities to its benefit.I reject that Elite can, should, would, or does file suit against me. Elite's stakeholders have lodged no grievance against me. Our interests are well aligned. If they had, I would not have allowed any grievance to cost us both this much.

19.     I include, as evidence, *Exhibit 00024*, a printout of two unanswered e-mails I sent to Peter C. Harvey, Jane Metcalf, and Elizabeth Riordan in response to one they sent me, allegedly on behalf of my client, Soundview Elite, Ltd. The same exhibit includes a printout of all reference attachments.

20.     Peter C. Harvey was involved in the Global Hawk transaction that led to Soundview Elite and the rest of the Merged Entities to loose over $140 million in assets, and that is part of the suit I filed referenced above and included *Exhibit 00038*. See *Exhibits 00033, 00034*.

Gerti Muho, Plaintiff

Sworn to and signed before me this 14 of February 2014

**Affidavit 4 Exhibits**

**Muho v. Fletcher et al.**

# Exhibit 024

# Muho v. Fletcher et al.

**Exhibit 00024 - GM e-mail (3 files), GM e-mail, Harvey e-mail (1 file), followed by Harvey's file followed by GM 3 files.**

Sunday, December 29, 2013 at 6:56:19 AM Eastern Standard Time

**Subject:** Re: Your immediate attention is requested
**Date:** Saturday, September 21, 2013 at 11:18:58 PM Eastern Daylight Time
**From:** GM Capital Management, Inc.
**To:** Harvey, Peter C. (x2810)
**CC:** Metcalf, Jane (x2152), Riordan, Elizabeth (x2321)

Harvey:

You claim to represent entities that merged into Leveraged a few months ago. First I must say that i am surprised you and Buddy are said to be having issues with the merger. I informed Buddy that notwithstanding RPGP holding 1% of RAI shares, Buddy could join Board any board meeting etc. and express his opinion, which I do value very much. Please do tell Buddy that we confirmed Citco's ownership of the 15% share in RHI was was a sham. Citco did not retain the economic risk necessary to qualify for a recognition of its 15% equity--notwithstanding its claims. It is unfortunate, I know.

You and Buddy should consider that the merger preserves assets of the funds from being destroyed by actions like Ogier's in the Cayman in secret, trying to liquidate New Wave even though it is counsel to New Wave

t assume your conflicts department missed these:

| | | | |
|---|---|---|---|
| Patterson Belknap | $ 18,943.70 | 11/5/2012 | FDIF |
| Patterson Belknap | $ 18,943.69 | 11/5/2012 | FII |

I have to inform you that those clients are adverse to both FDIF and FII. I wish I could tell you more but you know, I can't.  Also my understanding from Stewart is that you had reviewed the attached letters. I thought I had copied you earlier too.

Let me know,
Gerti

On Sep 21, 2013, at 11:27 PM, Gerti Muho <gm@gmcapital.net> wrote:

Deary:

Thank you for your e-mail. I think it's prudent for you first get us both a letter confirming your authority to send around these e-mails. I don't know much about these things and I don't want either of us to get in trouble for transacting with the wrong party. Just have a human client sign it. You know I've heard there are some law firms out there who knowingly represent strangers against true fiduciaries. It is unfortunate they act like that, I think.  But hey it's not as bad as Ogier et al. who openly represent others against their own clients.

Sorry I could not be of more help. Oh and please address all future communications to gm@gmcapital.net  I am told I need to keep copies of all my communications. Sorry for having to tell you but I must. And I know you guys don't really represent registered investment advisers much so I understand.
Gerti

Gerti Muho
President

**Exhibit 00024 - GM e-mail (3 files), GM e-mail, Harvey e-mail (1 file), followed by Harvey's file followed by GM 3 files.**

**GM Capital Management, Inc.**
42 Broadway, 36th I New York, NY 10010
1 Market St. 3600 I San Francisco, CA.
(212) 480-0001 x 700

On Fri, Sep 20, 2013 at 11:36 AM, Riordan, Elizabeth (x2321) <eriordan@pbwt.com> wrote:

Dear Mr. Muho:

Please see the attached correspondence.

Regards,

**Elizabeth M. Riordan**

Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036-6710
Tel: (212) 336-2321 | Fax: (212) 336-2222

eriordan@pbwt.com

```
-----------------------------------------------
Privileged/Confidential Information may be contained in this message.  If
 you are not
the addressee indicated in this message (or responsible for delivery of t
he message to
such person), you may not copy or deliver this message to anyone.  In suc
h case, you
should destroy this message and kindly notify the sender by reply email.
 Please advise
immediately if you or your employer do not consent to Internet email for
messages of this
kind.

-----------------------------------------------

IRS Circular 230 disclosure:  Any tax advice contained in this communicat
ion (including
any attachments or enclosures) was not intended or written to be used, an
d cannot be
used, for the purpose of (i) avoiding penalties under the Internal Revenu
e Code or (ii)
promoting, marketing or recommending to another party any transaction or
matter addressed
in this communication.  (The foregoing disclaimer has been affixed pursua
nt to U.S.
Treasury regulations governing tax practitioners.)

================================================================
=====
```

**Page 2 of 3**

Exhibit 00024 - GM e-mail (3 files), GM e-mail, Harvey e-mail (1 file), followed by Harvey's file followed by GM 3 files.

## Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

September 20, 2013

Peter C. Harvey
Partner
(212) 336-2810
Direct Fax: (212) 336-1217
pcharvey@pbwt.com

**CERTIFIED REGISTERED MAIL ELECTRONIC MAIL and
FEDERAL EXPRESS**
E-mail:  gm@gmcapital.net; gm@gmg7.com; gm@gmg9.com

Mr. Gerti Muho
Leveraged Hawk, Inc. and/or
Gerti Muho Capital Management
2428 Sacramento Street
Berkley, CA 94704

Dear Mr. Muho:

      We represent Soundview Elite LTD Fund ("Soundview") and Vanquish Fund
LTD ("Vanquish"), the "Richcourt Funds." The Richcourt Funds have received credible
information from HSBC bank that on or about August 8, 2013 you improperly transferred
monies in the amount of $2,067,377.24 from Soundview and/or Vanquish's accounts to your
entity, Leveraged Hawk, Inc. ("Leveraged Hawk") and/or you personally. As you are neither an
authorized signatory on these accounts nor affiliated with the Richcourt Funds in any manner,
this transfer constitutes an unlawful interference with the Richcourt Funds' right to possession.
It also constitute in our view theft of funds by deception and/or bank fraud.

      Accordingly, the Richcourt Funds hereby demand that you immediately return the
$2,067,377.24 transferred from Soundview and/or Vanquish's accounts. The Richcourt Funds
also demand that none of these monies be expended by either Leveraged Hawk or you. Please be
advised that the Richcourt Funds are pursuing both civil and criminal actions with respect to
these events.

      Sincerely,

      Peter C. Harvey

cc:    Soundview Elite LTD Fund
       Vanquish Fund LTD
       Elizabeth Riordan, Esq.

6416044v.1

**Exhibit 00024 - GM e-mail (3 files), GM e-mail, Harvey e-mail (1 file), followed by Harvey's file followed by GM 3 files.**

--
This communication, and any attachment(s), is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential and/or protected by privilege. This communication is for information purposes and should not be regarded as an offer, a contract, or any form of official statement of Gerti Muho Capital Management, or any of its affiliated entities. If you are not the intended recipient, any use, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please delete the original email, any copies, attachments thereto, or printouts and notify the sender immediately.

Exhibit 00024 - GM e-mail (3 files), GM e-mail, Harvey e-mail (1 file), followed by Harvey's file followed by GM 3 files.



# GERTI MUHO

Dear Mrs. Midanek:

I respectfully request once again that you[1] observe the contract you executed with the **Funds** listed below under Funds. You agreed to act honestly, in good faith, and in the Funds best interests.

You breached your duty of honesty when you claimed you would be, or ever were, an independent director to Richcourt Holding (or RHI), and also when you claimed you were the, and required the label of, non-management director to Richcourt.[2]

First, you are no director of Richcourt. You are very aware your appointment to RHI was rejected for legal impossibility. Any resolutions you parade as signed by RHI's board are invalid, for neither I nor Fletcher were directors of RHI. Non-corporate directors shied off of RHI's Board to avoid possible liability to the Funds investors. And your lack of consent to any director appointment prior to April 5, 2013 on its own means you are no Richcourt director **and no Fund director.**[3]

Disregarding your actual title, a manager is someone "vested with a certain amount of discretion and independent judgment in managing [another's] affairs."[4] You were a manager when you met with Stewart Turner and Denis Kiely to inform them of your decision about their future compensation. A manager of Richcourt, and also a manager of R.F. Services, LLC and of Fletcher International, Inc. and Fletcher Asset Management, Inc. **(FII/FAM)**. You were management when you decided to pay Walkers from the Funds investor money $200,000 for the work Walkers had done for FIA Leveraged and when you hired Ritch & Connelly and Weill to attack the three Louisiana pension funds interests, costing the investors in the Funds $1,000,000+. You were a manager when you contracted to have exclusive discretion over one third of the Funds assets. So you were management and manager of the Funds, and manager of R.F. Services, LLC and of Fletcher International, Inc. and Fletcher Asset Management, Inc. And by claiming, and requiring, to date, the label of non-management you breached your duty of honesty to the funds.

---

[1] Deborah H. Midanek and/or Solon Group, Inc.

[2] Richcourt is used as I understand you have used it: ambiguously for RHI or the entire structure.

[3] Ironically you have been parading director resignation letters that predate your consent to be appointed to any Board. A third reason, unaided, is that if the Funds directors consented to any appointment singly at one time or another does not mean the Funds Boards ever consented.

[4] Black's Law Dictionary 9th Edition.

Exhibit 00024 - GM e-mail (3 files), GM e-mail, Harvey e-mail (1 file), followed by Harvey's file followed by GM 3 files.



You claimed no relation to FAM and Richcourt. But you had a previous employer-employee relationship with FAM, and a personal relationship with Fletcher. And you appear to have an interest in Richcourt's assets through your husband's controlling stake in Midanek/Pak, now Black Pearl Capital. And you may have an interest in Richcourt and possibly FIA Leveraged via Solon Capital; a fund organized by individuals with ties to one or more, and possibly all, the Fletcher funds, Richcourt, Global Hawk and Corsair, that holds as much as $12,492,475 of Richcourt's assets; a fund that also received $5,000,000 the day the three L.A. pension funds sent FIA Leveraged April 1, 2008. You did not disclose any one of these interests to the Boards; claiming instead no interest to FAM or Richcourt, once more breaching your duty of honesty.

You breached your duty of good faith when you claimed that you were a director for the Funds to Denis Kiely May 1, 2013 and others since then. I delivered to you all the contracts and resolutions you were entitled to receive showing you directors duly appointed to RHI's, managers', and funds' boards on April 29, 2013 executed a formal contract transforming any interest previously held by FAM over Richcourt to a non-managing and non-control interest. I also informed you that to the extent you believed in good faith to be a Fund director, you were not, and, and out of goodwill, proved to you that FAM had **asked me after and only after** it lost control to write resolutions. Resolutions you claimed April 30, 2013, around 8:00am NYC, to have in your possession, and ater hedged by stating 'you would receive'. After you received **proof** you could not claim to be a director of Richcourt April 30, 2013, you breached your duty of good faith every time you claimed to continue to be a director to Richcourt.

You breached you duty to act in the Funds best interests when you failed to disclose to the Fund's Boards February 28, 2013 your full interests and when you claimed on the same day you were independent.[5] Unbeknown to you or FAM, as of Feb. 28, I had already discussed the transactions that transpired April 29, 2013 with Cravath, Crowell, and Boise Schiller, and had a call on Feb. 28 with Leiff around 1-2pm PST. My discussions with the four law firms in January and February were the result of Fletcher/FII selling to the Trustee in February assets Fletcher/FII sold Soundview Elite, a Fund, in December. The Fund had not paid Fletcher/FII as of that date. I feared Fletcher/FAM would very soon hold the Fund to the contract and require that the Fund pay FII for the December sale. My fears, later confirmed, was caused by Fletcher/FII agreeing to pay the Trustee $2,200,000 FII did not have. After I learned the next day that Fletcher and you had decided that you would join as the Independent director, I decided against taking actions that would have prevented the Fund from paying FII under the December contract. So you failure to disclose your interests and your active pursuit of the position of Independent director were against the Funds and their stakeholders interests, placing you in breach of your agreement.

---

[5] Note that pursuing actions for Richcourt against the interests of the LA pensions funds who invested in 2008 and not against the Funds managers who subordinated the Funds in 2010 is being left out for brevity.

Exhibit 00024 - GM e-mail (3 files), GM e-mail, Harvey e-mail (1 file), followed by Harvey's file followed by GM 3 files.



Also it appears the brand of Independent director and even Veteran Independent director which you appear to have built starting around 2001 were truly powerful. I understand it allows you to even petition a court and charge $600+ per hour for your services, which of course pale when compared to the non-financial opportunities the positions provide. Assuming one can access funds while remaining independent. I can now also understand why you shift between Independent and Non-management. I can understand you now. Unfortunately, I naively believed in your Veteran Independent brand to my detriment, given the fierce advocacy you have provided to Fletcher over this month, to the detriment of Investors in Soundview Elite who would have had $4,000,000 more in **their Fund**, and to the detriment of Richcourt and all Funds who for 30 days have continued paying for a dozen of expensive law firms to pursue actions against me and other investors, and none against easier targets.

**AS INVESTMENT ADVISOR TO LEVERAGED HAWK AND FIDUCIARY TO ALL OF RICHCOURT, I, HEREBY,**

**(I)LEGALLY PLACE YOU ON NOTICE OF THE FACTS I HAVE RECOUNTED ABOVE AND,**

**(II) INFORM YOU THAT YOUR FAILURE TO FOLLOW THE DIRECTIONS BELOW WILL CAUSE IRREPARABLE HARM TO LEVERAGED HAWK, ITS INVESTMENT ADVISOR, AND TO RICHCOURT.**

**(III)ASK THAT YOU IMMEDIATELY:**

    a. **Please cease and desist all work under all contracts with Richcourt immediately.**

    b. **Please send me a detailed invoice immediately and return any funds remaining on your retainer from the funds to:**

| | |
|---|---|
| ABA #: | 021000089 |
| Acct # | 497815214 |
| Name | Leveraged Hawk, Inc. |
| Ref: | Recovery from SG |

    c. **Please include either me, directly, or the Funds duly appointed legal representative on each and every future communication related to the Funds, their Managers, or Richcourt.**

*page 3 of 5*

Exhibit 00024 - GM e-mail (3 files), GM e-mail, Harvey e-mail (1 file), followed by Harvey's file followed by GM 3 files.

⟨≋⟩

    d. **I, as Investment Advisor to Leveraged Hawk and Legal Representative of each entity have created separate e-mail accounts for each entity and the e-mails are listed next to each entity's name below.**

Thank you,

Gerti Muho

Gerti Muho
Investment Advisor
Leveraged Hawk, Inc.
20 Exchange pl 4504
New York, New York 10005
gm@gmg9.com
(212) 480-0001

**With a copy to:**

the Investors (by Administrator)
Pinnacle Fund Administration LLC
Wilmington Trust, N.A.
HSBC Bank USA
KPMG Netherlands
Brown Rudnick LLP
Richard J. Davis
Luskin Stern & Eisler LLP
Sher Tremonte
Kirkland & Ellis LLP
Cohen & Gresser LLP
Ritch & Conolly
Weil, Gotshal & Manges LLP
The Law Office of Denis J. Kiely
Walkers (BVI)
DMS Offshore Investment Services
Intertrust Group
Charles Adams Ritchie & Duckworth
Brickman Leonard & Bamberger, P.C.
British Virgin Islands Financial Services Commission
Cayman Island Monetary Authority
U.S. Securities and Exchange Commission

Exhibit 00024 - GM e-mail (3 files), GM e-mail, Harvey e-mail (1 file), followed by Harvey's file followed by GM 3 files.



**FUNDS:**

| | | |
|---|---|---|
| America Alternative Investments, Inc. | email @ | america@gmg7.com |
| Elite Designated | email @ | designated@gmg7.com |
| New Wave Fund SPC | email @ | wave@gmg7.com |
| Star Designated | email @ | star@gmg7.com |
| Richourt Composite Inc. | email @ | rcomposite@gmg7.com |
| Richourt Euro Strategies | email @ | euro@gmg7.com |
| Richourt Top Stars I Fund Ltd. | email @ | top@gmg7.com |
| Soundview Composite | email @ | scomposite@gmg7.com |
| Soundview Elite Ltd. | email @ | elite@gmg7.com |
| Soundview Premium, Ltd. | email @ | premium@gmg7.com |
| Soundview Star Ltd. | email @ | soundviewstar@gmg7.com |

**MANAGERS:**

| | | |
|---|---|---|
| Richourt Capital Management Inc. | email @ | rcm@gmg7.com |
| Soundview Capital Management, Inc. | email @ | scm@gmg7.com |
| New Wave Asset Management, Ltd. | email @ | nwam@gmg7.com |
| Pitagora Capital Management Ltd. | email @ | pcm@gmg7.com |

**RICHCOURT**

| | | |
|---|---|---|
| Richourt Holding, Inc. | email @ | holding@gmg7.com |

**Exhibit 00024 - GM e-mail (3 files), GM e-mail, Harvey e-mail (1 file), followed by Harvey's file followed by GM 3 files.**

Friday, May 3, 2013

Nathaniel P.T. Read
800 Third Avenue
New York, New York 10022
1 212 957 7069
nread@cohengresser.com
www.cohengresser.com

Dear Mr. Read:

I write you this letter to give you legal notice that (i) I have reason to believe the services you and your firm provides to Fletcher Asset Management Inc. and to Alphonse Fletcher, Jr. personally ("*Your Clients*") are funded by assets belonging to at least one of the entities I have listed below ("*Investment Vehicles*"), and (ii) that Your Clients have no legal right to any asset belonging to the Investment Vehicles.

Additionally, all the entities, with each acting to further its own and also the group's interests, have agreed as follows:

(i) the Investment Vehicles recently purchased 1,000 Preferred Stock of Leveraged Hawk, Inc., a Delaware company, ("**Hawk**") for a combined $5,000,000, or $5,000 per share, and with dividend rights;

(ii) each of the four distinct entities that managed the Investment Vehicles ("**Managers**") executed the same aforementioned agreement with Hawk, and together the Managers purchased 200 Class A Common Stock of Hawk, with voting power, and separately paid for it in kind with the Managers rights over (i) the voting rights over the Investment Vehicles, and (ii) the Managers contracts to manage the Investment Vehicles; and

(iii) Richcourt Holding Inc., which owned the Managers also executed the aforementioned agreement with Hawk and paid for the 800 voting shares of Class A Common Stock it separately received

I thus ask on behalf of Hawk, Hawk's Board, its common stock holders, and its Preferred Stockholders please stop doing any additional work until you have replied to

**Exhibit 00024 - GM e-mail (3 files), GM e-mail, Harvey e-mail (1 file), followed by Harvey's file followed by GM 3 files.**

Friday, May 3, 2013

this e-mail and have confirmed in writing the details of each payment or advance Your Clients have received a direct or indirect credit for any past due, future advance, or expense paid or incurred, etc. in connection with the services you have provided to your clients for the past six months on any matter, and in any capacity. Please provide the details in the same form you or your provider would save those details for the purpose of the complying with the Patriot Act.

Very truly yours,

Gerti

Gerti Muho
Managing Director
*Leveraged Hawk, Inc.*
(212) 480-0001 Dir.
(212) 480-0666 Cell.
gm@gmg7.com
gm@gmg9.com

cc:

Richard David
Michael Luskin

Alphonse Fletcher Jr.

Exhibit 00024 - GM e-mail (3 files), GM e-mail, Harvey e-mail (1 file), followed by Harvey's file followed by GM 3 files.

Gerti Muho Capital Management

June 14, 2013

Rahul K. Sharma
Associate
**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York New York 10153
1 (212) 310-8236

**Re: Request that you cease providing aid to Fletcher**

I am the investment advisor to Leveraged Hawk, Inc, the entity that controls Richcourt and the Richcourt funds.[1] Fletcher does not control Richcourt[2] and wrote off its investment in RAI.[3] Deborah Midanek and Alphonse Fletcher are no Richcourt directors.[4]

Soundview Elite, a *fund*, paid you $275,000 March 28, 2013.[5] A professional service provider may have sent you up to an additional $1,000,000 that originates from Soundview Elite, and up to yet another $1,000,000 originating from a group of Richcourt *funds*.

Soundview Elite and every other Richcourt *fund* hold investor assets--client money.  The share of *fund* assets belonging to the managers and Richcourt Holding equals **exactly** nil, zero, nothing--OPM (other peoples money). Clients and managers interests weren't even aligned, with managers not paid to perform--i.e., your common 2-20, at Richcourt, was 2?-O.

Clients gave monies to the *funds* to *invest*. I carefully reviewed every *fund's* offering memorandum, and Weill can not qualify as a fund investment. But I look forward to learning about the reasonably

---

[1] http://www.sec.gov/Archives/edgar/data/1578347/000157834713000001/xslFormDX01/primary_doc.xml ; http://www.adviserinfo.sec.gov/iapd/content/viewform/adv/sections/iapd_AdvIdentifyingInfoSection.aspx?ORG_PK=168066&RGLTR_PK=50000&STATE_CD=&FLNG_PK=000F29A40008016B0572F5600468FFA9056C8CC0; and Exhibit 1.

[2] Exhibit 2

[3] Exhibits 3, 4

[4] Exhibit 5, see also your copy of the letter addressed to Deborah Midanek May 29, 2013

[5] Exhibit 6

*page 1 of 3*

Exhibit 00024 - GM e-mail (3 files), GM e-mail, Harvey e-mail (1 file), followed by Harvey's file followed by GM 3 files.

equivalent value Weill has provided to each *payor's* clients. Nonetheless, I cannot justify clients paying $1000+ per hour for your firm to make calls on behalf of Fletcher, so I ask that you stop billing any and all Richcourt entities **immediately**.[6]

I additionally **order you** to:
(i) immediately cease all forms of communication about all matters relating to Richcourt with **any person other than myself,**
(ii) send me any and all past invoices
(iii) provide me with accounting records

I don't take writing this ugly letter lightly for many, many reasons. So please, please stop aiding Fletcher.

Sincerely,

Gerti Muho
Investment Advisor
(212) 300-3826

**With a copy to:**

the Investors (via Administrator)
Pinnacle Fund Administration LLC
Wilmington Trust, N.A.
Federal Bureau of Investigations
HSBC Bank USA
KPMG Netherlands
Ernst&Young
Brown Rudnick LLP
Richard J. Davis
Luskin Stern & Eisler LLP

---

[6] I am happy to explain away all confusion, should there be any. **Do not hesitate to ask.**

**Exhibit 00024 – GM e-mail (3 files), GM e-mail, Harvey e-mail (1 file), followed by Harvey's file followed by GM 3 files.**

Sher Tremonte
Kirkland & Ellis LLP
Cohen & Gresser LLP
Ritch & Conolly
Weil, Gotshal & Manges LLP
The Law Office of Denis J. Kiely
Walkers (BVI)
DMS Offshore Investment Services
Intertrust Group
Charles Adams Ritchie & Duckworth
Brickman Leonard & Bamberger, P.C.
British Virgin Islands Financial Services Commission
Cayman Island Monetary Authority
U.S. Securities and Exchange Commission

**Exhibit 00024 - GM e-mail (3 files), GM e-mail, Harvey e-mail (1 file), followed by Harvey's file followed by GM 3 files.**

**Exhibit 1**

Elementary portrayal of the April 29th transaction.

| | |
|---|---|
| Richcourt Holding, Inc. (BVI) | Leveraged Hawk, Inc. (Delaware) |

sells 4 subsidiaries

subsidiaries

Richcourt Capital Management (Bahamas)

Soundview Capital Management, Inc. (BVI)

1000 Class A CS

Pitagora Capital Management, (Bahamas)

1000 Class B CS

New Wave Asset Management (Cayman)

2000 Preferred 5% per annum dividend

sell 12 'Funds' subsidiaries to Leveraged

purchase 1000 PS for $5,000,000 (remains client money)

| | |
|---|---|
| Star | R. Composite |
| S. Designated | S. Composite |
| America | R. Designated |
| Elite | Euro |
| New Wave | Top Stars |
| Premium | E. Designated |

**Exhibit 00024 - GM e-mail (3 files), GM e-mail, Harvey e-mail (1 file), followed by Harvey's file followed by GM 3 files.**

**Exhibit 2**

Subject: Re: Questions re: Related Parties
From: S&E Law <eshahmoon@sandelaw.com>
Date: Wed, 12 Oct 2011 17:11:04 -0400
To: richard.thomas2@ey.com
CC: AF {AFletcher} <AFletcher@fletcher.com>, "Robert L. Rust" <brust@mersla.com>, "David A. Clark"
<david.clark@ey.com>, DJK {DKiely} <DKiely@fletcher.com>, JDM {JMajor} <jmajor@fletcher.com>, "Richard J.
Hampton" <noffrichie@bellsouth.net>, Seth M Schwartz <Seth.Schwartz@skadden.com>, Steven Stockstill
<sstockstill@lafire.brcoxmail.com>, SAT {STurner} <sturner@fletcher.com>, EGL {ELieberman}
<ELieberman@fletcher.com>

Richard,

I believe that part of the confusion that has arisen results from the fact that Fletcher was in the process of reorganizing the
structure of the Vanquish and Aesop funds during the period from the beginning of May through the end of August, which changes
were made effective as of May 30, and those changes were being implemented while we were preparing responses to your
requests.  As of May 30, Aesop is 100% owned by FILB and Vanquish is 100% owned by Richcourt Holding Inc., an entity
indirectly owned by Fletcher affiliated entities.

Although the Richcourt fund management companies are partially indirectly owned by Fletcher controlled entities, and Richcourt
funds invest in FIA Leveraged and other Fletcher funds, none of the investors in the Richcourt funds are affiliated with, owned by
or controlled in any way by any Fletcher entity.  Therefore, redemptions by those funds were not included on the redemption and
subscription schedule.  Any redemptions or subscriptions to or from those funds would be paid by or payable to non-Fletcher
investors.  In addition, those funds do not pay fees to DFS or RFS.

The schedule of investors that was delivered on August 24 was prepared internally by Fletcher.  I have asked them to recheck the
ownership percentages as of June 30 to confirm that no other related parties, including Fletcher Fund LP, should be added to that
list.

Please let me know if you have any questions.

Eli

**Exhibit 00024 - GM e-mail (3 files), GM e-mail, Harvey e-mail (1 file), followed by Harvey's file followed by GM 3 files.**

Exhibit 3



**Exhibit 00024 - GM e-mail (3 files), GM e-mail, Harvey e-mail (1 file), followed by Harvey's file followed by GM 3 files.**

**Exhibit 4**

Registration No. 42834



**BERMUDA**

### CERTIFICATE OF DEPOSIT
### OF
### CANCELLATION OF LIMITED AND EXEMPTED PARTNERSHIP

**THIS IS TO CERTIFY** that a Certificate of Cancellation for Richcourt Partners L.P. pursuant to section 20(1) of *the Exempted Partnerships Act 1992* and section 8F(2) and (3) of the *Limited Partnerships Act 1883* ("the Act"), was delivered to the Registrar of Companies and registered on the **13th day of January 2012.**

The effective date of Cancellation is 31st day of December 2011.



Given under my hand and Seal of the
REGISTRAR OF COMPANIES this
23rd day of January 2012

for Registrar of Companies

---

THE LIMITED PARTNERSHIP ACT 1883
Section 8F
THE EXEMPTED PARTNERSHIPS ACT 1992
Section 20

### CERTIFICATE OF CANCELLATION

RPGP Limited the General Partner of the within-named exempted limited partnership (the "Partnership") DO HEREBY CERTIFY as follows:

1. The name of the Partnership to which this Certificate of Cancellation relates is

    RICHCOURT PARTNERS L.P.

2. The Partnership was registered on the 23 day of June 2008

3. With effect from the 31 day of December 2011 there are no Limited Partners and the Partnership is now dissolved.

4. The effective date of cancellation is the 31 day of December 2011

Dated this 12th day of January 2012

Name: Stewart Turner
Title: Director, RPGP Limited
For and on behalf of
Richcourt Partners L.P.

Exhibit 00024 - GM e-mail (3 files), GM e-mail, Harvey e-mail (1 file), followed by Harvey's file followed by GM 3 files.

Exhibit 5

# RICHCOURT CAPITAL
# MANAGEMENT INC.

**IMMEDIATE RELEASE**
April 30, 2013

**RESOLUTIONS IN WRITING AGREED AND EXECUTED BY ALL MEMBERS OF THE BOARD OF DIRECTORS OF RICHCOURT CAPITAL MANAGEMENT INC.**

(New York, New York) Richcourt Capital Management Inc. (the **"Company"**) on the 29th day of April 2013 directed that its wholly-owned subsidiaries listed below (each, a **"Fund"**) remove Solon Group, Inc., New York, and Alphonse Fletcher, Jr. from each Fund's Board of Directors. The Company directed each Fund to appoint Gerti Muho to serve as sole member of the Funds Boards.

The Board of Directors (the **"Board"**) of the Company desires to ratify the validity of all actions taken to effect the aforementioned governance changes at each Fund.

**THEREFORE:**

**Resolved.** The Board of the Company hereby ratifies each and every action listed herein.

**GENERAL AUTHORISATION & RATIFICATION OF ALL PRIOR ACTIONS:**

**RESOLVED.** In connection with the actions contemplated by the foregoing resolutions, each of the Directors and such other persons as are authorised by any of them be, and each hereby is, authorised, in the name and on behalf of the Company, to do such further acts and things as any Director or other person shall deem necessary or appropriate in connection with, or to carry out the actions contemplated by, the foregoing resolutions, including to do and perform (or cause to be done and performed), in the name and on behalf of the Company, all such acts and to make, execute, deliver, issue or file (or cause to be made, executed, delivered or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents and waivers, and all amendments to any such agreements, documents, instruments or certificates, and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable to carry out the intent of the foregoing resolutions, the authority for the taking of any such action and the execution and delivery of such of the foregoing to be conclusively evidenced thereby.

**RESOLVED.** that any and all actions of the Company, or of any Director, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and hereby are ratified, confirmed,

RICHCOURT CAPITAL MANAGEMENT, INC.
tel: (212) 480-0001   fax: (650) 300-4352   e-mail: rcm@gmg7.com

approved and adopted in all respects as fully as if such action(s) had been presented to for approval, and approved by, all the Directors prior to such action being taken.

executed by: ............................... in his capacity director of Richcourt Holding, Inc.

executed by: ............................... in his capacity as Managing Director of Leveraged Hawk, Inc.

**Exhibit 00024 - GM e-mail (3 files), GM e-mail, Harvey e-mail (1 file), followed by Harvey's file followed by GM 3 files.**

Exhibit 6

## Soundview Elite Ltd.

### INSTRUCTION

| | |
|---|---|
| **Date :** | March 28, 2013 |
| **TO :** | Wilmington |
| **Cc :** | * * * * * * * |
| **FROM :** | Soundview Elite Ltd. |
| **Ref. :** | Richcourt Holding, Inc. Weil Gotshal Retainer |
| **Account :** | ████████████ |

Dear all,

Please can you arrange for the following monetary transaction:

| | |
|---|---|
| Value date | Thursday 28-March-2013 |
| Amount | USD 275,000.00 net to the beneficiary |
| Bank | JP Morgan Chase Bank |
| ABA # | ████████████████ |
| Account Name | Weil, Gotshal & Manges LLP |
| Account # | ████████████ |
| Reference | Richcourt Holding, Inc. |

Yours sincerely,
Soundview Elite Ltd.

_____
Gerti Muho/Floyd Saunders
Authorized Signatory

**Exhibit 033**

**Muho v. Fletcher et al.**

**Exhibit 033**
**Muho v. Fletcher et al.**   12/29/13, 8:00 PM

| | |
|---|---|
| **From:** | Harvey, Peter C. (x2810) <pcharvey@pbwt.com> |
| **Sent:** | Friday, August 21, 2009 12:26 PM |
| **Subject:** | Privileged and Confidential |

Thanks, Michelle. We will not proceed any further.

One word of advice for whatever value it has in this process. Your negotiation position will be enhanced by understanding the strengths and weaknesses of RBS's legal position - and FAM's (Global Hawk's). (I suspect that RBS is having that analysis performed right now.) Having a true calculation of what presumably is owed also is helpful.

Good luck in your negotiations. We are available if you need us.

---

**From:** MLR {MRoberts} [mailto:mroberts@fletcher.com]
**Sent:** Friday, August 21, 2009 12:15 PM
**To:** Harvey, Peter C. (x2810)
**Cc:** AF {AFletcher}; DJK {DKiely}; SAT {STurner}; MSM {MMeade}
**Subject:** RE: Privileged and Confidential

Dear Peter,

Thank you for taking the time to speak to us on the Global Hawk/RBS matter yesterday afternoon.  We are currently considering our options for negotiating a termination or resolution with RBS, and accordingly we are not yet prepared to take action in court at this time.  We ask that you cease work on this matter now until further notice.  Again, thank you for your advice yesterday.

Yours truly,

Michelle Roberts
(212) 284-4794

---

**From:** Harvey, Peter C. (x2810) [mailto:pcharvey@pbwt.com]
**Sent:** Thursday, August 20, 2009 1:16 PM
**To:** DJK {DKiely}
**Cc:** AF {AFletcher}; SAT {STurner}; MSM {MMeade}; MLR {MRoberts}
**Subject:** Re: Privileged and Confidential


Will do.

---

**From:** DJK {DKiely}
**To:** Harvey, Peter C. (x2810)
**Cc:** AF {AFletcher} ; SAT {STurner} ; MSM {MMeade} ; MLR {MRoberts}
**Sent:** Thu Aug 20 12:50:59 2009
**Subject:** RE: Privileged and Confidential
Privileged and Confidential –

I will be at a meeting but Stewart and Michelle should be available and I would encourage you to start the process with them.

---

**From:** Harvey, Peter C. (x2810) [mailto:pcharvey@pbwt.com]

**Exhibit 033**
**Muho v. Fletcher et al.**

**Case No** _____

Exhibit 033
Muho v. Fletcher et al.                12/29/13, 8:00 PM

**Sent:** Thursday, August 20, 2009 12:46 PM
**To:** DJK {DKiely}
**Cc:** AF {AFletcher}; SAT {STurner}; MSM {MMeade}; MLR {MRoberts}
**Subject:** Re: Privileged and Confidential

Yes. I was before the SECOND yesterday in Washington and got it this morning.

Are you available to speak at 3:30 or 4 today?

Peter

---

**From**: DJK {DKiely}
**To**: Harvey, Peter C. (x2810)
**Cc**: AF {AFletcher} ; SAT {STurner} ; MSM {MMeade} ; MLR {MRoberts}
**Sent**: Thu Aug 20 12:39:55 2009
**Subject**: Privileged and Confidential
Privileged and Confidential –

Hi Peter,

We left a message for you yesterday to discuss the RBS Loan matter we mentioned previously.  I have also included below a memo written by one of attorneys Michelle Roberts that summarizes some of the key facts.  Could you let us know when you are free to speak?

Thanks,
Denis

---

**From:** MLR {MRoberts}
**Sent:** Thursday, August 20, 2009 9:49 AM
**To:** AF {AFletcher}; DJK {DKiely}; SAT {STurner}
**Cc:** MSM {MMeade}
**Subject:** RE: Global Hawk (RBS)

Gentlemen,

At Michael's request I prepared the following memo, summarizing the facts surrounding the RBS designation letter, and our analysis thereof.  Please see below.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

August 19, 2009

**Memo To:**     **Michael Meade**

**Re:**          **Designation of Early Termination Date letter from RBS to the Funds dated as of June 24, 2009
                  (the "Letter").**

Exhibit 033
Muho v. Fletcher et al.

Case No _____

**Exhibit 033**                          12/29/13, 8:00 PM
**Muho v. Fletcher et al.**

Dear Michael:

You asked me to summarize our discussion and analysis of the facts surrounding the Letter.

Richcourt Allweather Fund B, Richcourt Allweather Fund Inc., Richcourt Euro Strategies Inc., America Alternative Investments Inc. and Pitagora Fund Ltd. (together, the "Funds") have invested in Global Hawk Ltd. ("Global Hawk"), a Cayman Islands company formed for the purpose of acquiring $106,250,000 Zero Coupon Fund Linked Guaranteed Principal Protected Notes issued by Corsair (Jersey) Limited (the "Collateral Notes").  In order to pay for the Collateral Notes, Global Hawk issued $91,250,000 Medium Term Notes due 2014 (the "GH Notes") to The Royal Bank of Scotland plc ("RBS") on May 26, 2006.  Global Hawk's obligations in respect of the GH Notes were collateralized by a security interest in all of Global Hawk's present and future assets, including the Collateral Notes.

RBS and the Funds simultaneously entered into a credit default swap referencing Global Hawk and the GH Notes (the "swap").  The cash flows of the swap are as follows (A) RBS will pay the purchase price of the GH Notes, and (B) on any date of determination, the Funds will pay (i) the outstanding amount of the GH Notes on such determination date, *plus* (ii) any accrued and unpaid interest thereon, *plus* (iii) the Early Termination Spread Amount, *plus* (iv) any other amounts owed to RBS by Global Hawk under the GH Notes (the amount payable by the Funds to RBS is called the "Floating Rate Payer Calculation Amount").  Basically, RBS paid for credit protection on Global Hawk by paying the purchase price of the GH Notes.  In exchange, the Funds promised to pay the Floating Rate Payer Calculation Amount in the event of certain defaults by Global Hawk.

Certain events by Global Hawk constitute events of default or termination events under the swap.  An event of default or termination event gives RBS the right to demand the Floating Rate Payer Calculation Amount. For instance, Global Hawk's bankruptcy or failure to pay an amount due under the GH Notes would constitute an event of default.  RBS would then be entitled to designate an Early Termination Date, effectively terminating the swap and creating an obligation for the Funds to pay the Floating Rate Payer Calculation Amount.

In this swap, it is considered an Early Termination Event for the Funds to fail to deliver to RBS certain weekly reporting requirements for two consecutive weeks.  The Letter alleges that the Funds failed to deliver these reports for the weeks ending May 22, May 29, June 5 and June 12, 2009.  Consequently, RBS wrote to the Funds to designate June 26, 2009 as the Early Termination Date.  The effect of this designation is that there are no further payments due under the swap, and the Funds must pay the Floating Rate Payer Calculation Amount.  If the swap is terminated, then covenants under swap, such as the LTV test, are no longer relevant.

You have called this a "technical" default, and I understand why.  Typically, when we think of credit protection, we assume that the credit protection seller will pay the credit protection buyer when there is a default by the reference entity.  That is, if I sell credit protection on GE bonds, I expect to pay when GE defaults – not when my administrator neglectfully fails to send weekly performance estimates.  This Early Termination Event creates an unusual situation, where the swap is being terminated even though there has been no default by the reference entity.

From RBS' perspective, the terms of the swap do state that failure to provide such reports for two consecutive weeks constitutes an Early Termination Event.  RBS is simply enforcing the swap in accordance with its terms.  Since these terms basically provide a windfall to RBS for a "technical" failure by the Funds, it is easy to understand why RBS is insisting on full, immediate payment of the Floating Rate Payer Calculation Amount.

Unfortunately for RBS, it does not appear that the Funds posted any collateral or prepayment to protect RBS against counterparty risk.  To illustrate, if I buy credit protection on GE bonds, I am protected against GE's default, but now I am exposed to the risk that my counterparty may default.  For this reason, I may insist that my counterparty prepay the full amount of the credit protection in advance into a trust (or other bankruptcy-remote entity).  It does not appear that the Funds prepaid any of their obligations under the swap.

Meanwhile, the Note Agreement between Global Hawk and RBS provides that an event of default or termination event under the swap is also an early termination event under the GH Notes.  This means that RBS as holder of the GH Notes may also designate an Early Termination Date under the Note Agreement and declare the outstanding amount of the GH Notes due and payable.

This seems to create a situation where RBS is entitled to payment of the outstanding amount of the GH Notes from both RBS, as credit protection seller, and from Global Hawk, as issuer of the GH Notes.  As discussed above, typically

**Exhibit 033**
**Muho v. Fletcher et al.**

**Case No** _____

**Exhibit 033**
12/29/13, 8:00 PM
**Muho v. Fletcher et al.**

when we think of credit protection, we assume that the credit protection buyer will only get paid once – either (A) GE will pay on its bonds, and the bondholder does not need the credit protection, or (B) GE fails to pay on its bonds and the credit protection seller pays in place of GE to make the bondholder whole.  In the GE scenario, the bondholder only gets paid once.  In this case however, it seems that RBS is entitled to collect payment from both RBS and Global Hawk.  This makes sense in the context of naked swaps: if I buy credit protection on GE bonds, and GE defaults, I will be able to demand payment, whether or not I actually own GE bonds and am harmed as a result of GE's default.  We have referred to this as the "double payment issue."

You have referred to this swap arrangement as a "guarantee."  Typically when we think of a guarantee, we think of a controlling parent corporation promising to pay for its subsidiary's obligations.  However, in this case, Global Hawk is not a party to the swap between RBS and the Funds, and it does not have any obligation to reimburse the Funds for their obligations under the swap.  That is, Global Hawk is not required to liquidate its assets in order to indemnify the Funds against losses under the swap.  From Global Hawk's perspective, its obligations to RBS are fully collateralized by the Collateral Notes and all its other assets.  Similarly, GE is not required to reimburse credit protection sellers for their losses.  The solution you suggested is for the Funds to redeem their holdings in Global Hawk, forcing Global Hawk to liquidate its assets to redeem the Funds.  But recall that the Collateral Notes and all of Global Hawks assets (present and future) have been pledged as collateral to RBS under the GH Notes.  RBS as Global Hawk's secured creditor will stand before Global Hawk's shareholders in line to get paid.  We have referred to this as the "reimbursement issue."

This problem is all the more frustrating because the default under the swap was caused by the Funds' administrator, Citco.  The Funds may consider looking to Citco to indemnify them in connection with losses incurred as a result of the default under the swap.

Accordingly, I advise that we do not include Citco on any confidential discussions regarding this matter, in order to preserve privilege.  As you are aware, privilege is a rule of evidence that protects confidential attorney-client communications for the purpose of seeking legal advice.  Privilege is relevant in the context of what will or will not be produced at a trial (or in a regulatory investigation).  Discussions between you and I regarding this matter will almost certainly be privileged because I am providing legal advice and our discussions are confidential.  By including a third party in our discussions, such as Citco, the privilege may be waived.  Remember: the rules of privilege protect our *communications*, not the underlying facts we are discussing.  The fact that the Funds have received the Letter from RBS is not privileged, but our legal analysis, strategies, etc. regarding this matter are privileged.  Since privilege belongs to the client, and not the attorney, I leave it to your discretion to decide to whom you would like to distribute this confidential communication.

The above discussion is a preliminary analysis based on my initial review of the transaction documents.  My analysis may change as I become more familiar with the transaction documents and the facts surrounding this transaction.  I advise engaging outside counsel to discuss the double payment issue and the reimbursement issue.  I would also like to review the Funds' administration agreement with Citco.

Yours truly,

Michelle Roberts
(212) 284-4794

*This communication, and any attachment(s), is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential and/or protected by privilege.  This communication is for information purposes and should not be regarded as an offer, a contract, or any form of official statement of Fletcher Asset Management Inc., or any of its affiliated entities. If you are not the intended recipient, any use, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please delete the original email, any copies, attachments thereto, or printouts and notify the sender immediately.*
-----------------------------------------------
Privileged/Confidential Information may be contained in this message.  If you are not the addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy or deliver this message to anyone.  In such case, you should destroy this message and kindly notify the sender by reply email.  Please advise immediately if you or your employer do not consent to Internet email for messages of this

**Exhibit 033**
**Muho v. Fletcher et al.**

Case No _____

**Exhibit 033**          12/29/13, 8:00 PM
**Muho v. Fletcher et al.**

kind.

-------------------------------------------------

IRS Circular 230 disclosure:  Any tax advice contained in this communication (including
any attachments or enclosures) was not intended or written to be used, and cannot be
used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii)
promoting, marketing or recommending to another party any transaction or matter addressed
in this communication.  (The foregoing disclaimer has been affixed pursuant to U.S.
Treasury regulations governing tax practitioners.)

================================================================================
-------------------------------------------------
Privileged/Confidential Information may be contained in this message.  If you are not
the addressee indicated in this message (or responsible for delivery of the message to
such person), you may not copy or deliver this message to anyone.  In such case, you
should destroy this message and kindly notify the sender by reply email.  Please advise
immediately if you or your employer do not consent to Internet email for messages of this
kind.

-------------------------------------------------

IRS Circular 230 disclosure:  Any tax advice contained in this communication (including
any attachments or enclosures) was not intended or written to be used, and cannot be
used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii)
promoting, marketing or recommending to another party any transaction or matter addressed
in this communication.  (The foregoing disclaimer has been affixed pursuant to U.S.
Treasury regulations governing tax practitioners.)

================================================================================

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 8.5.406 / Virus Database: 270.13.62/2315 - Release Date: 08/20/09 06:05:00
-------------------------------------------------
Privileged/Confidential Information may be contained in this message.  If you are not
the addressee indicated in this message (or responsible for delivery of the message to
such person), you may not copy or deliver this message to anyone.  In such case, you
should destroy this message and kindly notify the sender by reply email.  Please advise
immediately if you or your employer do not consent to Internet email for messages of this
kind.

-------------------------------------------------

IRS Circular 230 disclosure:  Any tax advice contained in this communication (including
any attachments or enclosures) was not intended or written to be used, and cannot be
used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii)
promoting, marketing or recommending to another party any transaction or matter addressed
in this communication.  (The foregoing disclaimer has been affixed pursuant to U.S.
Treasury regulations governing tax practitioners.)

================================================================================

**Exhibit 033**
**Muho v. Fletcher et al.**

**Case No** _____

# Exhibit 034

# Muho v. Fletcher et al.

Exhibit 034
Muho v. Fletcher et al.

From: MLR {MRoberts}
Sent: Friday, August 21, 2009 11:39 AM
To:   DJK {DKiely}; MSM {MMeade}; SAT {STurner}
Cc:   AF {AFletcher}
Subject:   RE: Global Hawk (RBS)

CONFIDENTIAL

I advise that this is not a minor technical breach.  This is an additional
termination event under the terms
of the swap agreement, which has the effect of terminating the swap AND the
medium term notes
Global Hawk issued to RBS.  RBS is enforcing their rights under the swap
agreement and I agree with
their interpretation.  I think they will also seek to enforce their rights under
the MTNs, which are fully
collateralized by the zero coupon JPM notes and all other assets of Global Hawk,
including Global Hawk's
investment in FIA LEVERAGED.  I understand that it is high priority to protect
Global Hawk's investment
FIA Leverage.

The letter of designation the Richcourt Funds received from RBS designated the
termination date of the
swap as June 26th/09.  The floating rate payer calculation amount is due and
payable by the Richcourt
Funds against delivery of the MTNs.  This is what is being demanded by RBS.

I do not think that RBS will concede that the swap is ongoing.  I think we
should accept termination and
negotiate the best deal we can, such as payment 80-20, so that JPM does not
seize Global Hawk's
collateral under the MTNs (i.e. investment in FIA Leverage, I understand we
don't care about the zero
coupons).  We need advice of outside counsel on how to proceed in these
negotiations.

I do not doubt that Peter is a forceful advocate.  I agree we don't want to run
up a legal bill to have him
poor over the documents.  I don't think we should be paying outside counsel to
learn ISDA.  We need
counsel that has already mastered ISDA.  Counsel with ISDA expertise will be
able to review the docs and
appreciate these facts quickly because they will understand the mechanics of
ISDA.  Further, they will
have experience negotiating terminations, which are not in accordance with the
terms of
the swap.

Michelle Roberts
(212) 284-4794


-----Original Message-----
From: DJK {DKiely}

Exhibit 034
Muho v. Fletcher et al.

Exhibit 034
Muho v. Fletcher et al.

Sent: Friday, August 21, 2009 11:21 AM
To: MLR {MRoberts}; MSM {MMeade}; SAT {STurner}
Cc: AF {AFletcher}
Subject: RE: Global Hawk (RBS)

Privileged and Confidential -

Peter is a forceful advocate and will be very helpful in convincing them that we are not going to stand
for any sheninagans.  I don't want to run a large bill just yet to pore over the documents.  Can we just
have him focus on the very basics first - in that what they are pursuing, if even correct, is a minor
technical breach?

Denis

-----Original Message-----
From: MLR {MRoberts}
Sent: Friday, August 21, 2009 11:04 AM
To: DJK {DKiely}; MSM {MMeade}; SAT {STurner}
Cc: AF {AFletcher}
Subject: RE: Global Hawk (RBS)

We did not ask him to make a referral yesterday, but I can call him today to do so.  However, after
reviewing the PBWT website and attorney bios, I do not believe that derivatives/ISDA is one of their
practice areas.
Their focus seems to be on litigation.

Michelle Roberts
(212) 284-4794


-----Original Message-----
From: DJK {DKiely}
Sent: Friday, August 21, 2009 10:59 AM
To: MLR {MRoberts}; MSM {MMeade}; SAT {STurner}
Cc: AF {AFletcher}
Subject: RE: Global Hawk (RBS)
Importance: High

I guess everyone else forgot this but Skadden is conflicted on this matter since RBS is also their client.
Did you ask Peter if he has a derivative/ISDA attorney that could help with this?

Denis

-----Original Message-----
From: MLR {MRoberts}
Sent: Friday, August 21, 2009 10:54 AM
To: MSM {MMeade}; SAT {STurner}
Cc: DJK {DKiely}; AF {AFletcher}

Exhibit 034
Muho v. Fletcher et al.

**Case No _____**

Exhibit 034
Muho v. Fletcher et al.

Subject: RE: Global Hawk (RBS)

To confirm, do I have your approval to reach out to John Osborn at Skadden?  I believe he is the right
person to advise us on this matter, especially with respect to whether or not to continue to provide
information to RBS (discussed below).

I do not advise that we pursue an engagement with Peter Harvey at this time.  I don't think his litigation
expertise is a fit for this matter at this stage.

Thank you.

Michelle Roberts
(212) 284-4794


-----Original Message-----
From: MSM {MMeade}
Sent: Friday, August 21, 2009 10:38 AM
To: SAT {STurner}; MLR {MRoberts}
Cc: DJK {DKiely}; AF {AFletcher}
Subject: Re: Global Hawk (RBS)

I am not opposed to getting at least some initial speciaized advice from Skadden attorney as Michelle
recommended in other email.

-----Original Message-----
From: SAT {STurner}
To: MLR {MRoberts}
CC: MSM {MMeade}; DJK {DKiely}; AF {AFletcher}
Sent: Fri Aug 21 10:17:06 2009
Subject: FW: Global Hawk (RBS)

Privileged and Confidential


Michelle –


After talking with Michael, we decided that you and Peter Harvey should figure out how we choose to
respond to Pamela de Jager's (RBS) request below (whether we agree to provide this information after
the termination
notice) and how we should respond to Aaron Cooney (Citco).


For your convenience, I have attached Pamela's and Aaron's email in case either you or Harvey will

Exhibit 034
Muho v. Fletcher et al.

Case No _____

Exhibit 034
Muho v. Fletcher et al.

decide to respond to RBS on our behalf later.
Of course, please inform us of the plan of action before implementing it.


Thank you,

Stewart


_____

From: Cooney, Aaron (Citco) [mailto:AaCooney@Citco.com]
Sent: Friday, August 21, 2009 9:40 AM
To: DJK {DKiely}; MSM {MMeade}; SAT {STurner}
Subject: FW: Global Hawk (RBS)


Dear Stewart,


Can you let me know when I should send the file I sent last night out? and could
you advise on which
details I should include on the cash assets?


I am close to completing 8/14 weekly report as well. I'll send that along for
approval as well.


Kind regards,

Aaron Cooney

Citco Fund Services (Europe) B.V.
Telestone 8 - Teleport
Naritaweg 165
1043 BW Amsterdam
The Netherlands

Phone:  +31 - 20 5722 152
Fax:        +31 - 20 5722 610
Email:     aacooney@citco.com


_____

From: Pamela.DeJager@rbs.com [mailto:Pamela.DeJager@rbs.com]
Sent: Friday, August 21, 2009 3:26 PM
To: Cooney, Aaron (Citco)

Exhibit 034
Muho v. Fletcher et al.

Exhibit 034
Muho v. Fletcher et al.

Cc: Massari, Silvia (Richcourt); Unternaehrer, Ermanno; Magris, Gabriele
(Citco); Richcourt external2;
Richcourt external1; Brian.Redmond@rbs.com; Richcourt external3;
Kevin.Remy@rbs.com;
shahzad.ahmad@rbs.com; Tamerlaine.Beattie@rbs.com; Adam.Chaudhary@rbs.com;
Richcourt
External5; Grosjean, Gilbert (Citco)
Subject: RE: Global Hawk (RBS)

Aaron,


Can you please update on when you expect to deliver underlying data used to
generate the monthly
report and details on cash assets.



thanks


Pamela


Pamela DeJager
RBS Global Banking & Markets
Office: +1 203 897 6784   |   Fax: +1 203 873 5178



_____

From: Grosjean, Gilbert (Citco) [mailto:GGrosjean@Citco.com]
Sent: Thursday, August 20, 2009 11:46 AM
To: DeJager, Pamela, GBM; Cooney, Aaron (Citco)
Cc: Massari, Silvia (Richcourt); Unternaehrer, Ermanno; Magris, Gabriele
(Citco); Richcourt external2;
Richcourt external1; Redmond, Brian, GBM; Richcourt external3; Remy, Kevin, GBM;
Ahmad, Shahzad,
GBM; Beattie, Tamerlaine, GBM; Chaudhary, Adam, GBM; Richcourt External5
Subject: RE: Global Hawk (RBS)

Hi Pamela


As discussed, Aaron will get in touch with you directly and supply the
information.

Exhibit 034
Muho v. Fletcher et al.

**Case No _____**

Exhibit 034
Muho v. Fletcher et al.

gg

---

From: Pamela.DeJager@rbs.com [mailto:Pamela.DeJager@rbs.com]
Sent: Thursday, August 20, 2009 4:52 PM
To: Grosjean, Gilbert (Citco)
Cc: Massari, Silvia (Richcourt); Unternaehrer, Ermanno; Magris, Gabriele
(Citco); Richcourt external2;
Richcourt external1; Brian.Redmond@rbs.com; Richcourt external3;
Kevin.Remy@rbs.com;
shahzad.ahmad@rbs.com; Tamerlaine.Beattie@rbs.com; Adam.Chaudhary@rbs.com;
Richcourt
External5
Subject: RE: Global Hawk (RBS)
Importance: High


Gilbert


Could you please arrange to have sent to us today detailed back up information
used to generate this
report, including explanation on source, use and status of $9,412,632 cash newly
listed as Other Assets.


regards


Pamela


Pamela DeJager
RBS Global Banking & Markets
Office: +1 203 897 6784 |  Fax: +1 203 302 7478

---

Exhibit 034
Muho v. Fletcher et al.

Exhibit 034
Muho v. Fletcher et al.

From: MSM {MMeade} [mailto:mmeade@fletcher.com]
Sent: Wednesday, August 19, 2009 5:14 PM
To: Grosjean, Gilbert (Citco); DeJager, Pamela, GBM
Cc: Massari, Silvia (Richcourt); Unternaehrer, Ermanno; Magris, Gabriele
(Citco); DJK {DKiely}; AF
{AFletcher}; Redmond, Brian, GBM; SAT {STurner}; Remy, Kevin, GBM; Ahmad,
Shahzad, GBM; Beattie,
Tamerlaine, GBM; Chaudhary, Adam, GBM
Subject: RE: Global Hawk (RBS)

Pamela:


Thank-you for taking the time to discuss the LTV calculation today.  As we
discussed, the file that you
originally referred to, which was attached to the email below, was preliminary,
for internal use only, and
contained inconsistencies that were corrected in the version sent by Aaron
Cooney on Friday at 12:32
EDT.  In the accurate version, you can see that the LTV was at 35%, which is
well within the 60%
maximum.


Best regards,


Michael Meade

_____

From: Grosjean, Gilbert (Citco) [mailto:GGrosjean@Citco.com]
Sent: Friday, August 14, 2009 9:25 AM
To: Pamela.DeJager@rbs.com
Cc: MSM {MMeade}; Massari, Silvia (Richcourt); Unternaehrer, Ermanno; Magris,
Gabriele (Citco); DJK
{DKiely}; AF {AFletcher}; Brian.Redmond@rbs.com; SAT {STurner};
Kevin.Remy@rbs.com;
shahzad.ahmad@rbs.com; Tamerlaine.Beattie@rbs.com; Adam.Chaudhary@rbs.com
Subject: Global Hawk (RBS)




Pamela


Please find above attachments for point 1

Exhibit 034
Muho v. Fletcher et al.

**Case No _____**

Exhibit 034
Muho v. Fletcher et al.

Concerning point 2: The drop in GAV (Jul 17th vs Jul 24th reports) was caused by a revision of the Global
hawk price that was announced.

Concerning point 3: Fletcher will provide the information directly.


Based on the above Global Hawks would be grateful to receive a response on your position by Tuesday
18th August.


Regards


---------------------------------------------

From: Pamela.DeJager@rbs.com [mailto:Pamela.DeJager@rbs.com]
Sent: Wednesday, August 12, 2009 10:16 PM
To: Grosjean, Gilbert (Citco)
Cc: Richcourt External5; Massari, Silvia (Richcourt); Unternaehrer, Ermanno;
Magris, Gabriele (Citco);
Richcourt external2; Richcourt external1; Brian.Redmond@rbs.com; Richcourt
external3;
Kevin.Remy@rbs.com; shahzad.ahmad@rbs.com; Tamerlaine.Beattie@rbs.com;
Adam.Chaudhary@rbs.com
Subject: RE: Global Hawk (RBS)


Without Prejudice

Dear Gilbert,


Thank you for your e-mail of August 4, 2009 transmitting Global Hawk's response to RBS' e-mail of July
27, 2009. RBS rejects Global Hawk's characterization of the actions RBS has taken to date.


RBS is still evaluating Global Hawk's counter-proposal, particularly as to the amount and timing of the

Exhibit 034
Muho v. Fletcher et al.

Exhibit 034
Muho v. Fletcher et al.

payment that will come from realization of Global Hawk's liquid assets and fund assets and from other
fund assets supporting the transaction. To assist us in evaluating Global Hawk's counter-proposal, please
provide us with the following information: (i) portfolio level information on each Richcourt fund party to
the ISDA Agreement including the name of the underlying funds, percentage and cash allocation,
strategy and liquidity terms; (ii) an explanation for why the most recent Richcourt report shows a
significant decline of GAV over the prior week's report, and (iii) a current portfolio statement of assets
(with the same level of detail) for the Fletcher fund and the master and feeder funds into which it feeds.
Once we have that information, RBS believes that arranging a meeting to discuss the information and
the counter-proposal would be a constructive way forward.


This e-mail is confidential and to facilitate settlement discussions only.
Any statements made in the course of these discussions shall not be used for proof of admission of
liability, or for other evidentiary purposes.
RBS reserves all of its rights under the agreements between it and the various parties related to the
transactions involving Global Hawk and/or the CDS counterparties.


We would be grateful for a response by Friday, August 14.


Kind Regards,


Pamela DeJager
RBS Global Banking & Markets
Office: +1 203 897 6784 |  Fax: +1 203 302 7478



_____

From: Grosjean, Gilbert (Citco) [mailto:GGrosjean@Citco.com]
Sent: Tuesday, August 04, 2009 2:05 PM
To: Chaudhary, Adam, GBM; DeJager, Pamela, GBM
Cc: Richcourt External5; Massari, Silvia (Richcourt); Unternaehrer, Ermanno;
Magris, Gabriele (Citco);
Richcourt external2; Richcourt external1; Redmond, Brian, GBM; Richcourt
external3; Remy, Kevin,
GBM; Ahmad, Shahzad, GBM; Beattie, Tamerlaine, GBM
Subject: RE: Global Hawk (RBS)


Exhibit 034
Muho v. Fletcher et al.

Exhibit 034
Muho v. Fletcher et al.

Adam and Pamela


Please find below the response from Global Hawks:



"Thank you for your counter-proposal for early repayment of the financing from
RBS following RBS'
purported designation of the Early Termination Date as a result of the alleged
occurrence of a more than
immaterial Additional Termination Event there under.  While we appreciate your
need to terminate this
financing given your own increased cost of financing, your-counter proposal
would result in substantial
costs to the ultimate
investors and we there for find it unacceptable.

We welcome an amicable resolution.  We would be willing to consider setting the
payment date for the
early repayment to RBS of 80% of principal and accrued interest to October 5,
2009 with waiver of the
Early Termination Spread Amount and payment of the balance of principal and
accrued interest on the
scheduled termination date.  This counter-proposal does not constitute a binding
commitment.


Regards,


_____

From: Adam.Chaudhary@rbs.com [mailto:Adam.Chaudhary@rbs.com]
Sent: Monday, July 27, 2009 11:54 AM
To: Grosjean, Gilbert (Citco); Pamela.DeJager@rbs.com
Cc: Richcourt External5; Massari, Silvia (Richcourt); Unternaehrer, Ermanno;
Magris, Gabriele (Citco);
Richcourt external2; Richcourt external1; Brian.Redmond@rbs.com; Richcourt
external3;
Kevin.Remy@rbs.com; shahzad.ahmad@rbs.com; Tamerlaine.Beattie@rbs.com
Subject: Global Hawk (RBS)
Importance: High


Gilbert,


Please see below the RBS proposal for Global Hawk, any response should be
directed to all RBS persons

Exhibit 034
Muho v. Fletcher et al.

Case No _____

Exhibit 034
Muho v. Fletcher et al.

on this email.


Thank you,


Adam J. Chaudhary
RBS Global Banking & Markets
Office: +1 203 897 2930  |  Global Mobile: +1 203 517 6014  |  UK Direct:
+44 20 7678 4391




*******************


Dear Gilbert,

Thank you for your proposal for payment of amounts owed to RBS under the ISDA
Agreement between
the various Richcourt funds party thereto and RBS (the "ISDA Agreement"),
following RBS' designation of
the Early Termination Date as a result of the occurrence of an Additional
Termination Event thereunder.
Unfortunately because your proposal does not provide for the payment in full of
both principal and
accrued interest
within a reasonable period of time, we find it unacceptable.

We would be willing to consider setting the Payment Date for the amounts owed to
RBS under the ISDA
Agreement to October 5, 2009.  If principal and accrued interest are paid in
full by October 5, 2009, RBS
would waive the Early Termination Spread Amount.  If principal and accrued
interest are not paid on or
prior to October 5, 2009, the Richcourt funds would also be required to pay the
Early Termination
Spread Amount and Default Interest (as per Section 6(d)(ii) of the ISDA
Agreement).

The foregoing counter-proposal does not constitute a binding commitment on RBS.
A binding
agreement will exist only upon, among other things, the execution of a written
agreement between RBS
and the relevant parties in interest.  As such, RBS reserves all its rights
under the agreements between

Exhibit 034
Muho v. Fletcher et al.

Exhibit 034
Muho v. Fletcher et al.

RBS and the various parties thereto related to the Global Hawk transaction.
Capitalized terms used but
not defined herein shall have the meanings set forth in the ISDA Agreement.


Regards,

RBS

Disclaimer link. To see it, click the link below, or copy and paste it into your
browser's address line.
http://www.citco.com/emaildisclaimer.htm


*****Please note that my email address may have changed. For all future
correspondence, please use
this address*****


*****************************************************************This
message (including any attachments) is confidential and/or privileged. It is to
be used by the intended
recipients only. If you have received it by mistake please notify the sender by
return e-mail and delete
this message from your system. Any unauthorized use or dissemination of this
message in whole or in
part is strictly prohibited. Please note that e-mails are inherently insecure
and susceptible to change.
The Royal Bank of Scotland Group, plc ("RBS") and its US subsidiaries, and
affiliates and subsidiary
undertakings, including but not limited to, RBS plc New York and Connecticut
Branches, RBS Securities
Inc., ABN AMRO Bank N.V. New York and Chicago Branches and, ABN AMRO
Incorporated, Citizens
Financial Group, Inc. and RBS Citizens, N.A., shall not be liable for the
improper or incomplete
transmission of the information contained in this communication or Attachment
nor for any delay in its
receipt or damage to your system.
RBS does not guarantee that the integrity of this communication has been
maintained nor that this
communication is free of viruses, interceptions or interference. RBS and its
subsidiaries and affiliates do
not guarantee the accuracy of any email or attachment, that an email will be
received or that RBS or its
affiliates and subsidiaries will respond to an email. RBS makes no
representations that any information
contained in this message (including any attachments) are appropriate for use in
all locations or that
transactions, securities, products, instruments or services discussed herein are
available or appropriate
for sale or use in all jurisdictions, or by all investors or counterparties.
Those who utilize this information
do so on their own initiative and are responsible for compliance with applicable
local laws or

Exhibit 034
Muho v. Fletcher et al.

Case No _____

Exhibit 034
Muho v. Fletcher et al.

```
regulations.**************************************************************
******
```

_____

This communication, and any attachment(s), is intended only for the use of the individual or entity to
which it is addressed and may contain information that is confidential and/or protected by privilege.
This communication is for information purposes and should not be regarded as an offer, a contract, or
any form of official statement of Fletcher Asset Management Inc., or any of its affiliated entities. If you
are not the intended recipient, any use, distribution or copying of this communication is strictly
prohibited. If you have received this communication in error, please delete the original email, any
copies, attachments thereto, or printouts and notify the sender immediately.

Disclaimer link. To see it, click the link below, or copy and paste it into your browser's address line.
http://www.citco.com/emaildisclaimer.htm

*****Please note that my email address may have changed. For all future correspondence, please use
this address*****

****************************************************************This
message (including any attachments) is confidential and/or privileged. It is to be used by the intended
recipients only. If you have received it by mistake please notify the sender by return e-mail and delete
this message from your system. Any unauthorized use or dissemination of this message in whole or in
part is strictly prohibited. Please note that e-mails are inherently insecure and susceptible to change.
The Royal Bank of Scotland Group, plc ("RBS") and its US subsidiaries, and affiliates and subsidiary
undertakings, including but not limited to, RBS plc New York and Connecticut Branches, RBS Securities
Inc., ABN AMRO Bank N.V. New York and Chicago Branches and, ABN AMRO Incorporated, Citizens
Financial Group, Inc. and RBS Citizens, N.A., shall not be liable for the improper or incomplete
transmission of the information contained in this communication or Attachment nor for any delay in its
receipt or damage to your system.
RBS does not guarantee that the integrity of this communication has been maintained nor that this
communication is free of viruses, interceptions or interference. RBS and its subsidiaries and affiliates do

Exhibit 034
Muho v. Fletcher et al.

**Exhibit 034**
**Muho v. Fletcher et al.**

not guarantee the accuracy of any email or attachment, that an email will be
received or that RBS or its
affiliates and subsidiaries will respond to an email. RBS makes no
representations that any information
contained in this message (including any attachments) are appropriate for use in
all locations or that
transactions, securities, products, instruments or services discussed herein are
available or appropriate
for sale or use in all jurisdictions, or by all investors or counterparties.
Those who utilize this information
do so on their own initiative and are responsible for compliance with applicable
local laws or
regulations.**********************************************************
******

Disclaimer link. To see it, click the link below, or copy and paste it into your
browser's address line.
http://www.citco.com/emaildisclaimer.htm


No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 8.5.406 / Virus Database: 270.13.63/2317 - Release Date: 08/21/09
06:04:00

**Case No _____**

**Exhibit 034**
**Muho v. Fletcher et al.**

**Exhibit 038**

**Muho v. Fletcher et al.**

Exhibit 038
Muho v. Fletcher et al.

Case4:13-cv-03469-KAW   Document1   Filed07/25/13   Page1 of 19

1  Gerti Muho
   Gerti Muho Capital Management
2  2428 Sacramento Street
   Berkeley, California 94704
3  (212) 480-0001

4  Plaintiff, Pro se

5

**FILED**

JUL 2 5 2013

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**KAW**

7

8               IN THE UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10

11  LEVERAGED HAWK, INC. C/O GERTI MUHO          Case No. **CV 13 3469**
    D/B/A GERTI MUHO CAPITAL MANAGEMENT
12                                               **VERIFIED COMPLAINT**
              Plaintiff,
13
                   vs.
14
    GLOBAL HAWK, LTD., ALPHONSE FLETCHER,
15  JR., FLETCHER ASSET MANAGEMENT, INC.,
    FLETCHER INTERNATIONAL, INC.,
16  RICHCOURT FUND ADVISORS (SF),
    RICHCOURT USA, INC. CITCO GROUP LTD,
17  CITCO TRADING, INC., CITCO TRUSTEES
    (CAYMAN) LTD, CFS COMPANY LTD., CFS
18  CORPORATION LTD., CTC CORPORATION,
    LTD., SOLON GROUP, INC., CITCO GLOBAL
19  CUSTODY (N.A.) N.V., WILMINGTON TRUST,
    NATIONAL ASSOCIATION.
20
              Defendants,
21
    RICHCOURT CAPITAL MANAGEMENT, INC.,
22  SOUNDVIEW CAPITAL MANAGEMENT, LTD.,
    PITAGORA CAPITAL MANAGEMENT, LTD.,
23  NEW WAVE ASSET MANAGEMENT, LTD.,
    AMERICA ALTERNATIVE INVESTMENTS,
24  INC., ELITE DESIGNATED, NEW WAVE FUND
    SPC, STAR DESIGNATED, OPTIMA
25  ABSOLUTE RETURN FUND LTD., PREMIUM
    DESIGNATED, PITAGORA FUND LTD.,
26  RICHCOURT ALL-WEATHER FUND INC.,
    RICHCOURT ALLWEATHER FUND B INC.,
27  RICHCOURT COMPOSITE INC., RICHOURT
    EURO STRATEGIES, INC., RICHCOURT TOP
28  STARS I FUND LTD, SOUNDVIEW

                              1
          VERIFIED COMPLAINT - CASE NO. _____

Exhibit 038
Muho v. Fletcher et al.

Case No _____

Exhibit 038
Muho v. Fletcher et al.

Case4:13-cv-03469-KAW   Document1   Filed07/25/13   Page2 of 19

1 | COMPOSITE, SOUNDVIEW ELITE LTD,
SOUNDVIEW PREMIUM, LTD., SOUNDVIEW
2 | STAR LTD.

3 |          Nominal Defendants.

4

5      1.      Plaintiff, Gerti Muho, as its investment advisor, on behalf of Leveraged Hawk, Inc. ("L-

6 | Hawk"), a special purpose vehicle ("SPV") surviving a group of hedge funds listed here as Nominal

7 | Defendants, (the "Funds" and, for managing entities, the "Fund Managers"), alleges:

8

9                          **SUMMARY OF THE ACTION**

10      1.      This case is about a ponzi scheme defendants Fletcher Asset Management, Inc. ("FAM")

11 | and Citco Trading, Inc. ("Citco") ran on sophisticated creditors for hundreds of millions of dollars over a

12 | decade and a half.

13      2.      Since the mid-1990's FAM and Citco used SPVs to borrow from financial institutions and

14 | invest in private funds. The debt-funded private funds ("DPF") were part of the multi-layered master-

15 | feeder family of funds FAM managed and Citco administered. The DPFs generally invested together

16 | with other feeder funds into large feeder funds ("LF"). LFs then joined with other LFs to invest in master

17 | funds ("MF"). DPFs also loaned money to PFs, LFs, and to MFs. MFs pooled all the funds and made

18 | esoteric investments in small public companies (Fig. 1).

19                          Figure 1

20

21 

22

23

24

25      3.      FAM and Citco used overvalued prices for MF's non-marketable assets, and,

26 | consequently, for LF assets as a basis to charge excessive management and administrative fees, with

27 | FAM receiving 150-200 basis points for every dollar it managed and with Citco paid 50 basis points for

28 | every dollar it helped bring into the FAM structure.

                              2
                    VERIFIED COMPLAINT - CASE NO. _____

Case No _____

Exhibit 038
Muho v. Fletcher et al.

Exhibit 038
Muho v. Fletcher et al.
Case4:13-cv-03469-KAW  Document1  Filed07/25/13  Page3 of 19

4.　　FAM and Citco also used the high valuations to plunder MF's assets. They, alone or jointly, or both, invested with DPFs in cash or, more commonly, in kind, and they redeemed their investments in cash or in kind at high valuations. DPFs overtime were left with shares or notes, or both, of LFs whose share of MF assets had been exhausted almost entirely.

5.　　In 2010 FAM and Citco, then managers of the Funds, forced the Funds to buy $140,000,000 of worthless assets of DPFs they had pillaged over the years to repay notes Global Hawk, Ltd ("**G-Hawk**"), an SPV, issued to the Royal Bank of Scotland in 2006, which G-Hawk issued to meet obligations Jersey (Corsair), another SPV, had from notes it issued in 2004. FAM and Citco, as managers of the Funds, also forced the Funds to purchase more than $60,000,000 of worthless assets from a PF managed by FAM and administered by Citco.

6.　　Plaintiff, current manager of the Funds, brings this action for misappropriation of assets of the Funds c/o L-Hawk by FAM, Citco, and other defendants in violation of §§ 10(b), 20(a), and 27 of the Exchange Act, 15 U.S.C. §§ 78aa, 78j and 78t(a), and Rule l0b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. Plaintiff seeks recovery of misappropriated assets believed to be in excess of $200,000,000 from Citco and FAM defendants. Plaintiff further seeks to void all advisory contracts pursuant to 15 U.S.C. § 80b-15, and all contracts between the Funds and defendants under CA Code §§ 1667 and 1668. Plaintiff further seeks to enforce a contract for the sale of $5,000,000 in preferred shares by L-Hawk to defendants, pursuant to a registered transaction.

**Plaintiffs, Defendants, and Nominal Defendants**

2.　　Gerti Muho is a natural person residing in Berkeley, California, and he is the investment advisor of Leveraged Hawk, Inc., and of all Nominal Defendants as listed in Schedule D of the Investment Advisor Public Disclosure File No. 168066, available freely on the SEC's website. ("**GM**" and, as investment advisor, "**GM Capital**").

3.　　Leveraged Hawk, Inc. ("**L-Hawk**") is incorporated under the laws of the State of Delaware and is located at Suit 100 at 1679 S. DuPont Hwy. in the city of Dover in the State of Delaware. LHI survives the Nominal Defendant listed on the certificate of merger duly filed with the Secretary of State of LHI's home State of Delaware, pursuant to a merger transaction registered with the

3
VERIFIED COMPLAINT - CASE NO. _____

Exhibit 038
Muho v. Fletcher et al.

Case4:13-cv-03469-KAW   Document1   Filed07/25/13   Page4 of 19

SEC, available freely on the SEC website under Filer/Film No's. 021-197351/13886233.

4.      Global Hawk, Ltd. ("**G-Hawk**") is an SPV formed in the Cayman Islands, and Citco Trustees (Cayman) Ltd. serves as its sole Director and/or trustee.

5.      Alphonse Fletcher ("**F-AF**") is a natural person residing in San Francisco, California.

6.      Fletcher Asset Management, Inc. ("**FAM**") is a Delaware corporation managed out of San Francisco, California with its office located in New York, New York.

7.      Richcourt USA, Inc. ("**F-RUSA**") is a Delaware corporation managed out of San Francisco, California with its office in New York, New York.

8.      Fletcher International, Inc. ("**F-FII**") is a Delaware corporation managed out of San Francisco, California with an office in New York, New York.

9.      Citco Group Ltd., ("**C-Group**") is believed to be an entity organized in Monaco and based in Monte Carlo, Monaco.

10.     Citco Trading, Inc., ("**Citco**") is believed to be an entity organized in Monaco and based in Monte Carlo, Monaco.

11.     Citco Trustees (Cayman) Ltd, CFS Company Ltd., CFS Corporation Ltd., CTC Corporation, Ltd. (collectively, "**Citco Directors**") are all believed to be based out of the Cayman Islands.

12.     Solon Group, Inc. ("**SG**") is a New York, New York corporation with an office in Walnut Creek, California.

13.     Citco Global Custody (N.A.) ("**C-Ctd**") is believed a company formed in the Netherlands Antilles. Walkers (BVI) is believed a company based out of the British Virgin Islands.

14.     Wilmington Trust National Association is believed a Delaware corporation.

### Jurisdiction and Venue

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, §§ 10(b), 20(a), and 27 of the Exchange Act, 15 U.S.C. §§ 78aa, 78j and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC, as well as the common law, and pursuant to the supplemental jurisdiction of this Court, 28 U.S.C. § 1367.

4

VERIFIED COMPLAINT - CASE NO. _____

Case No _____

Exhibit 038
Muho v. Fletcher et al.

16.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Substantial acts in furtherance of the alleged fraud and other wrongdoing and/or their effects occurred within this District, and many of the Defendants reside in and/or maintain principal executive offices in this District.

17.     In connection with the acts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the mail and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### Gerti Muho, L-Hawk, and the Funds

18.     I/GM joined two Fletcher related entities one week after graduating from Berkeley law in May 2012. I/GM became Fletcher's second in command in mid-August, following an insider led attempt to takeover control of a FAM fund I/GM fought against for F-AF and FAM

19.     I/GM together with F-AF became sole directors of the Funds, the Fund Managers, and the Holding Co (indirectly) in mid-August and in September 2012, and I/GM soon learned HSBC Bank N.A. ("**HSBC**"), as the Funds custodian, had frozen the Funds assets. HSBC refused to release the assets until a new custodian was appointed and until an individual had claimed control over the Funds and had notified the Funds investors about his responsability. I/GM began seeking a new custodian immediately and filed papers with the Internal Revenue Service claiming control of the Funds.

20.     My/GM's efforts were frustrated by (i) the Funds not having had an audit for three-to-four years, and (ii) the Funds facing large redemptions from investors and that the Funds were holding commingled assets that were hard to value without a fundamental restructuring.

21.     Wilmington Trust, National Association ("**WTNA**") agreed to serve as custodian for the Funds in November 2012, or two months after I/GM began searching for HSBC's replacement. I/GM signed multiple agreements with WTNS. HSBC, however, refused to transfer assets to WTNA until January 14, 2013, requiring additional assurances that I/GM and WTNA assumed responsibility over the Funds assets. I/GM signed and e-mailed letters to investors and I/GM signed agreements letting HSBC off for liability they had incurred. I/GM executed all significant agreements between the Funds and the Funds providers during this time.

Exhibit 038
Muho v. Fletcher et al.
Case4:13-cv-03469-KAW   Document1   Filed07/25/13   Page6 of 19

22.     F-AF in February began using the Funds assets for personal use. Primarily, F-AF ordered that $4,000,000 be sent to F-FII and about $3,000,000 be sent to legal service providers who I/GM learned were primarily representing F-AF and his interests, some of which conflicted with the Funds interests.

23.     In late April after F-AF refused to register the Funds with the Securities and Exchange Commission ("**SEC**") even after I/GM informed F-AF of the Funds need to register with the SEC, as the Funds operated exclusively in the U.S. and had assets in excess of $100,000,000.

24.     I/GM at the same time also learned that F-AF had cancelled the entity that had purchased from Citco shares of the Holding Co. purportedly for a $27,000,000 tax write-off. I/GM then also realized that FAM and Citco likely had misused the Funds assets to their own advantage, and that control over the Funds was most significant for it allowed control of past information about the Funds assets. I/GM was advised by FAM's counsel that I/GM needed to report the $4,000,000 transaction above to the SEC and that WTNA was very likely liable for allowing the payments.

25.     I/GM informed FAM's counsel that I/GM for months had worked on a plan to sell control over the Fund's management to a new entity staffed with independent directors whose primary responsibility would be to investigate past misuse by FAM and Citco, who would also appoint an investment advisor who would comply with SEC rules.

26.     I/GM created L-Hawk Monday, April 29, 2013 and completed corporate document required to transfer to L-Hawk management rights over the Funds and the Fund Managers. L-Hawk would conduct an efficient investigation into past abuses also and would seek efficient legal and out of court actions to recover the $7,000,000 known misspent funds plus other misspent funds. L-Hawk agreed to fund the investigation and the recovery efforts from $5,000,000 it raised from the Funds by selling the Funds preferred stock. I/GM also agreed to serve as the Funds investment advisor.

27.     Since April 29, 2013, I/GM registered L-Hawk's transfer agreement with the Funds with the SEC, and I/GM also registered as the Funds investment advisor, registering the Funds with the SEC for the first time. I/GM has also provided assistance to a number of government agencies interested in the matter. In addition I/GM investigated past misuses of the Funds assets, which led me/GM to bring the

VERIFIED COMPLAINT - CASE NO. _____

1   current action. FAM, F-AF, and SG have used a dozen law firms I/GM paid with the Funds assets to

2   fight me/GM and L-Hawk outside of court over the April 29 transaction. WTNA, whom I informed April

3   30, 2013 of their failures in law, has refused to pay L-Hawk's proceeds from the sale of preferred stock

4   L-Hawk fully issued the Funds April 29, 2013. WTNA also refused to pay my/GMs management fees,

5   ensuring I/GM funded all above listed actions personally, incurring significant personal debt. WTNA

6   filed an interpleader action in Delaware court; WTNA naed L-Hawk, not me/GM/GMCM as parties after

7   WTNA learned L-Hawk did not have an attorney and could not hire an attorney, as I/GM had run out of

8   money I could even borrow.

9      28.   So my/GM's efforts have been frustrated by FAM, F-AF, and SG, and by WTNA. But

10   FAM's and F-AF's efforts to frustrate L-Hawk and my/GM efforts served as proof that an investigation

11   into the past acts was needed, strengthening my/GM's resolve in carrying out my/GM's obligations to the

12   Funds and their investors.

13      29.   F-AF owns all shares of FAM's equity. F-AF now or in the past has owned Fletcher

14   Global Management, LLC, a limited liability company that advised G-Hawk and related entities, that

15   unlike FAM is not registered with the SEC.

16      30.

17      31.   F-AF and a Citco executive based outside the United States talked about daily for hours

18   on the phone in the mid to late 1990's. F-AF and the Citco executive discussed how Citco could pump up

19   FAM's feeder funds. Additionally the FAM executive and the Citco executive discussed how the Citco

20   could cause the Funds to invest in FAM's feeder funds and how Citco and FAM could issue notes to

21   financial institutions using SPVs.

22      **Facts Primarily Related to F-AF, FAM, F-FII, and G-Hawk Defendents**

23      32.   Based on conversations between F-AF and Citco listed here and others F-AF and Citco

24   organized SPVs that in 1997 issued notes in exchange for cash. F-AF and Citco led the SPVs to invest

25   directly or indirectly in feeder funds that invested in other feeder funds FAM managed and Citco

26   administered.

27      33.   Jersey (Corsair) an SPV issued another $100,000,000 in notes in 2004 and used the

28

7

VERIFIED COMPLAINT - CASE NO. _____

Exhibit 038
Muho v. Fletcher et al.

Case4:13-cv-03469-KAW   Document1   Filed07/25/13   Page8 of 19

proceeds to invest in FAM managed feeder funds that invested in other FAM managed feeder funds that invested, ultimately in FAM managed master funds. Citco administered all funds FAM managed.

34.     RBS in 2006 bought another similar issuance of notes and the Funds repaid RBS by purchasing $140,000,000 in assets through G-Hawk.

35.     FAM purchased management of the Funds in 2007 and cancelled its interest in the Funds for a tax write-off in 2010. FAM kept existing management from Citco in charge of the Funds management, and only removed them after Citco insisted FAM pay it a fee of about 1% of the assets G-Hawk purchased that FAM did not wish to pay to Citco.

36.     FAM informed Citco that its fee was not part of any written agreement. FAM only changed its position after Citco through Citco Directors refused to use the Funds assets to purchase assets of G-Hawk necessary to repay RBS.

37.     RBS offered to accept a settlement of 80% of the amounts owed it indirectly by FAM and Citco. FAM however refused to provide RBS with details about the notes proceeds. FAM was aware of the LTV ratio forbidding overexposure of the notes proceeds and over-exposure of collateral RBS held. FAM was aware that the LTV ratio was breached by over-exposure to FAM managed feeder funds. FAM's awareness of the above caused FAM to decline to provide RBS with information about G-Hawk's investments that RBS requested. FAM's awareness of the above caused FAM to pay RBS all of the notes principal and interest, so as to avoid disclosing to RBS that FAM had caused with Citco's aid a breach of G-Hawk's agreement with RBS.

38.     FAM could exercise control over the Funds and the Funds managers in 2008 after it paid Citco $27,000,000. FAM exercised that control indirectly through untraceable methods of communications, and documented its control by writing e-mails that showed to the Funds executives someone had requested their actions, but not disclosing the requesting persons identity. The Citco executives required the e-mails to escape liability but did not persisted in explicit details because they were aware of the ultimate identities and were aware that FAM disclaimed control over the Funds. Even while exercising control of the Funds, FAM did not list the Funds with the SEC, despite its control over the Funds, which together held over $1,000,000,000 ($1 Billion) in assets when FAM took control.

VERIFIED COMPLAINT - CASE NO. _____

Case No _____

Exhibit 038
Muho v. Fletcher et al.

Exhibit 038
Muho v. Fletcher et al.

Case4:13-cv-03469-KAW   Document1   Filed07/25/13   Page9 of 19

39.     FAM directed the Funds investments in feeder funds FAM managed after taking control of the Funds. FAM was aware of the Funds offering memorandum pursuant to which the Funds investments were to be made. FAM was aware that the Funds investments in FAM feeder funds were not allowed by the Funds offering memorandum. FAM was a fiduciary of the Funds it managed and a fiduciary of the Funds investors. FAM represented itself to the Funds and the Funds investors (in the very few communications FAM had with the Funds) as an experienced Advisor who would not allow conflicts of interest to cause the Funds and the Funds investors' harm.

40.     FAM did not register the Funds with the SEC even after FAM executives replaced Citco executives and directly managed the Funds from FAM New York office. FAM was aware that the SEC required Funds FAM controlled to register with the SEC. FAM was aware that the SEC would require details from FAM about transactions between the Funds and G-Hawk, and the Funds and FAM managed feeder funds.

41.     FAM was also aware that FAM controlled funds needed to keep copies of books and records. FAM disputed factual assertions by employees about FAM's control over the Funds that, if true, required FAM to keep records of transactions and communications about the Funds it then controlled. FAM disputed facts that showed FAM controlled the Funds and the managers. \

### Facts Primarily Related to the Citco Defendants
### (Citco, C-Group, G-Hawk, Citco Directors, C-Ctd)

42.     Citco created the Funds starting in 1993 to be managed accounts; managed by different investment managers who Citco controlled through a holding company that owned each manager and could appoint or dispose of a Fund Manager's management at will (See Ex. Fig. 2, below). The Fund Manager in turn could appoint or dispose of the Funds' management at will.



Figure 2: A Simplified Representation of the Funds Structure

9

VERIFIED COMPLAINT - CASE NO. _____

Exhibit 038
Muho v. Fletcher et al.

Case No _____

43.    The Funds were structured and funded so as to avoid overbearing regulations and so as to avoid harming Citco's primary trade as custodian to over a trillion dollars in private fund assets.

44.    Citco did not invest its own money in the Funds, and the Fund Managers caused the Funds to issue to private outside investors non-voting shares in exchange for money the Fund managers claimed they would invest as fiduciaries of the Funds and the Funds investors in diversified portfolios of assets holding private funds.

45.    Citco gave FAM, indirectly, 85% of the Holding Co holder of the Fund Managers in 2008 and at the same time FAM gave Citco $27,000,000 in cash. Citco remained 15% holder of the Holding Co and its employees and executives remained with the Holding Co and with Funds and Fund Managers after the sale. Citco employees and executives only left in mid 2009 from their positions with the Holding Co, with the Fund Managers, and with the Funds.

46.    Citco agreed to invest the Funds assets in FAM funds that were part of the master-feeder funds that FAM and FAM related entities managed, and FAM paid Citco an unwritten but agreed upon cut of the fees FAM charged to the Funds money once in the FAM structure that neither Citco, nor FAM, nor Citco as custodian disclosed to the Funds and to the Funds investors.

47.    Citco served as custodian and administrator for the Funds and provided the Funds and the Funds investors with investor accounts statement and additional information related to the Funds investments.

48.    Citco as custodian omitted information to the Funds and the Funds investors about the Funds excessive exposure to FAM managed funds; and Citco as manager and as custodian not disclose to the Funds and to the Funds investors that the Funds investments in G-Hawk were used to invest in Hawkeye Finance Corporation, Hawks-Bill Holdings Limited, Hawks Nest Overseas Corporation, Principal Protected FIA I Fund Ltd., and Principal Protected FIA II Fund Ltd.

49.    Citco could and did control the management of the Funds and the management of the Fund Managers, and did lead the Funds to purchase G-Hawk assets and FIA Leveraged (Cayman) assets.

50.    Citco knew that FIA Leveraged had issued to three Louisiana pension funds debt-like shares that were senior in priority to the Funds investments in FIA Leveraged, and senior in priority to

10
VERIFIED COMPLAINT - CASE NO. _____

Exhibit 038
Muho v. Fletcher et al.

the investments the Funds made in G-Hawk. Citco as custodian omitted information to the Funds and to the Funds investors that would have informed them of the excessive junior exposure of the Funds in the FAM structure, and Citco as custodian failed to block the Funds assets from being invested in brazen violations of the offering memorandum pursuant to which the Funds investments were to be made.

51.     Citco received 50 basis points for every dollar under FAM's management that Citco helped bring into FAM's structure.

52.     Citco could block and did block the Funds and G-Hawk from purchasing the assets Citco knew were worthless from mid 2009 until mid 2010, but only after FAM refused to pay Citco its customary, unwritten but agreed upon fee in connection with Funds purchase of G-Hawk's worthless assets; and Citco continued to block the redemption of RBS's notes until Citco forced FAM to change position on the unwritten but agreed upon fee Citco was owed for helping bring the Funds money into the FAM structure.

53.     Citco's fee represented only about 1% of the assets the Funds purchased through G-Hawk after FAM changed its position on Citco's fee; Citco caused a one year delay for one percentage point but no delay once it was paid in wasting 100 times as much in the Funds assets. Citco's employees left managing positions with the Funds and the Funds Managers after its dispute with FAM over its unwritten but agreed on fee.

54.     Citco controlled G-Hawk at the time the Funds purchased through G-Hawk $140,000,000 in worthless assets.

**Facts Primarily Related to F-AF, FAM, F-FII, SG, and WTNA Defendants, for Events Occurring during late 2012 – 2013**

55.     F-AF and I/GM sold over three hours between Dec. 31, 2012-Jan. 1, 2013 all of F-FII's interest in BRG Investments, LLC, and all of F-FII's interest in Fletcher International, Ltd., managed by a court appointed Trustee, to a Fund for $5,400,000.

56.     F-AF sold the Trustee of Fletcher International Ltd. BRG Investments LLC and other property of F-FII in February 2013.

57.     F-AF requested indirectly at first through phone calls made by another FAM executive,

11

VERIFIED COMPLAINT - CASE NO. _____

Exhibit 038
Muho v. Fletcher et al.

Exhibit 038
Muho v. Fletcher et al.

Case4:13-cv-03469-KAW   Document1   Filed07/25/13   Page12 of 19

1   and directly later that I/GM pay to F-FII what the Fund owed to F-FII for the Funds purchase from F-FII

2   of property F-AF re-sold in February to the Trustee.

3       58.     F-AF also requested I/GM pay about $3,000,000 to law firms and other service providers

4   from the Funds accounts for services that F-AF and FAM had made side agreements with the law firms

5   and the other services providers for F-AF and FAM to receive and not for the Funds to receive.

6       59.     F-AF sent an e-mail in the form of Figure 3, below, after a certain service provider

7   recused from his position with FAM. I/GM later informed F-AF and FAM that the service provider

8   recused after a conversation I/GM had with the service provider, and that I/GM had informed the service

9   provider that L-Hawk's merger with the Funds had been completed prior to the service providers recusal

10  e-mail that prompted the e-mail in Figure 3.

11                           Figure 3:



12

13

14

15

16

17

18

19

20      60.     I/GM informed WTNA April 30, 2013 that I/GM would no longer allow the Funds assets

21  to remain with WTNA as WTNA was holding the Funds assets in violation of SEC rules and regulations.

22      61.     I/GM informed WTNA April 30, 2013 that I/GM planned to immediately begin

23  registration of the Funds with the SEC. Additionally I/GM informed WTNA that they had been illegally

24  taking orders from FAM about distributions out of the Funds assets that had been used by FAM for its

25  benefit and not for the Funds benefit.

26      62.     Deborah H. Midanek called me/GM June 28, 2013 on behalf of SG and told me that she

27  too believed AF's conduct disqualifies him from holding any position of trust over the Funds. She

28  informed me that SG had removed F-AF from control of the Funds on June 17, 2013 but only from the

VERIFIED COMPLAINT - CASE NO. _____

Case No _____

Exhibit 038
Muho v. Fletcher et al.

Funds formed in the British Virgin Islands (BVI).

63.   I informed her that GM had removed both SG and F-AF April 29, 2013 but that he courage in removing F-AF was appreciated.

64.   SG then requested that I give to her shares that would allow control over the Funds formed in the BVI. And SG also stated that those Funds have about $25,000,000 in assets.

65.   This plus SG's lack of documentation plus SG's recent shift in the story above, led me/GM to conclude that SG and F-AF and FAM had contrived to split management over the Funds so as to cause each F-AF, SG, and other Doe(s) to manage assets under $25,000,000.

66.   SEC registration is not required for investment managers that manage less than $25,000,000.

**Count I: Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
(Brought Against the F-AF, FAM, Citco, C-Group, C-Directors, C-Cstd., and G-Hawk)**

67.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

68.   During the period which defendants jointly controlled the Funds, defendants: (i) carried out a scheme, plan and course of conduct, in connection with the purchase and sale of securities, that was intended to and, through the period which defendant jointly controlled the Funds now controlled by assignee L-Hawk, did deceive the Funds and the Funds investors; (ii) made various deceptive and untrue statements of material fact, necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to the Funds and the Funds investors; and (iii) engaged in acts, practices, or a course of business which operated as a fraud or deceit upon the Funds and the Funds investors.

69.   Defendants, pursuant to said scheme, knowingly and recklessly engaged in employing the following deceptive devices and contrivances:

a.   Materially false and misleading Offering Memoranda and Discretionary Investment Management Agreements designed to market and promote to the Funds and to the Funds investors Citco, Citco Directors, and FAM using materially false and misleading

13

VERIFIED COMPLAINT - CASE NO. _____

Exhibit 038
Muho v. Fletcher et al.

Exhibit 038
Muho v. Fletcher et al.

statements concerning defendants investment strategies and the level of supervision to be exercised over outside Investment Managers.

b. Fraudulently certified audit reports, and account statements, that created a false impression of the Funds financial condition to the Funds and to the Funds investors.

70. In particular, the scheme, plan and course of conduct, acts, practices and course of business unfolded as follows:

71. Defendants incurred obligations over the years to creditors for hundred of millions of dollars.

72. Their own obligations led Defendants to cause the Funds to invest in various feeder funds that held little to no assets and that used the Funds money to meet other obligations Defendants had incurred over the years.

73. Defendants conspired and together prevented disclosure to the Funds and the Funds investors of Defendants scheme, pursuant to which the Funds purchased $140,000,000 of worthless assets from G-Hawk.

74. Defendants conspired and together prevented disclosure to the Funds and the Funds investors of Defendants scheme, pursuant to which the Funds purchased $60,000,000 of worthless assets from G-Hawk.

75. By virtue of their culpable participation in the actions carried out by G-Hawk, and co-defendants, Citco, Citco Directors, C-Cstd., C-Group, G-Hawk, F-AF, and FAM are liable pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder. As a direct and proximate result of their wrongful conduct, Plaintiff suffered damages of $200,000,000 or more in connection with their investment in the Funds.

76. Plaintiff is entitled to recover $200,000,000 or more from defendants Citco, Citco Directors, C-Cstd., C-Group, G-Hawk, F-AF, and FAM, all of whom are liable jointly for the damages they together caused Plaintiff.

**COUNT II: Violation of Section 20(a) of the Exchange Act**
**(Brought Against Citco, Citco Directors, F-AF, and FAM)**

14

Exhibit 038
Muho v. Fletcher et al.

77.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

78.     Citco, Citco Directors, F-AF, and FAM acted as controlling persons of Funds within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high level positions, participation in and/or awareness of the Funds operations, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Funds management, and of G-Hawk including the content and dissemination of the various statements alleged herein as false and misleading, and participation in the scheme and course of conduct alleged herein.

79.     Citco, Citco Directors, F-AF, and FAM had direct and supervisory involvement in the day-to-day operations of the Funds and, therefore, had the power to control or influence the particular allegedly false and misleading statements or cause the statements to be corrected, and had the ability to halt the scheme or course of conduct.

80.     Citco, Citco Directors, F-AF, and FAM oversaw the Discretionary Investment Management Agreements and Offering Memoranda that various Fund investors executed with the Funds and with the Fund Managers, within which there were repeated misrepresentations of the Funds investment strategies to investors. Pursuant to the Discretionary Investment Management Agreements between the Fund Managers and the Funds, and pursuant to the Offering Memoranda for the Funds investors, Citco, Citco Directors, F-AF, and FAM by way of the Fund Managers agreed to supervise and direct the Funds investments for the Funds investors. However, Citco, Citco Directors, F-AF, and FAM knew that a portion of these assets would be invested with G-Hawk and other Fletcher feeder funds, and thus, could not be supervised and directed for the Funds benefits and for the Funds investors benefit as stated in the investment management agreements and offering materials.

81.     By virtue of their positions as controlling persons, as well as their culpable participation in the actions carried out by G-Hawk, defendants Citco, Citco Directors, F-AF, and FAM are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, Plaintiff suffered damages of $200,000,000 or more in connection with their investment in the Funds.

**COUNT III: Unjust Enrichment**

15

VERIFIED COMPLAINT - CASE NO. _____

Exhibit 038
Muho v. Fletcher et al.

Exhibit 038
Muho v. Fletcher et al.
Case4:13-cv-03469-KAW   Document1   Filed07/25/13   Page16 of 19

1     **(Brought Against F-AF, FAM, Citco, C-Group, C-Directors, C-Cstd., and G-Hawk)**

2      82.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing

3  paragraphs as if fully set forth herein.

4      83.    As a result of the misconduct detailed herein, Plaintiffs' assets and Plaintiff investors'

5  assets have been decimated; yet F-AF, FAM, Citco, C-Group, C-Directors, C-Cstd., and G-Hawk have

6  reaped substantial fees, dividends, and other pecuniary benefits at the expense of Plaintiffs and of

7  Plaintiff's investors.

8      84.    F-AF, FAM, Citco, C-Group, C-Directors, C-Cstd., and G-Hawk have therefore been

9  unjustly enriched, and equity and good conscience require that these Defendants disgorge to Plaintiffs

10 and members of each Class all such unjust enrichment in an amount to be determined at trial. As a

11 proximate result of the F-AF, FAM, Citco, C-Group, C-Directors, C-Cstd., and G-Hawk breaches of their

12 duties and contractual obligations, Plaintiffs and Plaintiff's investors have sustained damages and lost a

13 substantial part of their respective investments in an amount to be proven at trial.

14

15     **COUNT IV: For Rescission of Fees Under the**
        **Investment Advisers Act (Brought Against FAM, Citco)**

16

17     85.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing

18 paragraphs as if fully set forth herein.

19     86.    Citco and FAM acted as "Investment Advisers" to the Funds and had discretionary

20 authority over the Funds assets.

21     87.    FAM is a SEC registered investment adviser.

22     88.    Citco acted in all respects as an investment adviser.

23     89.    As Investment Advisers FAM and Citco owed the Funds certain obligations.

24     90.    Specifically, FAM and Citco could not engage in any transaction, practice, or course of

25 business which operates as a fraud or deceit upon any client or prospective client. FAM and Citco

26 breached their duties to the Funds members by engaging in a course of conduct, which operated as a

27 fraud or deceit on the Funds.

28     91.    FAM and Citco failed to disclose that they had incurred obligations in the past to creditors

16

VERIFIED COMPLAINT - CASE NO. _____

and that the Funds assets would be used to repay those obligations.

92.     Such information was material to the Plaintiff and to Plaintiff's investors who would not have allowed FAM and Citco to manage the Funds had FAM and Citco made this information known to them.

93.     FAM and Citco was unjustly enriched by the investment management fees and the administrative that they shared with each other in exchange for investing the Funds assets in feeder funds whose assets they had exhausted over the years.

94.     As a result, Plaintiff is entitled to rescission of their investment adviser contracts and agreements with FAM and Citco and to recover, from FAM and Citco, all fees and commissions paid in connection with Plaintiff's and each Class members' investments.

**COUNT V: For Rescission of Contracts Under CA Code §§ 1667 and 1668
(Brought Against all Defendants)**

95.     Defendants contrived together to operated a scheme that served to defraud Plaintiff of over $207,000,000 in known damages over the years.

96.     Defendants scheme operated by exploiting the laws of the United States and of the State of California that required defendants to register all transactions and all self-interested transactions, and Defendants have continued to violate the same laws to prevent detection of their past acts and accountability of their past acts.

97.     Plaintiff is entitled to rescind all contracts and agreements with Defendants, all of which violate the laws of the United States and the laws of the State of California.

**COUNT VI: For Payment of $5,000,000 to L-Hawk in Connection with L-Hawk's Sale to the
Funds of Preferred Shares**

98.     L-Hawk has issued preferred shares to the Funds.

99.     L-Hawk issued the preferred shares pursuant to an agreement all parties executed by their authorized representatives.

100.     L-Hawk has taken all acts needed to entitle it to payment for the shares sold and has

17

VERIFIED COMPLAINT - CASE NO. _____

Exhibit 038
Muho v. Fletcher et al.
Case4:13-cv-03469-KAW   Document1   Filed07/25/13   Page18 of 19

instructed WTNA for payment.

101.   WTNA has refused to tender payment to L-Hawk

102.   L-Hawk is entitled to enforce WTNA to pay to L-Hawk the Funds obligations, or $5,000,000

## JURY TRIAL DEMANDED

103.   Plaintiff hereby demands a trial by jury.

Dated:  July 25, 2013

Leveraged Hawk, Inc. c/o Gerti Muho Capital Management, Pro se.

Gerti Muho
Plaintiff, pro se.

Sworn to before me this Thursday, July 25, 2013

*see attached RCC*

18
VERIFIED COMPLAINT - CASE NO. _____

Case No _____

Exhibit 038
Muho v. Fletcher et al.

Court Complaint
Plaintiff, Gerti Muho


California Notary Jurat


State of California

County of ___Sanfrancisco___

Subscribed and sworn to (or affirmed) before me on this ___25th___

day of ___July___, 20 __13__,

by _____Gerti Muho_____,
proved to me on the basis of satisfactory evidence to be the
person(s) who appeared before me.

RUSSELL CHUAN CHANG
Commission # 2012911
Notary Public - California
San Francisco County
My Comm. Expires May 17, 2017


(Seal) Signature _____

Exhibit 038
Muho v. Fletcher et al.

**Exhibit 039**

**Muho v. Fletcher et al.**

Exhibit 039
Muho v. Fletcher et al.
Thursday, January 2, 2014 at 11:40:30 PM Eastern Standard Time

**Subject:** RE: Letter

**Date:** Wednesday, September 4, 2013 at 11:31:38 AM Eastern Daylight Time

**From:** Tirado, Jc

**To:** 'Gerti Muho'

**CC:** Cuevas, Alberonys, Ting, Veronica

Mr. Muho. The fax was received, and the acc 4980261297, is unblocked, and will be fully functionable tomorrow 9/5/13

---

**From:** Gerti Muho [mailto:gm@gmcapital.net]
**Sent:** Wednesday, September 04, 2013 12:25 PM
**To:** Ting, Veronica [NCB-RTLB]
**Cc:** Cuevas, Alberonys [NCB-RTLB]; Tirado, Jc [NCB-RTLB]; David Wilks
**Subject:** Re: Letter

Veronica:

Please confirm that you are in receipt of the signed letter your fax machine accepted this morning, as it did yesterday too. Also I must be direct here for Citibank appears to be too used to its power to appreciate its deadliness:  If an entity cannot pay say a court ordered fee, say $300.00 to allow the entity to sue and recover, say $207,000,000.00, causing the failed entity to loose its rights to recover the aforementioned $207,000,000.00 from certain professional trust abusers, wouldn't you say that the entity blocking the payment of the $300.00 fee is as responsible for the foregone $207,000,000.00 as the professional trust abusers who actually took the money in the first place.  Not morally for it's oversight may not be with ill will, intentional, or to its benefit.  It may receive no benefit at all. Unfortunately, morals are too hard to discern. It's a job

I believe a judge and jury have a monopoly on. I remember even the US government asked a judge to approve any freeze of any money from that fugitive who stole billions from software companies by pirating software out of a basement. The same US government that has the authority to fly a missile using a robo-who-done-it into someone's jean pocket did not freeze a penny from a convicted fugitive, if I recall the facts right. A judge did, guided by laws written for all, and never  through an oral opinion or phone call.   It's a job a bank steals from them at significant peril I would say. I wouldn't want the duty, unless the compensation was sufficient to justify the responsibility, of course.

I recall from a contract's course that in California inmates started a practice of filing financing statements against prison guards.  The guards of course could remove it immediately by merely stating X was not authorized to make the filing--reserved for creditors only. I think they created an exception to prevent unauthorized parties from causing the 5 point credit drop that resulted from the inmates misfiling.

Anyway I am no lawyer, and am guided by mere sense of right and wrong. It works for me and keeps me out of trouble, for it appears to coincide often enough with law to be as good a substitute as you can get without paying a fortune in legal fees.

I have no reason to believe any accounts that I am an authorized party for are not fully operational. I am slightly preoccupied with slightly more timely matters, and have wasted too much time with a service provider. I know Leveraged Hawk must make a number of payments to preserve some rights: Please do let me know if any of the four accounts I can quickly think of has restrictions on them whatsoever, stating of course the details of any such restrictions.

Best,
Gerti
Sent from my iPhone

Exhibit 039       Page 1 of 2
Muho v. Fletcher et al.

Case No _____

**Exhibit 039**
**Muho v. Fletcher et al.**

On Sep 3, 2013, at 7:40 PM, "Ting, Veronica " <veronica.ting@citi.com> wrote:

Mr. Muho:

The number is 718-726-1394 but I did not get anything in the fax machine. Sorry that I got back to you so late since today was a very busy day. Could you please fax it again and I will have Juan Carlos look for it tomorrow. Thank you so much.

Veronica Ting
Assistant Branch Manager
Northern Blvd.& 51st Street
718-726-8586
NMLS# 726770

**From:** Gerti Muho [mailto:gm@gmcapital.net]
**Sent:** Tuesday, September 03, 2013 4:25 PM
**To:** Ting, Veronica [NCB-RTLB]
**Subject:** Re: Letter

Veronica :

I just faxed the signed letter to tel:(718)%20726-1394.  it's the only fax no I was able to find online for your branch.  please let me know if it is correct, as I worry I may have sent the document to a stranger.

Gerti

Sent from my iPhone

On Sep 3, 2013, at 12:39 PM, "Ting, Veronica " <veronica.ting@citi.com> wrote:

Dear Mr. Muho:

I've typed up the letter for you. If you can just print and sign then bring it in when you come in to see the Branch Manager Mr. Cuevas, it will be greatly appreciated.

Veronica Ting
Assistant Branch Manager
Northern Blvd.& 51st Street
718-726-8586
NMLS# 726770

<Letter for GM Capital.doc>

This communication, and any attachment(s), is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential and/or protected by privilege. This communication is for information purposes and should not be regarded as an offer, a contract, or any form of official statement of Gerti Muho Capital Management, or any of its affiliated entities. If you are not the intended recipient, any use, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please delete the original email, any copies, attachments thereto, or printouts and notify the sender immediately.

This communication, and any attachment(s), is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential and/or protected by privilege. This communication is for information purposes and should not be regarded as an offer, a contract, or any form of official statement of Gerti Muho Capital Management, or any of its affiliated entities. If you are not the intended recipient, any use, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please delete the original email, any copies, attachments thereto, or printouts and notify the sender immediately.

**Plaintiff Deposition in Fletcher Fund Bankruptcy**

**Muho v. Fletcher et al.**

# Exhibit 001

# Muho v. Fletcher et al.

*IN RE: CHAPTER 11*
*FLETCHER INTERNATIONAL, LTD.*

---

*GERTI MUHO*
*May 20, 2013*
*CONFIDENTIAL*

---



**COURT REPORTING**
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
**www.ELLENGRAUER.com**

*Original File 103887.TXT*

CONFIDENTIAL                                    1

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF NEW YORK
    ------------------------------------------x
3   In re: Chapter 11

4   FLETCHER INTERNATIONAL, LTD.,

5                          Debtor.

6   CASE NO. 12-12796(REG)
    ------------------------------------------x
7

8   *** CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

9

10                       Eleven Times Square
                         New York, New York
11
                         May 20, 2013
12                       11:46 a.m.

13

14       CONFIDENTIAL DEPOSITION of GERTI MUHO, a

15   non-party witness herein, pursuant to subpoena,

16   held at the above time and place, taken before

17   Darby Ginsberg, a Shorthand Reporter and Notary

18   Public of the State of New York.

19

20

21

22

23       ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
24              New York, New York 10022
                     212-750-6434
25                   Ref:  103887

CONFIDENTIAL                                    2

```
 1    A P P E A R A N C E S:

 2

 3    LUSKIN, STERN & EISLER, LLP

 4    Attorneys for Trustee

 5         Eleven Times Square

 6         New York, New York 10036

 7    BY:   LUCIA T. CHAPMAN, ESQ.

 8         PHONE     212.597.8200

 9         FAX       212.974.3205

10         E-MAIL    chapman@lsellp.com

11

12

13    WEIL, GOTSHAL & MANGES, LLP

14    Attorneys for Richcourt, et al.

15         767 Fifth Avenue

16         New York, New York 10153-0119

17    BY:   ROBERT S. LEVINE, ESQ.

18         PHONE     212.310.8618

19         FAX       212.310.8007

20         E-MAIL    robert.levine@weil.com

21

22

23

24

25
```

CONFIDENTIAL

3

```
 1   A P P E A R A N C E S (Cont'd):

 2

 3   SHER TREMONTE, LLP

 4   Attorneys for Fletcher

 5        41 Madison Avenue, 41st Floor

 6        New York, New York 10010

 7   BY:  MICHAEL TREMONTE, ESQ.

 8        PHONE    212.202.2603

 9        FAX      212.202.4156

10        E-MAIL   mtremonte@shertremonte.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL                                4

```
 1    -------------------- I N D E X --------------------

 2    WITNESS                 EXAMINATION BY              PAGE

 3    GERTI MUHO              MS. CHAPMAN                   5

 4

 5

 6    ---------------- E X H I B I T S ----------------

 7    TRUSTEE'S              DESCRIPTION            FOR I.D.

 8    Exhibit 1             Proof of Claim              5

 9    Exhibit 2             Proof of Claim              5

10    Exhibit 3             Proof of Claim              5

11    Exhibit 4             Proof of Claim              5

12    Exhibit 5             Proof of Claim              5

13

14

15              (EXHIBITS TO BE PRODUCED)

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL                                        5

```
 1                (Trustee's Exhibit 1, Proof of Claim,
 2         marked for Identification.)
 3                (Trustee's Exhibit 2, Proof of Claim,
 4         marked for Identification.)
 5                (Trustee's Exhibit 3, Proof of Claim,
 6         marked for Identification.)
 7                (Trustee's Exhibit 4, Proof of Claim,
 8         marked for Identification.)
 9                (Trustee's Exhibit 5, Proof of Claim,
10         marked for Identification.)
11    GERTI MUHO, called as a witness, having been
12    first duly sworn, was examined and testified as
13    follows:
14                THE WITNESS:  Yes, I swear.
15
16    EXAMINATION BY
17    MS. CHAPMAN:
18         Q.  Good morning, Mr. Muho.  My name is
19    Lucia Chapman.  I am an attorney with Luskin,
20    Stern & Eisler.  We represent Richard Davis, the
21    trustee for Fletcher International, Limited
22    Bermuda, which I will refer to as FILB.  And let
23    me ask you:  Am I correct that you are not
24    represented by counsel today?
25         A.  I don't have an attorney.
```

CONFIDENTIAL                    6

```
 1              MUHO - CONFIDENTIAL
 2     Q.   Could you speak up?
 3     A.   I do not have attorney.
 4          MS. CHAPMAN:   Would other counsel
 5     present please state their appearances?
 6          MR. LEVINE:   Yes.   I am Robert Levine
 7     from Weil, Gotshal & Manges on behalf of the
 8     Richcourt Funds.
 9          THE WITNESS:   Actually, earlier you
10     stated you that you were acting on behalf --
11     on direction of one person and not the --
12     and director -- if you could just add that,
13     it could be helpful.
14          MR. LEVINE:   I am here on behalf of -- I
15     will name the funds:   Richcourt Funds
16     Limited; New Wave Fund SBC; Soundview
17     Composite, Limited; Soundview Elite Limited;
18     Soundview Star, Limited; Soundview Premium,
19     Limited; Elite Designated; Star Designated;
20     Premium Designated; America Alternative
21     Investments, Inc.; Optima Absolute Returns
22     Fund, Limited; Richcourt Allweather Fund,
23     Inc.; Richcourt Allweather B, Inc.,
24     Richcourt Composite, Inc. and Richcourt
25     Eurostrategies, Inc.
```

1              MUHO - CONFIDENTIAL

2          THE WITNESS:  Now, because, correct me

3      if I am wrong, but because you stated

4      earlier that that you did not -- you did

5      not -- the funds did not --

6          MS. CHAPMAN:  Mr. Muho --

7          MR. LEVINE:  This is -- I don't want to

8      put this on the record.

9          MS. CHAPMAN:  I will --

10         THE WITNESS:  Because he said that he

11     worked for Deborah.

12         MS. CHAPMAN:  Counsel is here as a

13     courtesy and is not going to be asking

14     questions.

15         THE WITNESS:  But that's on the report,

16     isn't it?

17         MS. CHAPMAN:  Correct.

18         THE WITNESS:  So then he just stated

19     that he represented Richcourt on the record,

20     although he gets his directions from Deborah

21     at Sullivan Group, Inc.

22         MS. CHAPMAN:  I understand your

23     position, but it's not -- this is not the

24     time to go into that.

25         Mr. Tremonte, would you mind stating

CONFIDENTIAL                              8

```
 1              MUHO - CONFIDENTIAL
 2      your appearance, please?
 3          MR. TREMONTE:  Good morning.  This is
 4      Michael Tremonte, Sher Tremonte, LLP.
 5      That's S-H-E-R.  I represent Alphonse
 6      Fletcher, Junior, Fletcher Asset Management
 7      and Fletcher International, Inc.
 8      Q.  And let's just set forth a couple of
 9  basics in terms of the names of some of these
10  companies.  For Fletcher International, Inc.,
11  sometimes I think it's referred to as FII,
12  Fletcher Asset Management is sometimes referred
13  as FAM, and certainly I may be referring to them
14  by those acronyms?
15          When I refer to Fletcher, I will be
16  referring to all of the Fletcher-related
17  entities, including FII, and FAM and their
18  affiliates.
19          Mr. Muho, I will be asking you a series
20  of questions today.  If you have any questions,
21  if you don't understand any of the questions,
22  please let me know, and I will do my best to
23  restate them.  If at any time you need to take a
24  break, please let me know, and I will be happy to
25  accommodate you except to the extent that a
```

CONFIDENTIAL                              9

MUHO - CONFIDENTIAL

1
2   question is pending.
3           Have you ever testified before?
4       A.   What is testify?  What do you mean by
5   testify?
6       Q.   Testify in a courtroom, in a deposition,
7   any statements given under oath.  And I will
8   exclude affidavits.  I am talking about live
9   testimony.
10      A.   Under oath.  So it's the requirement is
11  that have I ever been under oath?
12      Q.   Correct.
13      A.   I -- it's most likely that I have
14  previously been under oath.  I am not sure
15  whether it's been courtroom.  But I have most
16  certainly been under oath.  I believe I have
17  raised my hand and swore to tell the truth.
18      Q.   Was this in a deposition context?
19      A.   No.  It was not in a deposition.  I know
20  this is the first deposition that I have ever
21  been a part of.
22      Q.   And let me ask you some background
23  questions.  Did you attend college?
24      A.   I did.
25      Q.   Where did you go to college?

```
 1                  MUHO - CONFIDENTIAL
 2        A.   In -- oh, the university?
 3        Q.   Yes.
 4        A.   St. John's University.
 5        Q.   When did you graduate?
 6        A.   2005.
 7        Q.   What was your degree?
 8        A.   Finance.
 9        Q.   And did you attend any post-graduate
10   schools?
11        A.   I did.
12        Q.   Where did you go?
13        A.   Berkley.  Berkley Law.  Berkley Law
14   School.
15        Q.   When did you graduate?
16        A.   2012.
17        Q.   Are you an attorney?
18        A.   I am not an attorney.
19        Q.   Do you have any other licenses?
20        A.   Driver's license?
21        Q.   Professional licenses.
22        A.   Security guard.  It may not be current.
23   I remember getting one.
24        Q.   Did there come a time when you began
25   working for Fletcher?
```

```
 1                 MUHO - CONFIDENTIAL

 2        A.   Yes.

 3        Q.   And when was that?

 4        A.   Really unknown.

 5        Q.   Can you give me an approximate --

 6             MR. TREMONTE:  May I make a request?

 7        Since I am here for the limited purpose, as

 8        we discussed as appropriate if you could

 9        when you say Fletcher, specify or ask the

10        witness to specify who he was working for

11        or --

12             MS. CHAPMAN:  I was going to ask the

13        specific question.  However, as I mentioned

14        earlier today, when I refer to Fletcher, I

15        am going to be referring to all of the

16        related entities, the Fletcher-related

17        entities, which includes FAM, FII and their

18        affiliates.

19             THE WITNESS:  Well, that's -- there

20        is -- what if there is an entity say within

21        the FAM group --

22        Q.   We will try and be specific with respect

23   to that specifically.

24        A.   Because FAM, that and let's assume FAM

25   has -- FAM had -- as required by law and has
```

1              MUHO - CONFIDENTIAL

2    done -- so has, you know, withdrawn all interests

3    from the entity, that would not be part of FAM,

4    right?

5          Q.   You know, my suggestion is, let's deal

6    with that on a question-by-question basis.  If

7    you have a question about that or you are unclear

8    about that, please ask me and we can discuss

9    that.

10         A.   And -- okay.

11         Q.   Do you recall approximately when you

12   first started working for Fletcher?

13         A.   I worked for the independent -- the

14   in-house administrator starting in May 21, 2012,

15   for a three-month contract with in-house

16   administrator of the Fletcher funds; and I also

17   started working on May 21st that same day I

18   became consultant for the asset holding

19   companies.  I don't know if that -- either of

20   them is Fletcher.  The first one I said earlier

21   that -- the first one that earlier I said that

22   FAM is, I believe is required by law, but whether

23   it's required by law or not, Buddy has withdrawn

24   all interests in that, in that administrator.  As

25   I am basing this on a signed withdrawal letter

```
 1                  MUHO - CONFIDENTIAL
 2   that I noticed one day when I was looking through
 3   the independent administrator's paperwork.
 4            And as far as asset holding companies,
 5   given that they are not liquid, I would say that
 6   Buddy --
 7            MR. TREMONTE:  I want to make an
 8       objection here.  It's going to be pretty
 9       broad.  So the witness appears to be
10       drawing --
11            THE WITNESS:  To tell the truth.
12            MR. TREMONTE:  -- any number of
13       conclusions with respect to the Fletcher
14       entities, including FAM, and also with
15       respect to Mr. Fletcher himself.
16            To the extent that those are legal
17       conclusions that are based on his
18       participation in the presence at
19       communications between an employee or agent
20       or officer of FAM's counsel, I am going to
21       instruct the witness or I am asserting the
22       privilege, and I am going to instruct the
23       witness not to answer.
24            THE WITNESS:  You assert that privilege
25       based on your knowledge of exactly what?
```

CONFIDENTIAL                                    14

```
 1              MUHO - CONFIDENTIAL
 2         MS. CHAPMAN:  You know what, why don't
 3    you let me address this?
 4         THE WITNESS:  Okay.
 5         MS. CHAPMAN:  It's the trustee's
 6    position that we are permitting counsel for
 7    Richcourt and counsel for FAM and FII to
 8    attend today as observers.  I understand
 9    that they may wish at certain points to
10    object in the event that they feel that
11    there is a question of privilege, and I
12    understand that.  I would like to request
13    that no other objections be made, and I
14    think that was our understanding prior to
15    this, going into this.  Is that agreeable?
16         MR. TREMONTE:  I would agree to that is
17    my expectation and my understanding that
18    that I would like to make objections based
19    on privilege.  I don't think I want to raise
20    my right to make every kind of objection
21    that would be appropriate.  Nor do I want to
22    try to anything right now.  Why don't we
23    take it as it comes?
24         MR. LEVINE:  Make the same -- have the
25    same.
```

MUHO - CONFIDENTIAL

1

2          THE WITNESS:  I have no idea what he

3      just said.

4      Q.  When you say you started working for the

5  in-house administrator, was that FAM?

6      A.  No.

7      Q.  Who was the in-house administrator?

8      A.  Well, the names have changed over the

9  years, but I believe the latest version is RF

10 Services, LLC.

11     Q.  And in-house administrator, what was it

12 called when you first started working?

13     A.  Well, I don't know -- I don't recall the

14 exact date when the names changed, but I -- it

15 was called many things, including Richcourt Funds

16 Services, RFS Services, and there was other in-

17 house -- but yeah, so I don't recall the exact

18 name, but it's one of -- it's either RFS or RF

19 Services, LLC or Richcourt Funds, LLC.

20     Q.  Did there come a point in time when you

21 became an employee of FAM?

22     A.  There was.

23     Q.  And when did that happen?

24     A.  It's the time -- I cannot specify the

25 time for you.  It occurred over time.

CONFIDENTIAL                                    16

```
 1              MUHO - CONFIDENTIAL
 2        Q.   Do you have a rough idea?
 3        A.   Sometime between the start of all this.
 4   So around the beginning of August.
 5        Q.   Of what year?
 6        A.   2012.
 7        Q.   I show you what's been marked as Trustee
 8   Exhibit 1, which is a proof of claim filed on
 9   behalf of Richcourt Acquisition, Inc. and ask you
10   to take a look at that, please.
11             MS. CHAPMAN:  There is a copy for you
12        gentlemen to share.
13        Q.   Is that your signature on the second
14   page of Exhibit 1?
15        A.   Above where it says signature?
16        Q.   Yes.
17        A.   It's a copy of.  I believe it looks
18   likes a copy of my signature.
19        Q.   Did you prepare this document?
20        A.   What do you mean by that?  Actually, I
21   think I understand the question now.
22             What I -- what I -- my -- my -- my input
23   in this document is -- is -- can be -- can be
24   seen in the exhibit I think I call it an exhibit,
25   where I have written using a pen.  I did not
```

MUHO - CONFIDENTIAL

1    prepare -- I did not type any of these, any of

2    the words there.

3         Q.  Are you referring to the what looks like

4    handwriting on the second page of this document?

5         A.  Correct.

6         Q.  Did you do any of the typing in this

7    document?

8         A.  No.

9         Q.  How did you receive this document?

10        A.  E-mail.

11        Q.  From whom?

12        A.  I am not certain, but I believe it was

13   someone at Kirkland Ellis, LLP.

14        Q.  Did you receive instructions with

15   respect to this document?

16        A.  From whom?

17        Q.  From anyone at Kirkland & Ellis?

18        A.  I -- after signing them, I did receive

19   instructions from Kirkland & Ellis that they

20   wished that I re-signed because my first -- the

21   first time I signed I used an electronic

22   signature, and they wished that I had signed by

23   hand.  So that's the instructions, but they

24   didn't instruct me to sign this or anything.

```
 1                    MUHO - CONFIDENTIAL

 2          Q.   Why did you sign this?

 3          A.   I -- I -- it was my job to sign it.

 4          Q.   How did you understand that it was your

 5     job?

 6          A.   I was told a few hours earlier that I

 7     had to sign a documents and the proof of claim.

 8          Q.   Who told you?

 9          A.   Alphonse Fletcher, Junior.

10          Q.   What did Mr. Fletcher tell you?

11          A.   That instead of wasting time looking at

12     the law, I should have been in the office to

13     sign -- to sign the documents that he was

14     signing, I think.  I am almost positive.  Let me

15     see.

16          Q.   When did this occur, this conversation?

17          A.   12:00 p.m. on the day I signed.

18          Q.   Did you sign on January 18th, 2013,

19     which is the date reflected on the document?

20          A.   I would assume so, but I don't recall.

21     I know that I signed and I wrote on the -- on --

22     I -- I don't recall the details because when I

23     got in the office, I wished to change when I read

24     the -- when I read another document that they

25     prepared, which was similar to this, but it's not
```

MUHO - CONFIDENTIAL

1

2  the same.  I wished -- I suggested that they --

3  that they make changes before I signed, and that

4  took a very good amount of time.  So when it came

5  time to signing, I just quickly went through

6  everything, and by that I mean quickly signed

7  about 20 or 30 proofs of claim.

8       Q.  Do you recall specifically what

9  questions you had on the document that you just

10  testified you reviewed?

11      A.  On this document?

12      Q.  No.  No.  You testified that on the day

13  that you signed these various documents, that you

14  examined a similar one, am I correct?

15      A.  Correct.  It was the similar document.

16  I recall coming into the office I believe Stewart

17  Turner and Michael Siedlecki were discussing the

18  other documents.  They showed me a copy of it.  I

19  suggested that changes be made in order not to

20  pin me down to exact figures, which I could not

21  assert -- which I could -- I could not be assured

22  of.  It would have been easier for me to sign.

23  It was it would be -- it would be easier for me

24  to sign without worrying about -- about lying by

25  signing if they made the documents less specific.

```
 1              MUHO - CONFIDENTIAL
 2   However, I must say that I did know that
 3   Richcourt was -- that Richcourt Funds had,
 4   whether by choice or not, invested, made
 5   investments into the -- into FII leveraged.
 6        Q.  Do you recall which company's proof of
 7   claim it was that you had examined and had
 8   questions about?
 9        A.  Well, it most likely would be one of the
10   funds since those were prepared by the people
11   working in the Wall Street office whereas the
12   Fletcher entities received their service or their
13   documents prepared by Kirkland & Ellis.
14        Q.  When you say Fletcher entities, are you
15   including the entity reflected in Exhibit 1,
16   Richcourt Acquisition, Inc.?
17        A.  It's -- well -- yes.
18        Q.  And by funds, what are you referring to?
19        A.  So Richcourt Acquisition, Inc. is one of
20   many vehicles that funnels or that money passes
21   through in order for control of the Richcourt
22   Funds.  Richcourt Acquisition, Inc. is the last
23   step before you come to Richcourt Holding, Inc.
24   which is the parent entity.  The parent entity
25   then is owned, then -- the parent entity is a
```

```
 1              MUHO - CONFIDENTIAL
 2   Richcourt Holding, Inc.  That entity owns the
 3   rights, all shares of four management companies.
 4   Those four management companies located one in --
 5   one in Cayman, Pitagora is in Caymans; Soundview
 6   Elite, Soundview Capital Management -- so
 7   Pitagora Capital Management -- sorry about
 8   that -- Pitagora Capital Management is the Cayman
 9   entity.  Soundview Capital Management is the
10   British Virgin Islands entity, and Richcourt
11   Capital Management is a Bermuda company, and I
12   believe that there is also a New Wave Asset
13   Management, which is a Cayman entity.
14           Those entities then, in turn, own
15   voting -- voting shares of funds.  The funds then
16   issue, issue non-voting shares to investors who
17   as of -- so they issue non-voting shares in
18   return for cash, and then they use for investment
19   purposes.  Those are the funds that I originally
20   referred to.
21       Q.  Why don't we, as we go through these
22   proofs of claim, I am going to ask you to
23   identify whether the entity for each specific
24   proof of claim is one of those funds that you
25   function mentioned or a Fletcher entity --
```

CONFIDENTIAL                                22

```
 1                  MUHO - CONFIDENTIAL
 2    Fletcher-related entity I should say.  Is that --
 3         A.  If it's fund -- I am sorry I cut you
 4    off, but if it is a fund, it would not be a
 5    Fletcher-related entity.
 6         Q.  And with respect to Exhibit Number 1,
 7    Richcourt Acquisition, Inc., is it your testimony
 8    that Kirkland & Ellis provided this form to you?
 9         A.  It was e-mailed to me.
10         Q.  Right.
11         A.  I believe it was.  The e-mail originated
12    from Kirkland & Ellis most likely, most likely,
13    and I may have to kind of go back.  If I gave a
14    short answer, which would not be then correct
15    because I don't know if the e-mail came directly
16    to me or whether it went or it was forwarded to
17    me.  I couldn't be certain of that right now.
18         Q.  What is your relationship with
19    Richcourt?  What was your relationship with
20    Richcourt Acquisition, Inc. on the day that you
21    signed this?
22         A.  The same as it is today.
23         Q.  And what is that?
24         A.  Director.  Director for every Richcourt
25    fund and director of the management companies and
```

MUHO - CONFIDENTIAL

 1
 2   director of the parent entity and director of
 3   Richcourt Acquisition, Inc., but that's not a
 4   Richcourt entity.  Let's just go back.
 5       Q.  When you received Exhibit 1 to sign, did
 6   it come with the -- what I would call the
 7   attachment, which is on pages 4, 5 and 6, and it
 8   is an attachment to proof of claim of Richcourt
 9   Acquisition, Inc.?
10       A.  Yes.
11       Q.  Did you do anything to investigate the
12   veracity of the statements contained in
13   Exhibit 1?
14       A.  I may not have read the statement.
15       Q.  Did you have any conversations with
16   anyone concerning Exhibit 1 at the time you
17   signed it?
18           MR. TREMONTE:  Again, I am going to
19           caution the witness to instruct him not to
20           disclose the contents of any communications
21           between himself and counsel inasmuch as he
22           was acting on behalf of my clients, Fletcher
23           and FII and note for the record that he
24           appears to have signed the document on
25           behalf of Fletcher Asset Management.

1                    MUHO - CONFIDENTIAL

2         MS. CHAPMAN:  I believe he stated that

3    he signed it as a director of Richcourt

4    Acquisition, Inc.

5         THE WITNESS:  I was a director.

6         MR. TREMONTE:  I just note that on page

7    two under his name -- I don't know if this

8    is his handwriting.  I am going to ask him,

9    but he appears to have written the company

10   on behalf of which he signed as Fletcher

11   Asset Management.

12        THE WITNESS:  I believe I may have

13   caused a confusion by signing too many

14   documents in too short a time and signing

15   some as authorized signatory and some as

16   director.

17        I may have also taken a shortcut upon

18   rewriting and resigning where I just may

19   have used authorized signatory as a

20   shortcut, which would require less thinking

21   on my part in signing these documents that

22   were due at 5:00 p.m., I believe.

23        Q.  Did you have any conversations with

24   anyone concerning the -- on the day of the -- did

25   you have any conversations with anyone on the day

1                   MUHO - CONFIDENTIAL

2      that you signed this document in Exhibit 1

3      concerning the documents?

4              MR. TREMONTE:  Same objection and same

5          instruction.

6          Q.  Other than the conversation to which you

7      have already testified and other than

8      conversations with counsel for --

9          A.  No.  I mean, I had plenty of

10     conversations.  I don't believe I -- I -- well,

11     yes, I did speak to counsel a couple of --

12         Q.  With exception to that.

13             MR. LEVINE:  The same objection that Mr.

14         Tremonte asserted on behalf his clients.  I

15         assert the same objection on behalf of the

16         Richcourt Funds and instruct --

17             THE WITNESS:  But I don't understand.

18             MS. CHAPMAN:  I am asking --

19             THE REPORTER:  Excuse me, counsel.  He's

20         writing on the exhibits.

21             MS. CHAPMAN:  Oh.  You can't write on

22         the exhibits.

23             Can we substitute a clean copy?

24             THE REPORTER:  Sure.

25         Q.  I will have you look at this in the

```
 1                MUHO - CONFIDENTIAL
 2   meantime.
 3           Other than conversations with counsel,
 4   and other than conversations to which you have
 5   already testified, did you have any conversations
 6   on the day that you signed Exhibit 1 concerning
 7   Exhibit 1?
 8       A.  Oh.  And concerning Richcourt
 9   Acquisition, Inc.?
10       Q.  Concerning anything having to do with
11   Exhibit 1.
12       A.  And Exhibit 1 is this one?
13       Q.  It's this exhibit, yes.
14       A.  No.
15       Q.  Did you have any such conversations
16   other than conversations with counsel concerning
17   any of the proofs of claim?
18       A.  And just to be clear for the record,
19   counsel did not act on behalf of the Richcourt
20   Funds or any Richcourt entity to the extent this
21   is Fletcher entity, counsel -- there was no
22   counsel to act on behalf of the Richcourt
23   entities for the proofs of claim.
24       Q.  Well, I can ask you, did you have
25   conversations with counsel concerning the proofs
```

```
 1              MUHO - CONFIDENTIAL
 2   of claim?
 3        A.  Yes.  Because some -- so -- so some
 4   proofs of claims were on behalf of Fletcher Asset
 5   Management.
 6        Q.  Without going into the details of the
 7   conversations, you had some conversations with
 8   counsel, correct?
 9        A.  Yes.
10        Q.  Did you have conversations with anyone
11   else concerning any of the proofs of claim?
12        A.  Yes.
13        Q.  Who did you have conversations with?
14           MR. TREMONTE:  I am going to object
15        again.  Instruct the witness again that to
16        the extent that these conversations you had
17        were with people who were not counsel
18        reflect or discuss or in any way dealt with
19        communications that you had with counsel,
20        communications that the other party had with
21        counsel, same objection, same instruction.
22           MR. LEVINE:  Same objection.
23           THE WITNESS:  I am confused.
24           MS. CHAPMAN:  Why don't you answer what
25        conversations you had, and then we will deal
```

CONFIDENTIAL                    28

1                MUHO - CONFIDENTIAL

2          with the question of whether there was a

3          privilege.  Can we ask counsel to -- I

4          understand you have a standing objection to

5          that.  Let's --

6              THE WITNESS:  Can I recount my day and

7          whenever if there was ever a conversation,

8          and that will recount all of my

9          conversations except for those that were

10         with Kirkland Ellis.

11         Q.  Yes, but I would like to know if you had

12    a conversation with counsel, that's not

13    privileged.  I don't want know what the

14    conversation was.  I am not going to ask that

15    right now, but to the extent that you had a

16    conversation, I would like to know all of the --

17         A.  Got it.

18         Q.  -- all the people you spoke to about any

19    of the proofs of claim.

20         A.  After being told that I was needed in

21    the office, as I stated earlier --

22         Q.  Who told you that?

23         A.  I stated it earlier for the record.

24    Alphonse Fletcher, Junior.  After being told that

25    I was needed in the office immediately, and I got

CONFIDENTIAL                          29

MUHO - CONFIDENTIAL

1

2    to the office around 1:00 p.m., and I am just

3    using the time for my own personal reference.

4    After I got the office around 1:00 p.m., I saw

5    that Stewart Turner and Michael Siedlecki --

6    Stewart Turner is a consultant for the trustee

7    and also -- he was the consultant --

8        Q.  Let's focus on what the conversations

9    were at the time.

10       A.  Yeah, that's what I am trying to figure

11   out.  I am not sure.  He was -- may have been a

12   director of Fletcher International, Inc.

13   Delaware.  He may have had a contract with

14   Fletcher International, Inc. Delaware, and he --

15   he may have also had a contract with RFS.

16       Q.  Did you have conversations with him

17   about the proofs of claim?

18       A.  And he had no relation with any of the

19   Richcourt Funds.  I had conversations with him

20   and Michael Siedlecki about the Richcourt Funds,

21   and is he filing claims.

22       Q.  Anyone else?

23       A.  After that I had a conversation with a

24   person where I had to run to deliver handle --

25   hand-deliver claims, but that was just me asking

MUHO - CONFIDENTIAL

1

2   if I could submit a claim for the money that I

3   was spending to photocopy this.

4          Q.  Any other conversations?

5          A.  Coming back, well, do we -- are we

6   including e-mail conversations?

7          Q.  Yes.

8          A.  Oh, of course.  There was more

9   conversations.  Previously I was unsure what to

10  sign for for Fletcher Asset Management, Inc. and

11  Fletcher Funds.  In -- well, my confusion arose

12  due to my position with Fletcher Asset Management

13  having been various things such as managing

14  director, when I transacted in businesses,

15  business transactions; and I was corporate

16  secretary for Fletcher Asset Management, and I

17  was also chief compliance officer, which was also

18  something I was.  So I was not sure how, what, I

19  should sign as, and I asked Buddy himself, I sent

20  him an e-mail saying whether I should sign as

21  corporate secretary since that was what I usually

22  signed other contracts, and it was a simplest way

23  to go about signing.

24         Q.  Did he respond to you?

25         A.  No.

CONFIDENTIAL                            31

```
 1                MUHO - CONFIDENTIAL
 2        Q.  Did you ultimately get an answer to that
 3   question?
 4        A.  No.
 5        Q.  Did you ask anyone else?
 6        A.  No.
 7        Q.  Did you have any other conversations
 8   concerning any of the proofs of claims?
 9        A.  Floyd Saunders then sends me an e-mail
10   saying you can -- you should sign -- I believe
11   either should have or could have, one of those.
12            MR. TREMONTE:  Same objection.
13        Instruction reflects communication with
14        counsel, whether between yourself or also
15        instruct him not to disclose the content of
16        any communication.
17            THE WITNESS:  But I am not sure what
18        position Saunders had at the time.
19        Q.  Was he acting as an attorney?
20        A.  No.
21            MR. LEVINE:  Same objection as
22        Mr. Tremonte.
23        Q.  Was he conveying any legal advice?
24        A.  No.  Well, I mean, to the extent that if
25   legal advice is you could just sign as authorized
```

```
 1              MUHO - CONFIDENTIAL
 2   signatory, that's all he said.  So if that's
 3   legal advice, yes.  But if not, no.
 4       Q.  Did you have any conversations with
 5   anyone else?
 6       A.  I had a conversation with -- around 4:40
 7   p.m. or 4:50 p.m. actually, I noticed that Buddy,
 8   sorry, Alphonse Fletcher's personal -- personal
 9   claim had not been signed at that time and that
10   the claims were due at 5:00 p.m.
11            I gave him a call, and I warned him of
12   this, and then I signed for -- I signed his claim
13   for him after he told me I should just go ahead
14   and sign it and send it to Kirkland & Ellis.
15       Q.  Could I ask you to put the phone away
16   while you are testifying?
17       A.  I am sorry.
18       Q.  Thank you.
19       A.  It's a nervous habit.
20       Q.  So let me retrace what you just said.
21            Who did you notify that Alphonse
22   Fletcher's personal claims were not signed?
23       A.  Alphonse Fletcher.
24       Q.  Was that in an e-mail?
25       A.  It was on the phone.  Over the phone
```

CONFIDENTIAL                                        33

1                    MUHO - CONFIDENTIAL

2    call.

3         Q.  And what was discussed during the phone

4    call?  What more was discussed?

5         A.  The need to sign.

6         Q.  Anything else?

7         A.  No.

8         Q.  The original conversations you had with

9    Mr. Turner and Mr. Siedlecki, what was discussed?

10        A.  I requested that they make the Richcourt

11   Funds claims less -- less -- less -- less

12   certain.  Less -- yeah.  I mean -- certain.

13   That's fine.

14        Q.  Can you be a little more specific about

15   that?

16        A.  Less -- less of a specific, so less

17   specific.

18        Q.  Okay.  Less specific with respect to

19   what?

20        A.  To the amount of the claim.

21        Q.  The amount of the claim.

22            And with respect to Exhibit 1, which is

23   Richcourt Acquisition, Inc., what specifically in

24   Exhibit 1, do you see that was an area in which

25   you wanted less specificity?

MUHO - CONFIDENTIAL

1

2      A.   This I did not touch.  I did not comment

3  about this document itself.

4      Q.   On page two, you testified that that is

5  a copy of your signature.  Is that your

6  handwriting on it to the left on page two?

7      A.   It reflects handwriting being written in

8  a hurry, but yes.

9      Q.   It's your handwriting, correct?

10      A.   It's mine.  Looks like mine.

11      Q.   And is that your handwriting that checks

12  off the box above it, "I am the creditor's

13  authorized agent"?

14      A.   Of course.

15      Q.   And did you --

16      A.   Because it looks kind of like -- yeah.

17      Q.   Did you review this document before

18  signing it?

19      A.   I believe I read it, but I would say

20  that I did not feel I needed to review documents.

21      Q.   Other than the conversations you have

22  testified to already, did you have any other

23  conversations, including e-mails or chats or

24  texts or any other form of communication,

25  concerning the proofs of claim that you signed?

CONFIDENTIAL                                35

```
 1                    MUHO - CONFIDENTIAL
 2   Please put the phone away.
 3        A.  I am sorry.
 4             I may, but I am not certain.  I can't --
 5   I don't recall.  I have not -- I had not thought
 6   much about the day right now.  So it's been quite
 7   sometime.
 8        Q.  Did you get any information in addition
 9   to what's set forth in Exhibit 1 concerning
10   Exhibit 1?
11        A.  I don't understand.  I can read it.
12        Q.  Did you receive any additional
13   information underlying this exhibit?
14        A.  What do you mean by that?  Regarding the
15   claim that Richcourt Acquisition, Inc. had?
16        Q.  Yes.
17        A.  To the extent -- no.
18        Q.  Yes.
19             You testified that you were a director
20   of Richcourt Acquisitions, I believe?
21        A.  I was a director of Richcourt
22   Acquisition, Inc. to the extent that --
23        Q.  Mr. Muho, please.
24        A.  I am sorry.
25        Q.  Put the phone aside.  Thank you.  Thank
```

CONFIDENTIAL                                    36

```
 1                   MUHO - CONFIDENTIAL
 2    you.
 3         A.   The reason that I -- I don't recall.  I
 4    don't -- I don't know much about anything about
 5    Richcourt Acquisition, Inc. that I can recall is
 6    because it's just a pass-through entity.  And --
 7         Q.   Who else was a director of Richcourt
 8    Acquisition, Inc. --
 9         A.   Qualified director or a disqualified
10    director.
11         Q.   I will take both of them.
12         A.   Well, I was a qualified director.  I was
13    the only qualified director.
14         Q.   Was anyone else a director?
15         A.   Well, I mean, to the extent that you
16    remain a director, a director to the extent
17    that -- but -- but -- but Alphonse Fletcher was
18    also a director; but however, it is my belief
19    that he may have been a disqualified director and
20    thus vacated his position, but that's just my
21    opinion based on reading various meetings over
22    and over again of the --
23         Q.   Did you have conversations with him
24    about that?
25         A.   That's -- there is no -- I -- whew,
```

MUHO - CONFIDENTIAL

1
2    interesting.  Did I ever tell him that he had
3    entered into self-interested transaction by
4    disclosing his interest?  Well, no.
5         Q.  Were there any other directors of
6    Richcourt Acquisition, Inc.?
7         A.  No.
8         Q.  To the extent you haven't already
9    testified to it, how did Richcourt Acquisition,
10   Inc. fit into the structure of various Richcourt
11   entities?
12        A.  Richcourt Acquisition, Inc. was a
13   connection entity, if I can say that, or -- or an
14   extra entity on top of Richcourt Holdings, Inc.,
15   which was part of -- which then became Richcourt
16   Funds or Richcourt Group.  And Richcourt
17   Acquisition, Inc. was the last -- was the last
18   entity whose -- whose equity was fully owned by
19   indirectly -- indirectly -- well, now I can't
20   even say that.
21              Whose equity was under -- whose equity
22   at the time I assumed was under Fletcher Asset
23   Management's indirect control.
24        Q.  And what was its relationship with other
25   Richcourt entities to the extent that you haven't

```
 1              MUHO - CONFIDENTIAL
 2    already answered that question?
 3         A.   It -- it did no business.  It held
 4    funds.  It existed.  It existed to connect other
 5    entities to Richcourt Holding, Inc. and still
 6    exists.
 7         Q.   What was its parent company?
 8         A.   I assumed at the time that the parent
 9    company of Richcourt Acquisition, Inc. was a
10    company called Richcourt -- well, it's called --
11    it's called Richcourt Partners Limited
12    Partnership.  I believe at the time that it was
13    not even -- that Richcourt Partners Limited
14    Partnership was actually not even a partnership
15    but a limited entity, a limited company.  It's --
16    it doesn't matter much whether it's a partnership
17    or not.
18         Q.   Are there documents that would reflect
19    that structure?
20         A.   I am sorry?
21         Q.   Are there documents that would reflect
22    that relationship, that structure?
23         A.   Of course.
24         Q.   And where?  What documents are those?
25         A.   It -- it's subscriptions -- well, sorry.
```

CONFIDENTIAL                    39

```
 1                    MUHO - CONFIDENTIAL
 2      Then I am just sorry.  I -- let me go back.
 3              It's -- it is -- there is documents.
 4      There is a creation document for Richcourt
 5      Partners Limited, L.P. that state that Richcourt
 6      Partners Limited Partnership is being created for
 7      the sole purpose -- and I believe it was sole
 8      purpose.  The only reason I doubt myself is
 9      because then it -- the Richcourt Partner, LLP --
10      I will refer to it as RPLP going forward -- the
11      only reason I am doubting myself; that because
12      then it appears that RPLP also was an investor in
13      F -- Fletcher F -- FIA Leveraged, but I believed,
14      and I am almost certain to a very high degree of
15      certainty, that Richcourt Partners, L.P. was
16      created for the sole purpose of investing in
17      Richcourt Acquisition, Inc. which then was
18      created for the sole purpose of purchasing a
19      controlling equity, equity stake in Richcourt
20      Holding, Inc.
21          Q.  The creation document you just referred
22      to, is that a document you have seen?
23          A.  Correct.
24          Q.  And where is that located, to your
25      knowledge?
```

CONFIDENTIAL                                    40

```
 1              MUHO - CONFIDENTIAL
 2       A.  It's -- it's -- all the documents are
 3   electronic.
 4       Q.  And are they located at the -- are they
 5   located on the Fletcher servers, to your
 6   knowledge?
 7       A.  The document that I saw?
 8       Q.  Yes.
 9       A.  No.  Fletcher had no claim to that
10   document or let's start with the --
11       Q.  You say it was electronic.  Where was it
12   stored electronically?
13       A.  It was stored electronically in my
14   personal computer.  Personal, I mean, personal
15   for -- you know.
16       Q.  Did you write the document?
17       A.  Did I write the document?  I believe the
18   document is mainly pre-filled.  It's kind of a
19   pre-filled, you know, a fill in type of thing
20   where you check off boxes, kind of similar to the
21   first two pages of the exhibit.
22           So I did not -- I did not -- I did not
23   fill in the not-already-filled-in form.  I did
24   not fill in the -- I did not write that document.
25       Q.  You didn't prepare that document?
```

CONFIDENTIAL                                        41

MUHO - CONFIDENTIAL

1

2      A.   I did not prepare the document.

3      Q.   Okay.  I am going to show you what's

4  been marked as Trustee Exhibit 2, please, which

5  is a proof of claim filed on behalf of America

6  Alternative Investments, Inc., and ask you to

7  review that.

8           MR. LEVINE:  While he is doing that,

9       this is one of the funds that I represent,

10      so I would ask Mr. Muho certain privilege to

11      the extent there is any testimony on behalf

12      of -- any privileged testimony and instruct

13      him not to answer or sorry -- instruct him

14      not to give that testimony.

15          MS. CHAPMAN:  With respect to only

16      privileged testimony?

17          MR. LEVINE:  With respect to the

18      privileged testimony, yes, sorry.

19          THE WITNESS:  I don't understand.

20      Counsel, as I stated earlier, Richcourt

21      Funds or any Richcourt entity did not -- was

22      not represented as counsel -- by counsel at

23      the time.  So I don't know where the

24      privilege would be coming from.

25      Q.   Did you prepare this document?

CONFIDENTIAL                          42

MUHO - CONFIDENTIAL

1

2        A.   No.  Well, did I -- I made some

3   suggestion.  Did I put the final piece together?

4   I don't believe so.

5        Q.   Who did you make suggestions to?

6        A.   The Stewart Turner and Michael

7   Siedlecki, who I saw when I walked in the office.

8        Q.   What were your suggestions with respect

9   to Exhibit 2?

10       A.   Minor changes in order to make -- in

11  order not to pin myself down to untrue

12  statements.

13       Q.   Do you recall specifically with respect

14  to Exhibit 2 what those changes were?

15       A.   Can I read the document?

16       Q.   Absolutely.

17       A.   This appears to be untrue now.  That's

18  just an additional -- it is my understanding that

19  Fletcher, Inc. primary holding Fletcher

20  International Inc. -- or well, given the

21  uncertainty, let's say that it's sufficiently

22  uncertain to make this not untrue.

23       Q.   I'm sorry.  I didn't understand.

24       A.   I was under the -- I was under the

25  impression that -- well, that's sort of

```
 1                    MUHO - CONFIDENTIAL
 2     interesting now.  This is -- this is no longer
 3     the case.  So the statements here are no longer
 4     true.
 5          Q.  What specific statements are no longer
 6     true?  And don't -- please don't write on the
 7     document.
 8          A.  I am sorry.
 9          Q.  Why don't we put the pen to the side?
10          A.  Oh, I -- I remember the changes that I
11     made.  I recall them now.
12          Q.  Are you looking at -- for the record,
13     let's be clear.  Are you looking at the fourth
14     page, which is headed America Alternative
15     Investments, Inc.?
16          A.  Correct.
17          Q.  And what were the specific changes that
18     were made?
19          A.  I -- I believe I can -- it's -- I can --
20     I see one change here, and it is that I put that
21     it's -- I made it that it is ultimately primarily
22     comprised of a debtor.  That statement is -- that
23     statement is sufficiently vague to bypass having
24     to go through technicalities that tend to change.
25          Q.  Are you referring to the sentence that
```

MUHO - CONFIDENTIAL

1

2   reads, "Since the creditor's underlying holding

3   is ultimately primarily comprised of the debtor,

4   the creditor wishes to file this claim to protect

5   its interests"?

6          A.   I believe so.

7          Q.   And what was the original statement that

8   you needed to be changed?

9          A.   It may have -- I don't recall.

10         Q.   And could you explain, first of all,

11  were there any other changes that were made?

12         A.   The amount of the debt that was owed.

13  The amount of the claims I made -- I took off all

14  the last four digits.  I asked -- I changed

15  the -- I asked the last four digits for every

16  claim be changed from, if they were not zero, to

17  become round number, that is, and I added the

18  word "about" in front of it.

19         Q.   So with respect to Exhibit 2, at the top

20  of the page we are examining are you referring to

21  claim from Holding and FIA Leveraged funds series

22  four:  About 2,630,000?  And below that claim

23  from Holdings, Inc. FIA Leveraged funds of:

24  About Ç1,050,000?

25         A.   Correct.

CONFIDENTIAL                          45

```
 1                  MUHO - CONFIDENTIAL
 2        Q.   What were those originally?
 3        A.   Complete figures.  Meaning by complete I
 4   mean it may have -- and this is just an
 5   example -- it would be $2,634,434.02 or something
 6   -- that's certain.
 7        Q.   Is that an example?
 8        A.   It is an example.
 9        Q.   And on what basis did you request the
10   changes be made?
11        A.   On the basis that I had -- did not have
12   sufficient knowledge to say for certain that the
13   claims are that specific.
14        Q.   Did you have sufficient knowledge to
15   assert that the claims were as stated in the what
16   is now reflected in Exhibit 2?
17        A.   If you compound information, the
18   reliance on the people on the person, or Michael
19   Siedlecki who represents -- who works for the
20   Richcourt Funds, I relied on him to have the
21   numbers, to do the figures, yes.
22        Q.   Is he the one who presented you with
23   this information?
24        A.   He and Stewart Turner.  I put them
25   together.  I believe Michael had done the
```

CONFIDENTIAL                                    46

1                    MUHO - CONFIDENTIAL

2    numbers.  Stewart Turner had helped on the

3    wording.

4         Q.  With respect to the last page in

5    Exhibit 2?

6         A.  Actually, I have to take that back.  I

7    don't know what Stewart Turner had done.  I

8    assumed it would be with the wording.  Stewart

9    tends to do more of that, and Michael Siedlecki

10   would have done -- and this is just based on my

11   experience.  It's -- so I have to say that I am

12   not sure exactly who did what, but I assumed that

13   Michael Siedlecki had done the numbers.  I

14   assumed.

15        Q.  Did you receive any other information

16   supporting the information set forth in

17   Exhibit 2?

18             MR. LEVINE:  Just except letters from

19        counsel.

20             THE WITNESS:  One more time?

21        Q.  Did you receive any other information

22   concerning the information set forth in

23   Exhibit 2?

24        A.  I just keep getting bogged down on

25   counsel.  There wasn't counsel.

```
1              MUHO - CONFIDENTIAL
2         So did I get additional information?
3    Well, I mean, it was -- it was -- it was a long
4    journey that I had been taken through, and over
5    time I had received information relating to the
6    investment that Richcourt -- and none of them --
7    none of that information had come from counsel,
8    just to make counsel happy.
9              None of the information I received about
10   the Richcourt entities investments had come from
11   any attorney.
12             But I did -- I did receive information
13   over time that the Richcourt was the -- the
14   subordinated investor -- can I say that?
15      Q.   You are the one answering the questions.
16      A.   So to the extent that Series N investors
17   were not subordinated investors -- were -- were
18   -- had priority to claim -- to FIA Leveraged,
19   then all the Richcourt Funds would be
20   subordinated investors, the remaining investors,
21   which would be subordinated through FIA L series
22   and shares.
23      Q.   Did you have any additional information
24   specific to the numbers set forth in Exhibit 2?
25      A.   No.
```

```
 1              MUHO - CONFIDENTIAL
 2       Q.  Did you have any other conversations
 3  concerning that, concerning the information set
 4  forth in Exhibit 2?
 5       A.  Actual information?
 6       Q.  Yes.
 7       A.  As in whether the numbers are correct or
 8  not.
 9       Q.  Yes.
10       A.  No.
11       Q.  To the extent that you previously
12  testified that some of the information in
13  Exhibit 2 might not currently be accurate, what
14  specifically might not be accurate?
15       A.  Well, it would be better -- it would be
16  more accurate if additional information was
17  provided, such as Fletcher International
18  Incorporated sold its interest to Soundview Elite
19  on December 31, 2012.  This is just a debtor.
20       Q.  And to what extent is that relevant to
21  the proof of claim by America Alternative
22  Investment?
23            MR. TREMONTE:  I am going to object --
24            THE WITNESS:  Well, there is -- there
25       is --
```

CONFIDENTIAL                          49

MUHO - CONFIDENTIAL

1

2          MR. TREMONTE:  Excuse me.  I am going to

3     object.  Let me see if I can make a

4     suggestion, and that is, the witness is

5     stating his belief --

6          THE WITNESS:  I wrote the contract,

7     counsel.  And I --

8          MR. TREMONTE:  Excuse me.  Please let me

9     finish.  Stating his conclusions as to

10    certain facts without there having been

11    previous testimony as to the basis for his

12    conclusion.

13         MS. CHAPMAN:  Let me explore it, then.

14    It's not -- it's not a privilege claim.  So

15    it's certainly something I can explore, and

16    to the extent that in the future there is an

17    issue with respect to whether this is --

18         THE WITNESS:  It's also bothering the

19    witness that counsel keeps on interjecting

20    whether -- I -- when and saying that I am

21    making opinions when I was stating truth,

22    and that's what I wanted to do was add

23    truth.

24    Q.  Mr. Muho, to what extent is the

25 transaction you testified about relevant to the

MUHO - CONFIDENTIAL

1

2     proof claim filed by America Alternative

3     Investments, Inc.?

4          A.  So there is the -- there has been a

5     restructuring of the connect -- of the vehicles

6     that connect FIA Leveraged Funds Series 4 and FIA

7     Leveraged Funds Series 6 to the debtor whereas --

8     whereas FIA Leveraged Fund continues to hold FIA

9     Arbitrage Funds shares -- continues to have to an

10    interest in FIA Arbitrage Fund shares equity, but

11    and then FIA Arbitrage Fund interest is then --

12    is then held -- is then in FIA -- Fletcher

13    International, Inc.  Delaware which then no

14    longer has a connection to the Fletcher

15    International Limited as it did on the date that

16    this was signed.

17             That interest has been transferred to an

18    entity -- Richcourt Fund actually.  So it would

19    be quite interesting to the extent that that fund

20    also goes to itself, but that's just an extra

21    comment.

22             MR. TREMONTE:  Objection.

23        Q.  What is the basis for your understanding

24    of that transaction?

25        A.  I wrote the transaction and signed it on

CONFIDENTIAL                                             51

```
 1                 MUHO - CONFIDENTIAL
 2   both sides, I believe, as a director of both
 3   entities.  Oh, no, actually, I did not sign as
 4   director of Fletcher International, Inc. because
 5   I was not a director of Fletcher International,
 6   Inc.  Also Fletcher was a director of Fletcher
 7   International, Inc., and he signed -- I signed on
 8   behalf of Soundview Elite Limited, Cayman.
 9        Q.  On page two, is that a copy of your
10   signature?
11        A.  I signed.  Nobody else signed documents
12   so -- but I could definitely look at it.  That's
13   an electronic version of my signature.
14        Q.  That's an electronic version of your
15   signature?
16        A.  Correct.
17        Q.  And is that check in the box above your
18   name on page two next to, "I am the creditor's
19   authorized agent," was that done by you?
20        A.  Electronic through the use of a
21   computer.
22        Q.  What is America Alternative Investments,
23   Inc.?
24        A.  No idea.  It's a hedge fund.  It's a
25   fund.  It's an investment fund.
```

CONFIDENTIAL                                    52

1                    MUHO - CONFIDENTIAL

2        Q.   What is its relationship to any other

3    Fletcher entities?

4        A.   It has no relationship.

5        Q.   Does it have a relationship to any of

6    the Richcourt entities?

7        A.   It's part of the Richcourt entities.

8        Q.   Were you a director of America

9    Alternative Investments, Inc.?

10       A.   I was, and I remain.

11       Q.   Pardon me?

12       A.   I was a director at the time.  I believe

13   I would have been.  Then again, the only

14   non-disqualified director.

15       Q.   Who were the disqualified directors as

16   you understood?

17       A.   The second director, as I understood

18   it -- and the second director was Alphonse

19   Fletcher, Junior.  However, his interest had been

20   -- as I understand it, he is disqualified.

21           MR. TREMONTE:  Objection.  Could we just

22       have the basis of his understanding as to

23       his legal conclusions to ensure he is not

24       using the context of a communications of

25       counsel?

```
1              MUHO - CONFIDENTIAL
2         THE WITNESS:  My basis is that -- my
3      basis is that I -- I, as a director, took it
4      upon myself to go over law, law --
5      corporate, the corporate code instead of a
6      law.  Maybe it is law.  The corporate code
7      of the British Virgin Islands, Cayman
8      Islands and Bermuda, and saw that there are
9      five reasons how a director would be
10     disqualified with serving as a member of the
11     board of directors.  They cannot serve as a
12     member of the board of directors, and one of
13     the reasons why was entering into a
14     transaction that benefited himself without
15     disclosing to the other board members that
16     should -- that the transaction was
17     benefiting himself personally to the -- and
18     not -- and then that may have affected --
19     that would affect his reasons for entering
20     into the transaction and binding the other
21     entity to sell the fund.  I may have blurted
22     there, but getting there.
23        Q.  Mr. Muho, regardless of whether in your
24  opinion a director was qualified or disqualified,
25  were there any other investors other than you and
```

CONFIDENTIAL                                54

```
 1              MUHO - CONFIDENTIAL
 2   Mr. Fletcher of America Alternative Investments,
 3   Inc.?
 4        A.  Mr. Fletcher and I are not investors of
 5   the America.
 6        Q.  Directors.
 7        A.  Directors.  No.  No.  Well -- yes.  I
 8   mean, yes.  As in yes, I will take the answer
 9   because I will accept that Fletcher was a
10   director, even though he may not have been, but
11   no, there were no other directors except for me.
12        Q.  And did you file the proof of claim
13   which is reflected in Exhibit 2?
14        A.  What do you mean by file?
15        Q.  What did you do with the claim once you
16   signed it?
17        A.  I believe a number of claims were
18   submitted that day due basically to my -- to the
19   lack of time in getting organized and submitting
20   one and getting it done right.  I believe that
21   the first ones I signed, I did -- as I signed
22   electronically, and I then -- once I got to the
23   bankruptcy court, I had idea what to do.  So I
24   finally after finding the place, I was told that
25   I should have copies that the bankruptcy court
```

MUHO - CONFIDENTIAL

1

2    can stamp.  I said that I was not aware of that,

3    but if there needed -- but then I would do

4    whatever necessary to make sure that I would get

5    a stamp of -- that would have included getting a

6    paper and writing it, you know, a solution, but

7    she offered me a solution very quickly that day,

8    and she said you can just make photocopies and it

9    costs X amount of dollars to make a photocopy of

10   every page, but you can just make a photocopy of

11   the first page, and that's what I did.

12           After that, Steward Turner may have

13   taken it upon himself to go again to the

14   bankruptcy court to make sure that the proofs of

15   claim was stamped with and with all pages being

16   attached to that.  It's just a technicality.

17       Q.  So is it my understanding that after you

18   signed all of the proofs of claim that you

19   signed -- that you took hard copies of those

20   proofs of claim to the bankruptcy court and

21   attempted to submit those?

22       A.  I -- I -- so because of the rush -- and

23   I am not trying to explain myself.  I am just

24   trying to point out how little time I did to --

25   had to review or even look at what I was signing.

```
 1              MUHO - CONFIDENTIAL
 2   After I signed, apparently I already had copies
 3   that I was given.  So I ended -- I had copies for
 4   the purpose of getting them stamped, but I was
 5   under the impression that every claim that I had
 6   in my hand, out of the papers that I had in my
 7   hand was unique.  So I thought I had to make
 8   copies, even though I had copies.  So I had
 9   copies to take them back with me, but I thought I
10   did not because I thought every one was unique.
11   So -- so I just stamped them.  I just signed
12   them, and then I created a copy.  I purchased
13   copies of it.  Yeah.  So I never even got to look
14   at the fact that there was two copies for every
15   fund.
16        Q.  Let me show you what's been marked as
17   Trustee Exhibit 3 and ask you to review that,
18   please.  It's a proof of claim filed on behalf of
19   Duhallow Financial services.
20        A.  This would be speculation.  I -- making
21   speculation.  I would ask counsel for who
22   represents Duhallow.
23        Q.  You know what, let me ask the questions.
24   I am going to ask you to review this.  Have you
25   had a chance to review the entire document?
```

CONFIDENTIAL                                    57

```
 1                    MUHO - CONFIDENTIAL
 2        A.   Correct.  Well, I said that because they
 3   are all the same documents, but yes.  I just
 4   reviewed the documents.
 5        Q.   And on the second page, is that a copy
 6   of your signature?
 7        A.   It's the same electronic copy.
 8        Q.   So yes, it's a copy of your electronic
 9   signature?
10        A.   It's -- yes.
11        Q.   And you signed this document?
12        A.   I signed -- I had an electronic
13   signature that I put on it.
14        Q.   And the check above your name as
15   corporate secretary of Fletcher Asset Management,
16   Inc. next to, "I am the creditor's authorized
17   agent," did you add that checkmark?
18        A.   Correct.
19        Q.   Did you add that electronically?
20        A.   I did.
21        Q.   With respect to the signatures in
22   Exhibit 1 and 2 that you have already looked at,
23   am I correct in understanding that those -- that
24   you did sign those documents?
25        A.   Correct.
```

```
1                 MUHO - CONFIDENTIAL
2         Q.   Did you make any changes?  Did you
3    suggest any changes be made to this particular
4    proof of claim in Exhibit 3?
5         A.   No.
6         Q.   Did you receive any information in
7    addition to this proof of claim?
8         A.   I am sorry?
9         Q.   Did you receive any additional
10   information underlying this proof of claim?
11        A.   I -- I was told to sign.
12        Q.   Did you receive any documentation
13   underlying the information set forth in this
14   proof of claim?
15        A.   No.  I -- and this is a special --
16   special claim, if I can call it a special claim,
17   if I may use those words, given that I am not --
18   I don't -- all I know about that entity is that
19   it's some sort of -- it was a point -- some sort
20   of an independent administrator or some sort of
21   an independent, in-house administrator or not
22   in-house because it was, I believe, given for
23   some reason I have just always associated with
24   Duhallow with Dennis -- so but yeah, it was an
25   administrator, and it was accounting purposes,
```

CONFIDENTIAL                                        59

```
 1                 MUHO - CONFIDENTIAL
 2   yes.
 3        Q.   You signed as the creditor's authorized
 4   agent.  What was your relationship to Duhallow
 5   Financial Services?
 6        A.   I was corporate secretary of Fletcher
 7   Asset Management, Inc.
 8        Q.   And what was your relationship to the
 9   specific company listed in Exhibit 3, Duhallow
10   Financial Services?
11        A.   Well, given that I was told to sign by
12   the person who appointed me the corporate
13   secretary of Fletcher International -- Fletcher
14   Asset Management, Inc., and given that I was told
15   to sign by him, I assumed that he would know what
16   the relationship would have been to Duhallow
17   Financial Services.  So did I not question.
18        Q.   You are referring to Dehallow -- do you
19   mean Duhallow?
20        A.   Correct.
21        Q.   And by "him" are you referring to
22   Mr. Alphonse Fletcher?
23        A.   Nobody else would tell me to sign the
24   documents.
25        Q.   Am I correct that it is -- that you were
```

CONFIDENTIAL                    60

1          MUHO - CONFIDENTIAL
2    instructed to sign Exhibit 3 by Mr. Fletcher?
3         A.  Yes.  Yes.  I'm sorry.  Let me rephrase.
4    That would not be true.  I was told to sign
5    documents that was -- there was no discussion
6    over Duhallow Financial.  There was no discussion
7    over every individual claim except that 4:50
8    phone call where we discussed his personal claim.
9         Q.  Where did you receive Exhibit 3 before
10   you signed it?  From where did you receive it?
11        A.  And I am basing this to the fact that --
12   that the current claim -- well, that -- that I
13   had received via e-mail by a non-Fletcher or not
14   Richcourt affiliated employee a certain type
15   of -- a certain looking claim, and I received
16   others from elsewhere and they were always
17   grouped.
18        Q.  Where do you, based on your observation
19   of Exhibit 3, who do you believe you received
20   that from?
21        A.  The same place that I received other --
22   the same place I received Fletcher claims, the
23   Fletcher claims from.
24        Q.  Was this Kirkland & Ellis?
25        A.  Yes.  That I -- I chose not to say out

MUHO - CONFIDENTIAL

1

2    of respect of counsel.

3         Q.  What was it about the proofs of claim

4    that you believe you received from Kirkland &

5    Ellis that was distinctive and permit you to

6    group them together?

7         A.  I had no input in changing the numbers

8    in any -- in the writing of the claims as I

9    had -- whereas I had input as I -- and we talked,

10   as we touched upon earlier where I added the word

11   "about" and took off numbers before the Richcourt

12   Funds and Richcourt entities.  I had no such --

13   no such input in the Kirkland -- in K&E -- in

14   K&E's claims.  By K&E, I refer to Kirkland.

15        Q.  Did you make any inquiries into the

16   basis of this claim before you signed it?

17        A.  Why would I do that?

18        Q.  If you would please, yes or no?

19        A.  Oh, no.

20        Q.  Did you make any inquiries other than

21   what you have already testified to into the basis

22   of the claims for the first three exhibits?

23        A.  No.  And I can say that with certainty

24   because if I made any inquiries, it was

25   definitely not about this claim.

CONFIDENTIAL                                    62

MUHO - CONFIDENTIAL

1

2    Q.  And I am correct that you -- you

3  acknowledged that you signed Exhibit 3?

4    A.  It's my signature.  Yes.  So yes.  Yes,

5  I did sign it.

6    Q.  I show you what's been marked as Trustee

7  Exhibit 4, and ask you to review that, please.

8  It is a proof of claim filed on behalf of

9  Fletcher Asset Management, Inc.

10    A.  I will just save you the trouble and say

11  the same applies as applied for other claims as

12  in I -- I signed.  It's my signature.  It's an

13  electronic signature, and I did sign it as a

14  corporate secretary of Fletcher Asset Management.

15    Q.  And you were corporate secretary of

16  Fletcher Asset Management?

17    A.  As I said earlier, it was corporate

18  secretary, compliance managing director, and

19  that's it for the Fletcher Asset Management.

20    Q.  Did you make any inquiries into the

21  basis of the claims set forth in Exhibit 4 --

22    A.  I --

23    Q.  -- before signing it?

24    A.  I -- I was aware that Fletcher Asset

25  Management, Inc. would be received -- would be

CONFIDENTIAL 63

1              MUHO - CONFIDENTIAL
2    entitled to charge for management fees.
3         MR. TREMONTE:  Objection to the extent
4         that the answer he is about to give reflects
5         communications with advice of counsel.
6         THE WITNESS:  And let me just make clear
7         that the counsel since has just joined
8         recently.  There was no counsel prior to --
9         I never -- I never received advice or
10        communication from counsel regarding to
11        Fletcher Asset Management's rights or -- or
12        you know, there was no outside counsel or
13        any counsel that would -- that provided me
14        information about Fletcher Asset Management,
15        Inc.'s rights and obligations.  So that --
16        that could clear things up.
17             I believe the first counsel that
18        Fletcher Asset Management, Inc. was --
19        outside counsel that Fletcher Asset
20        Management, Inc. had was -- was hired in --
21        in August, mid August, mid August, and I
22        remember that because I wired funds to that
23        entity, to that law firm out of the New Wave
24        Fund SBC.
25        Q.  Thank you.  I show you what's been

CONFIDENTIAL

64

1                    MUHO - CONFIDENTIAL

2    marked as Trustee Exhibit 5, and ask you to

3    review that.   It's proof of claim for Fletcher

4    Fund, LP.

5              THE WITNESS:   Off the record?

6              MS. CHAPMAN:   Yes, we can go off the

7         record.

8              (Discussion off the record.)

9              (Luncheon recess taken at 12:55 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MUHO - CONFIDENTIAL

2          A F T E R N O O N   S E S S I O N

3              (Time Noted:  1:25 p.m.)

4

5    GERTI MUHO, resumed and testified as follows:

6

7    CONTINUED EXAMINATION

8

9          MS. CHAPMAN:  We are back on the record.

10         I want to let the record reflect that the

11         witness has indicated that he wishes to

12         retain counsel at this point.  I am not

13         going to question him further today.  We

14         agreed to adjourn the deposition to a date

15         certain of May 30th at 10:00 a.m.

16         Gentlemen, do you have any other

17         statements that you wish to make?

18         MR. TREMONTE:  No.  Nothing other than

19         it's our understanding that we are going

20         to -- it's my understanding that I will get

21         an opportunity to review the transcript from

22         today's deposition and request to have it

23         marked pursuant to the protective order, and

24         noted our objections based on privilege for

25         the record, and that's all we have to say

CONFIDENTIAL                                    66

| | |
|---|---|
| 1 | MUHO - CONFIDENTIAL |
| 2 | right now. |
| 3 | MR. LEVINE:  And I have the same |
| 4 | understanding. |
| 5 | MS. CHAPMAN:  Yes.  To the extent that |
| 6 | you will be provided with a copy of the |
| 7 | transcript so that you can review it for |
| 8 | confidentiality pursuant to the protective |
| 9 | order in place in this case. |
| 10 | Mr. Muho, do you have any other comments |
| 11 | that you would like to make? |
| 12 | THE WITNESS:  No.  I do not have any. |
| 13 | MS. CHAPMAN:  Thank you very much for |
| 14 | coming, and I will see you on the 30th. |
| 15 | (Time noted:  1:34 p.m.) |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

```
1              A C K N O W L E D G M E N T

2

3    STATE OF              )

4                          :ss

5    COUNTY OF             )

6

7              I, GERTI MUHO, hereby certify that I

8    have read the transcript of my testimony taken

9    under oath in my deposition of May 20, 2013; that

10   the transcript is a true, complete and correct

11   record of my testimony, and that the answers on

12   the record as given by me are true and correct.

13

14

15   _____

16              GERTI MUHO

17

18

19   Signed and Subscribed to

20   before me, this    day

21   of           , 2013.

22

23   _____

24   Notary Public, State of New York

25
```

CONFIDENTIAL                                                    68

```
 1              C E R T I F I C A T E

 2

 3    STATE OF NEW YORK   )

 4                        )ss.:

 5    COUNTY OF NEW YORK )

 6

 7            I, DARBY GINSBERG, a Notary Public

 8    within and for the State of New York, do hereby

 9    certify:

10            That GERTI MUHO, the witness whose

11    deposition is herein before set forth, was duly

12    sworn by me and that such deposition is a true

13    record of the testimony given by such witness.

14            I further certify that I am not related

15    to any of the parties to this action by blood or

16    marriage; and that I am in no way interested in

17    the outcome of this matter.

18            IN WITNESS WHEREOF, I have hereunto set

19    my hand this 29th day of May, 2013.

20

21

22

23    -------------------

24    DARBY GINSBERG
      Commission Number: 01GI6230654
25    Expires:  11-1-2014
```

CONFIDENTIAL                    69

```
1                    *** ERRATA ***

2          ELLEN GRAUER COURT REPORTING CO. LLC
              126 East 56th Street, Fifth Floor
3                 New York, New York  10022
                       212-750-6434
4
    NAME OF CASE:  In re:  Fletcher
5   DATE OF DEPOSITION:  May 20, 2013
    NAME OF WITNESS:  GERTI MUHO
6
    PAGE LINE    FROM      TO        REASON
7
8   ___|___|_____|_____|_____

9   ___|___|_____|_____|_____

10  ___|___|_____|_____|_____

11  ___|___|_____|_____|_____

12  ___|___|_____|_____|_____

13  ___|___|_____|_____|_____

14  ___|___|_____|_____|_____

15  ___|___|_____|_____|_____

16  ___|___|_____|_____|_____

17  ___|___|_____|_____|_____

18  ___|___|_____|_____|_____

19  ___|___|_____|_____|_____

20  ___|___|_____|_____|_____

21                        _____

22
    Subscribed and sworn before me
23  this_____day of _____, 2013

24  _____    _____
    (Notary Public)         My Commission Expires:
25
```

IN RE: CHAPTER 11
FLETCHER INTERNATIONAL, LTD.

CONFIDENTIAL

GERTI MUHO
May 20, 2013

**$**

**$2,634,434.02 (1)**
45:5

**1**

**1 (18)**
5:1;16:8,14;20:15;
22:6;23:5,13,16;25:2;
26:6,7,11,12;33:22,24;
35:9,10;57:22
**1:00 (2)**
29:2,4
**1:25 (1)**
65:3
**1:34 (1)**
66:15
**10:00 (1)**
65:15
**10010 (1)**
3:6
**12:00 (1)**
18:17
**12:55 (1)**
64:9
**18th (1)**
18:18

**2**

**2 (14)**
5:3;41:4;42:9,14;
44:19;45:16;46:5,17,23;
47:24;48:4,13;54:13;
57:22
**2,630,000 (1)**
44:22
**20 (1)**
19:7
**2005 (1)**
10:6
**2012 (4)**
10:16;12:14;16:6;
48:19
**2013 (1)**
18:18
**21 (1)**
12:14
**212.202.2603 (1)**
3:8
**212.202.4156 (1)**
3:9
**21st (1)**
12:17

**3**

**3 (8)**
5:5;56:17;58:4;59:9;
60:2,9,19;62:3
**30 (1)**

**19:7**
**30th (2)**
65:15;66:14
**31 (1)**
48:19

**4**

**4 (5)**
5:7;23:7;50:6;62:7,21
**4:40 (1)**
32:6
**4:50 (2)**
32:7;60:7
**41 (1)**
3:5
**41st (1)**
3:5

**5**

**5 (3)**
5:9;23:7;64:2
**5:00 (2)**
24:22;32:10

**6**

**6 (2)**
23:7;50:7

**A**

**Above (4)**
16:15;34:12;51:17;
57:14
**Absolute (1)**
6:21
**Absolutely (1)**
42:16
**accept (1)**
54:9
**accommodate (1)**
8:25
**accounting (1)**
58:25
**accurate (3)**
48:13,14,16
**acknowledged (1)**
62:3
**Acquisition (21)**
16:9;20:16,19,22;
22:7,20;23:3,9;24:4;
26:9;33:23;35:15,22;
36:5,8;37:6,9,12,17;
38:9;39:17
**Acquisitions (1)**
35:20
**acronyms (1)**
8:14
**act (2)**
26:19,22
**acting (3)**

**6:10;23:22;31:19**
**Actual (1)**
48:5
**Actually (7)**
6:9;16:20;32:7;38:14;
46:6;50:18;51:3
**add (4)**
6:12;49:22;57:17,19
**added (2)**
44:17;61:10
**addition (2)**
35:8;58:7
**additional (6)**
35:12;42:18;47:2,23;
48:16;58:9
**address (1)**
14:3
**adjourn (1)**
65:14
**administrator (9)**
12:14,16,24;15:5,7,11;
58:20,21,25
**administrator's (1)**
13:3
**advice (5)**
31:23,25;32:3;63:5,9
**affect (1)**
53:19
**affected (1)**
53:18
**affidavits (1)**
9:8
**affiliated (1)**
60:14
**affiliates (2)**
8:18;11:18
**Again (6)**
23:18;27:15,15;36:22;
52:13;55:13
**agent (5)**
13:19;34:13;51:19;
57:17;59:4
**agree (1)**
14:16
**agreeable (1)**
14:15
**agreed (1)**
65:14
**ahead (1)**
32:13
**Allweather (2)**
6:22,23
**almost (2)**
18:14;39:14
**Alphonse (9)**
8:5;18:9;28:24;32:8,
21,23;36:17;52:18;
59:22
**Alternative (8)**
6:20;41:6;43:14;
48:21;50:2;51:22;52:9;
54:2
**although (1)**

**7:20**
**always (2)**
58:23;60:16
**America (9)**
6:20;41:5;43:14;
48:21;50:2;51:22;52:8;
54:2,5
**amount (6)**
19:4;33:20,21;44:12,
13;55:9
**answered (1)**
38:2
**apparently (1)**
56:2
**appearance (1)**
8:2
**appearances (1)**
6:5
**appears (5)**
13:9;23:24;24:9;
39:12;42:17
**applied (1)**
62:11
**applies (1)**
62:11
**appointed (1)**
59:12
**appropriate (2)**
11:8;14:21
**approximate (1)**
11:5
**approximately (1)**
12:11
**Arbitrage (3)**
50:9,10,11
**area (1)**
33:24
**arose (1)**
30:11
**around (4)**
16:4;29:2,4;32:6
**aside (1)**
35:25
**assert (4)**
13:24;19:21;25:15;
45:15
**asserted (1)**
25:14
**asserting (1)**
13:21
**Asset (24)**
8:6,12;12:18;13:4;
21:12;23:25;24:11;27:4;
30:10,12,16;37:22;
57:15;59:7,14;62:9,14,
16,19,24;63:11,14,18,19
**associated (1)**
58:23
**assume (2)**
11:24;18:20
**assumed (6)**
37:22;38:8;46:8,12,
14;59:15

**assured (1)**
19:21
**attached (1)**
55:16
**attachment (2)**
23:7,8
**attempted (1)**
55:21
**attend (3)**
9:23;10:9;14:8
**attorney (5)**
5:19,25;6:3;10:17,18;
31:19;47:11
**Attorneys (1)**
3:4
**August (4)**
16:4;63:21,21,21
**authorized (7)**
24:15,19;31:25;34:13;
51:19;57:16;59:3
**Avenue (1)**
3:5
**aware (2)**
55:2;62:24
**away (2)**
32:15;35:2

**B**

**back (7)**
22:13;23:4;30:5;39:2;
46:6;56:9;65:9
**background (1)**
9:22
**bankruptcy (4)**
54:23,25;55:14,20
**based (7)**
13:17,25;14:18;36:21;
46:10;60:18;65:24
**basically (1)**
54:18
**basics (1)**
8:9
**basing (2)**
12:25;60:11
**basis (11)**
12:6;45:9,11;49:11;
50:23;52:22;53:2,3;
61:16,21;62:21
**became (3)**
12:18;15:12;37:15
**become (1)**
44:17
**began (1)**
10:24
**beginning (1)**
16:4
**behalf (17)**
6:7,10,14;16:9;23:22,
25;24:10;25:14,15;
26:19,22;27:4;41:5,11;
51:8;56:18;62:8
**belief (2)**

(1) $2,634,434.02 - belief

IN RE: CHAPTER 11                    CONFIDENTIAL                          GERTI MUHO
FLETCHER INTERNATIONAL, LTD.                                              May 20, 2013

36:18;49:5
**below (1)**
  44:22
**benefited (1)**
  53:14
**benefiting (1)**
  53:17
**Berkley (3)**
  10:13,13,13
**Bermuda (3)**
  5:22;21:11;53:8
**best (1)**
  8:22
**better (1)**
  48:15
**binding (1)**
  53:20
**blurted (1)**
  53:21
**board (3)**
  53:11,12,15
**bogged (1)**
  46:24
**both (3)**
  36:11;51:2,2
**bothering (1)**
  49:18
**box (2)**
  34:12;51:17
**boxes (1)**
  40:20
**break (1)**
  8:24
**British (2)**
  21:10;53:7
**broad (1)**
  13:9
**Buddy (4)**
  12:23;13:6;30:19;32:7
**business (2)**
  30:15;38:3
**businesses (1)**
  30:14
**bypass (1)**
  43:23

**C**

**Ç1,050,000 (1)**
  44:24
**call (7)**
  16:24;23:6;32:11;
  33:2,4;58:16;60:8
**called (6)**
  5:11;15:12,15;38:10,
  10,11
**came (2)**
  19:4;22:15
**Can (26)**
  11:5;12:8;16:23,23;
  25:23;26:24;28:3,6;
  31:10;33:14;35:11;36:5;
  37:13;42:15;43:19,19;

47:14;49:3,15;55:2,8,10;
58:16;61:23;64:6;66:7
**Capital (5)**
  21:6,7,8,9,11
**case (1)**
  43:3;66:9
**cash (1)**
  21:18
**caused (1)**
  24:13
**caution (1)**
  23:19
**Cayman (5)**
  21:5,8,13;51:8;53:7
**Caymans (1)**
  21:5
**certain (14)**
  14:9;17:13;22:17;
  33:12,12;35:4;39:14;
  41:10;45:6,12;49:10;
  60:14,15;65:15
**certainly (3)**
  8:13;9:16;49:15
**certainty (2)**
  39:15;61:23
**chance (1)**
  56:25
**change (3)**
  18:23;43:20,24
**changed (5)**
  15:8,14;44:8,14,16
**changes (10)**
  19:3,19;42:10,14;
  43:10,17;44:11;45:10;
  58:2,3
**changing (1)**
  61:7
**CHAPMAN (22)**
  5:17,19;6:4;7:6,9,12,
  17,22;11:12;14:2,5;
  16:11;24:2;25:18,21;
  27:24;41:15;49:13;64:6;
  65:9;66:5,13
**charge (1)**
  63:2
**chats (1)**
  34:23
**check (3)**
  40:20;51:17;57:14
**checkmark (1)**
  57:17
**checks (1)**
  34:11
**chief (1)**
  30:17
**choice (1)**
  20:4
**chose (1)**
  60:25
**Claim (57)**
  5:1,3,5,7,9;16:8;18:7;
  19:7;20:7;21:22,24;
  23:8;26:17,23;27:2,11;

28:19;29:17;30:2;32:9,
12;33:20,21;34:25;
35:15;40:9;41:5;44:4,
16,21,22;47:18;48:21;
49:14;50:2;54:12,15;
55:15,18,20;56:5,18;
58:4,7,10,14,3,16,16;60:7,
8,12,15;61:3,16,25;62:8;
64:3
**claims (18)**
  27:4;29:21,25;31:8;
  32:10,22;33:1;44:13;
  45:13,15;54:17;60:22,
  23;61:8,14,22;62:11,21
**clean (1)**
  25:23
**clear (4)**
  26:18;43:13;63:6,16
**clients (2)**
  23:22;25:14
**code (2)**
  53:5,6
**college (2)**
  9:23,25
**coming (4)**
  19:16;30:5;41:24;
  66:14
**comment (2)**
  34:2;50:21
**comments (1)**
  66:10
**communication (4)**
  31:13,16;34:24;63:10
**communications (6)**
  13:19;23:20;27:19,20;
  52:24;63:5
**companies (6)**
  8:10;12:19;13:4;21:3,
  4;22:25
**company (7)**
  21:11;24:9;38:7,9,10,
  15;59:9
**company's (1)**
  20:6
**Complete (2)**
  45:3,3
**compliance (1)**
  30:17;62:18
**Composite (2)**
  6:17,24
**compound (1)**
  45:17
**comprised (2)**
  43:22;44:3
**computer (2)**
  40:14;51:21
**concerning (15)**
  23:16;24:24;25:3;
  26:6,8,10,16,25;27:11;
  31:8;34:25;35:9;46:22;
  48:3,3
**conclusion (1)**
  49:12

**conclusions (4)**
  13:13,17;49:9;52:23
**CONFIDENTIAL (61)**
  6:1;7:1;8:1;9:1;10:1;
  11:1;12:1;13:1;14:1;
  15:1;16:1;17:1;18:1;
  19:1;20:1;21:1;22:1;
  23:1;24:1;25:1;26:1;
  27:1;28:1;29:1;30:1;
  31:1;32:1;33:1;34:1;
  35:1;36:1;37:1;38:1;
  39:1;40:1;41:1;42:1;
  43:1;44:1;45:1;46:1;
  47:1;48:1;49:1;50:1;
  51:1;52:1;53:1;54:1;
  55:1;56:1;57:1;58:1;
  59:1;60:1;61:1;62:1;
  63:1;64:1;65:1;66:1
**confidentiality (1)**
  66:8
**confused (1)**
  27:23
**confusion (2)**
  24:13;30:11
**connect (3)**
  38:4;50:5,6
**connection (2)**
  37:13;50:14
**consultant (3)**
  12:18;29:6,7
**contained (1)**
  23:12
**Cont'd (1)**
  3:1
**content (1)**
  31:15
**contents (1)**
  23:20
**context (2)**
  9:18;52:24
**CONTINUED (1)**
  65:7
**continues (2)**
  50:8,9
**contract (4)**
  12:15;29:13,15;49:6
**contracts (1)**
  30:22
**control (2)**
  20:21;37:23
**controlling (1)**
  39:19
**conversation (8)**
  18:16;25:6;28:7,12,
  14,16;29:23;32:6
**conversations (31)**
  23:15;24:23,25;25:8,
  10;26:3,4,5,15,16,25;
  27:7,7,10,13,16,25;28:9;
  29:8,16,19;30:4,6,9;
  31:7;32:4;33:8;34:21,
  23;36:23;48:2
**conveying (1)**

31:23
**copies (9)**
  54:25;55:19;56:2,3,8,
  8,9,13,14
**copy (12)**
  16:11,17,18;19:18;
  25:23;34:5;51:9;56:12;
  57:5,7,8;66:6
**corporate (11)**
  30:15,21;53:5,5,6;
  57:15;59:6,12;62:14,15,
  17
**costs (1)**
  55:9
**counsel (45)**
  5:24;6:4;7:12;13:20;
  14:6,7;23:21;25:8,11,19;
  26:3,16,19,21,22,25;
  27:8,17,19,21;28:3,12;
  31:14;41:20,22,22;
  46:19,25,25;47:7,8;49:7,
  19;52:25;56:21;61:2;
  63:5,7,8,10,12,13,17,19;
  65:12
**couple (2)**
  8:8;25:11
**course (3)**
  30:8;34:14;38:23
**court (4)**
  54:23,25;55:14,20
**courtesy (1)**
  7:13
**courtroom (2)**
  9:6,15
**created (4)**
  39:6,16,18;56:12
**creation (2)**
  39:4,21
**creditor (1)**
  44:4
**creditor's (5)**
  34:12;44:2;51:18;
  57:16;59:3
**current (1)**
  10:22;60:12
**currently (1)**
  48:13
**cut (1)**
  22:3

**D**

**date (4)**
  15:14;18:19;50:15;
  65:14
**Davis (1)**
  5:20
**day (12)**
  12:17;13:2;18:17;
  19:12;22:20;24:24,25;
  26:6;28:6;35:6;54:18;
  55:7
**deal (2)**

IN RE: CHAPTER 11
FLETCHER INTERNATIONAL, LTD.

CONFIDENTIAL

GERTI MUHO
May 20, 2013

12:5;27:25
**dealt (1)**
  27:18
**Deborah (2)**
  7:11,20
**debt (1)**
  44:12
**debtor (4)**
  43:22;44:3;48:19;50:7
**December (1)**
  48:19
**definitely (2)**
  51:12;61:25
**degree (2)**
  10:7;39:14
**Dehallow (1)**
  59:18
**Delaware (3)**
  29:13,14;50:13
**deliver (1)**
  29:24
**Dennis (1)**
  58:24
**deposition (6)**
  9:6,18,19,20;65:14,22
**Designated (3)**
  6:19,19,20
**details (2)**
  18:22;27:6
**digits (2)**
  44:14,15
**direction (1)**
  6:11
**directions (1)**
  7:20
**directly (1)**
  22:15
**director (37)**
  6:12;22:24,24,25;
  23:2,2;24:3,5,16;29:12;
  30:14;35:19,21;36:7,9,
  10,12,13,14,16,16,18,19;
  51:2,4,5,6;52:8,12,14,17,
  18;53:3,9,24;54:10;
  62:18
**directors (7)**
  37:5;52:15;53:11,12;
  54:6,7,11
**disclose (2)**
  23:20;31:15
**disclosing (2)**
  37:4;53:15
**discuss (2)**
  12:8;27:18
**discussed (5)**
  11:8;33:3,4,9;60:8
**discussing (1)**
  19:17
**discussion (3)**
  60:5,6;64:8
**disqualified (6)**
  36:9,19;52:15,20;
  53:10,24

**distinctive (1)**
  61:5
**document (31)**
  16:19,23;17:5,8,10,16;
  18:19,24;19:9,11,15;
  23:24;25:2;34:3,17;
  39:4,21,22;40:7,10,16,
  17,18,24,25;41:2,25;
  42:15;43:7;56:25;57:11
**documentation (1)**
  58:12
**documents (21)**
  18:7,13;19:13,18,25;
  20:13;24:14,21;25:3;
  34:20;38:18,21,24;39:3;
  40:2;51:11;57:3,4,24;
  59:24;60:5
**dollars (1)**
  55:9
**done (7)**
  12:2;45:25;46:7,10,
  13;51:19;54:20
**doubt (1)**
  39:8
**doubting (1)**
  39:11
**down (3)**
  19:20;42:11;46:24
**drawing (1)**
  13:10
**Driver's (1)**
  10:20
**due (4)**
  24:22;30:12;32:10;
  54:18
**Duhallow (8)**
  56:19,22;58:24;59:4,
  9,16,19;60:6
**duly (1)**
  5:12
**during (1)**
  33:3

**E**

**earlier (11)**
  6:9;7:4;11:14;12:20,
  21;18:6;28:21,23;41:20;
  61:10;62:17
**easier (2)**
  19:22,23
**Eisler (1)**
  5:20
**either (3)**
  12:19;15:18;31:11
**electronic (10)**
  17:22;40:3,11;51:13,
  14,20;57:7,8,12;62:13
**electronically (4)**
  40:12,13;54:22;57:19
**Elite (5)**
  6:17,19;21:6;48:18;
  51:8

**Ellis (10)**
  17:14,18,20;20:13;
  22:8,12;28:10;32:14;
  60:24;61:5
**else (9)**
  27:11;29:22;31:5;
  32:5;33:6;36:7,14;
  51:11;59:23
**elsewhere (1)**
  60:16
**E-MAIL (9)**
  3:10;17:11;22:11,15;
  30:6,20;31:9;32:24;
  60:13
**e-mailed (1)**
  22:9
**e-mails (1)**
  34:23
**employee (3)**
  13:19;15:21;60:14
**ended (1)**
  56:3
**ensure (1)**
  52:23
**entered (1)**
  37:3
**entering (2)**
  53:13,19
**entire (1)**
  56:25
**entities (17)**
  8:17;11:16,17;13:14;
  20:12,14;21:14;26:23;
  37:11,25;38:5;47:10;
  51:3;52:3,6,7;61:12
**entitled (1)**
  63:2
**entity (28)**
  11:20;12:3;20:15,24,
  24,25;21:2,9,10,13,23,
  25;22:2,5;23:2,4;26:20,
  21;36:6;37:13,14,18;
  38:15;41:21;50:18;
  53:21;58:18;63:23
**equity (6)**
  37:18,21,21;39:19,19;
  50:10
**ESQ (1)**
  3:7
**Eurostrategies (1)**
  6:25
**even (7)**
  37:20;38:13,14;54:10;
  55:25;56:8,13
**event (1)**
  14:10
**exact (3)**
  15:14,17;19:20
**exactly (2)**
  13:25;46:12
**EXAMINATION (2)**
  5:16;65:7
**examined (3)**

  5:12;19:14;20:7
**examining (1)**
  44:20
**example (3)**
  45:5,7,8
**except (5)**
  8:25;28:9;46:18;
  54:11;60:7
**exception (1)**
  25:12
**exclude (1)**
  9:8
**Excuse (3)**
  25:19;49:2,8
**Exhibit (49)**
  5:1,3,5,7,9;16:8,14,24,
  24;20:15;22:6;23:5,13,
  16;25:2;26:6,7,11,12,13;
  33:22,24;35:9,10,13;
  40:21;41:4;42:9,14;
  44:19;45:16;46:5,17,23;
  47:24;48:4,13;54:13;
  56:17;57:22;58:4;59:9;
  60:2,9,19;62:3,7,21;64:2
**exhibits (3)**
  25:20,22;61:22
**existed (2)**
  38:4,4
**exists (1)**
  38:6
**expectation (1)**
  14:17
**experience (1)**
  46:11
**explain (2)**
  44:10;55:23
**explore (2)**
  49:13,15
**extent (21)**
  8:25;13:16;26:20;
  27:16;28:15;31:24;
  35:17,22;36:15,16;37:8,
  25;41:11;47:16;48:11,
  20;49:16,24;50:19;63:3;
  66:5
**extra (2)**
  37:14;50:20

**F**

**fact (2)**
  56:14;60:11
**facts (1)**
  49:10
**FAM (13)**
  8:13,17;11:17,21,24,
  24,25;12:3,22;13:14;
  14:7;15:5,21
**FAM's (1)**
  13:20
**far (1)**
  13:4
**FAX (1)**

  3:9
**feel (2)**
  14:10;34:20
**fees (1)**
  63:2
**few (1)**
  18:6
**FIA (12)**
  39:13;44:21,23;47:18,
  21;50:6,6,8,8,10,11,12
**figure (1)**
  29:10
**figures (3)**
  19:20;45:3,21
**FII (6)**
  8:11,17;11:17;14:7;
  20:5;23:23
**FILB (1)**
  5:22
**file (3)**
  44:4;54:12,14
**filed (5)**
  16:8;41:5;50:2;56:18;
  62:8
**filing (1)**
  29:21
**fill (3)**
  40:19,23,24
**final (1)**
  42:3
**finally (1)**
  54:24
**Finance (1)**
  10:8
**Financial (5)**
  56:19;59:5,10,17;60:6
**finding (1)**
  54:24
**fine (1)**
  33:13
**finish (1)**
  49:9
**firm (1)**
  63:23
**first (14)**
  5:12;9:20;12:12,20,
  21;15:12;17:21,22;
  40:21;44:10;54:21;
  55:11;61:22;63:17
**fit (1)**
  37:10
**five (1)**
  53:9
**Fletcher (71)**
  3:4;5:21;8:6,6,7,10,12,
  15:10;25:11;9,14;12:12,
  16,20;13:13,15;18:9,10;
  20:12,14,21;25:23;22,
  25;24:10;26:21;27:4;
  28:24;29:12,14;30:10,
  11,12,16;32:23;36:17;
  37:22;39:13;40:5,9;
  42:19,19;48:17;50:12,

IN RE: CHAPTER 11
FLETCHER INTERNATIONAL, LTD.

CONFIDENTIAL

GERTI MUHO
May 20, 2013

14;51:4,5,6,6;52:3,19;
54:2,4,9;57:15;59:6,13,
13,22;60:2,22,23;62:9,
14,16,19,24;63:11,14,18,
19;64:3
**Fletcher-related (4)**
8:16;11:16;22:2,5
**Fletcher's (2)**
32:8,22
**Floor (1)**
3:5
**Floyd (1)**
31:9
**focus (1)**
29:8
**follows (2)**
5:13;65:5
**form (3)**
22:8;34:24;40:23
**forth (8)**
8:8;35:9;46:16,22;
47:24;48:4;58:13;62:21
**forward (1)**
39:10
**forwarded (1)**
22:16
**four (5)**
21:3,4;44:14,15,22
**fourth (1)**
43:13
**front (1)**
44:18
**fully (1)**
37:18
**function (1)**
21:25
**Fund (18)**
6:16,22,22;22:3,4,25;
50:8,10,11,18,19;51:24,
25,25;53:21;56:15;
63:24;64:4
**Funds (34)**
6:8,15,15;7:5;12:16;
15:15,19;20:3,10,18,22;
21:15,15,19,24;25:16;
26:20;29:19,20;30:11;
33:11;37:16;38:4;41:9,
21;44:21,23;45:20;
47:19;50:6,7,9;61:12;
63:22
**funnels (1)**
20:20
**further (1)**
65:13
**future (1)**
49:16

## G

**gave (2)**
22:13;32:11
**gentlemen (2)**
16:12;65:16

**GERTI (2)**
5:11;65:5
**gets (1)**
7:20
**given (8)**
9:7;13:5;42:20;56:3;
58:17,22;59:11,14
**goes (1)**
50:20
**Good (3)**
5:18;8:3;19:4
**Gotshal (1)**
6:7
**graduate (2)**
10:5,15
**Group (4)**
7:21;11:21;37:16;61:6
**grouped (1)**
60:17
**guard (1)**
10:22

## H

**habit (1)**
32:19
**hand (4)**
9:17;17:24;56:6,7
**hand-deliver (1)**
29:25
**handle (1)**
29:24
**handwriting (6)**
17:5;24:8;34:6,7,9,11
**happen (1)**
15:23
**happy (2)**
8:24;47:8
**hard (1)**
55:19
**headed (1)**
43:14
**hedge (1)**
51:24
**held (2)**
38:3;50:12
**helped (1)**
46:2
**helpful (1)**
6:13
**high (1)**
39:14
**himself (6)**
13:15;23:21;30:19;
53:14,17;55:13
**hired (1)**
63:20
**hold (1)**
50:8
**holding (9)**
12:18;13:4;20:23;
21:2;38:5;39:20;42:19;
44:2,21

**Holdings (2)**
37:14;44:23
**hours (1)**
18:6
**house (1)**
15:17
**hurry (1)**
34:8

## I

**idea (4)**
15:2;16:2;51:24;54:23
**Identification (5)**
5:2,4,6,8,10
**identify (1)**
21:23
**immediately (1)**
28:25
**impression (2)**
42:25;56:5
**in- (1)**
15:16
**inasmuch (1)**
23:21
**Inc (57)**
6:21,23,23,24,25;7:21;
8:7,10;16:9;20:16,19,22,
23;21:2;22:7,20;23:3,9;
24:4;26:9;29:12,14;
30:10;33:23;35:15,22;
36:5,8;37:6,10,12,14,17;
38:5,9;39:17,20;41:6;
42:19,20;43:15;44:23;
50:3,13;51:4,6,7,23;
52:9;54:3;57:16;59:7,
14;62:9,25;63:18,20
**included (1)**
55:5
**includes (1)**
11:17
**including (6)**
8:17;13:14;15:15;
20:15;30:6;34:23
**Incorporated (1)**
48:18
**Inc's (1)**
63:15
**independent (4)**
12:13;13:3;58:20,21
**indicated (1)**
65:11
**indirect (1)**
37:23
**indirectly (2)**
37:19,19
**individual (1)**
60:7
**information (22)**
35:8,13;45:17,23;
46:15,16,21,22;47:2,5,7,
9,12,23;48:3,5,12,16;
58:6,10,13;63:14

**in-house (7)**
12:14,15;15:5,7,11;
58:21,22
**input (4)**
16:22;61:7,9,13
**inquiries (4)**
61:15,20,24;62:20
**instead (2)**
18:11;53:5
**instruct (9)**
13:21,22;17:25;23:19;
25:16;27:15;31:15;
41:12,13
**instructed (1)**
60:2
**instruction (3)**
25:5;27:21;31:13
**instructions (3)**
17:15,20,24
**interest (6)**
37:4;48:18;50:10,11,
17;52:19
**interesting (3)**
37:2;43:2;50:19
**interests (3)**
12:2,24;44:5
**interjecting (1)**
49:19
**International (13)**
5:21;8:7,10;29:12,14;
42:20;48:17;50:13,15;
51:4,5,7;59:13
**into (13)**
7:24;14:15;19:16;
20:5,5;27:6;37:3,10;
53:13,20;61:15,21;62:20
**invested (1)**
20:4
**investigate (1)**
23:11
**investing (1)**
39:16
**investment (4)**
21:18;47:6;48:22;
51:25
**Investments (9)**
6:21;20:5;41:6;43:15;
47:10;50:3;51:22;52:9;
54:2
**investor (2)**
39:12;47:14
**investors (7)**
21:16;47:16,17,20,20;
53:25;54:4
**Islands (3)**
21:10;53:7,8
**issue (4)**
21:16,16,17;49:17

## J

**January (1)**
18:18

**job (2)**
18:3,5
**John's (1)**
10:4
**joined (1)**
63:7
**journey (1)**
47:4
**Junior (4)**
8:6;18:9;28:24;52:19

## K

**K&E (2)**
61:13,14
**K&E's (1)**
61:14
**keep (1)**
46:24
**keeps (1)**
49:19
**kind (5)**
14:20;22:13;34:16;
40:18,20
**Kirkland (12)**
17:14,18,20;20:13;
22:8,12;28:10;32:14;
60:24;61:4,13,14
**knowledge (5)**
13:25;39:25;40:6;
45:12,14

## L

**lack (1)**
54:19
**last (6)**
20:22;37:17,17;44:14,
15;46:4
**latest (1)**
15:9
**Law (11)**
10:13,13;11:25;12:22,
23;18:12;53:4,4,6,6;
63:23
**left (1)**
34:6
**legal (5)**
13:16;31:23,25;32:3;
52:23
**less (12)**
19:25;24:20;33:11,11,
11,11,12,16,16,16,18,25
**letter (1)**
12:25
**letters (1)**
46:18
**leveraged (8)**
20:5;39:13;44:21,23;
47:18;50:6,7,8
**Levine (12)**
6:6,6,14;7:7;14:24;
25:13;27:22;31:21;41:8,

17;46:18;66:3
**license (1)**
  10:20
**licenses (2)**
  10:19,21
**likely (4)**
  9:13;20:9;22:12,12
**likes (1)**
  16:18
**Limited (16)**
  5:21;6:16,17,17,18,19,
  22;11:7;38:11,13,15,15;
  39:5,6;50:15;51:8
**liquid (1)**
  13:5
**listed (1)**
  59:9
**little (2)**
  33:14;55:24
**live (1)**
  9:8
**LLC (3)**
  15:10,19,19
**LLP (4)**
  3:3;8:4;17:14;39:9
**located (4)**
  21:4;39:24;40:4,5
**long (1)**
  47:3
**longer (4)**
  43:2,3,5;50:14
**look (5)**
  16:10;25:25;51:12;
  55:25;56:13
**looked (1)**
  57:22
**looking (5)**
  13:2;18:11;43:12,13;
  60:15
**looks (4)**
  16:17;17:4;34:10,16
**LP (3)**
  39:5,15;64:4
**Lucia (1)**
  5:19
**Luncheon (1)**
  64:9
**Luskin (1)**
  5:19
**lying (1)**
  19:24

## M

**Madison (1)**
  3:5
**mainly (1)**
  40:18
**making (2)**
  49:21;56:20
**Management (29)**
  8:6,12;21:3,4,6,7,8,9,
  11,13;22:25;23:25;

24:11;27:5;30:10,12,16;
57:15;59:7,14;62:9,14,
16,19,25;63:2,14,18,20
**Management's (2)**
  37:23;63:11
**managing (2)**
  30:13;62:18
**Manges (1)**
  6:7
**many (3)**
  15:15;20:20;24:13
**marked (1)**
  5:2,4,6,8,10;16:7;
  41:4;56:16;62:6;64:2;
  65:23
**matter (1)**
  38:16
**may (24)**
  8:13;10:22;11:6;
  12:14,17;14:9;22:13;
  23:14;24:12,17,18;
  29:11,13,15;35:4;36:19;
  44:9;45:4;53:18,21;
  54:10;55:12;58:17;
  65:15
**Maybe (1)**
  53:6
**mean (14)**
  9:4;16:20;19:6;25:9;
  31:24;33:12;35:14;
  36:15;40:14;45:4;47:3;
  54:8,14;59:19
**Meaning (1)**
  45:3
**meantime (1)**
  26:2
**meetings (1)**
  36:21
**member (2)**
  53:10,12
**members (1)**
  53:15
**mentioned (2)**
  11:13;21:25
**MICHAEL (10)**
  3:7;8:4;19:17;29:5,20;
  42:6;45:18.25;46:9,13
**mid (2)**
  63:21,21
**might (2)**
  48:13,14
**mind (1)**
  7:25
**mine (2)**
  34:10,10
**Minor (1)**
  42:10
**money (2)**
  20:20;30:2
**more (6)**
  30:8;33:4,14;46:9,20;
  48:16
**morning (2)**

5:18;8:3
**most (5)**
  9:13,15;20:9;22:12,12
  mtremonte@shertremontecom (1)
  3:10
**much (4)**
  35:6;36:4;38:16;66:13
**MUHO (71)**
  5:11,18;6:1;7:1,6;8:1,
  19;9:1;10:1;11:1;12:1;
  13:1;14:1;15:1;16:1;
  17:1;18:1;19:1;20:1;
  21:1;22:1;23:1;24:1;
  25:1;26:1;27:1;28:1;
  29:1;30:1;31:1;32:1;
  33:1;34:1;35:1,23;36:1;
  37:1;38:1;39:1;40:1;
  41:1,10;42:1;43:1;44:1;
  45:1;46:1;47:1;48:1;
  49:1,24;50:1;51:1;52:1;
  53:1,23;54:1;55:1;56:1;
  57:1;58:1;59:1;60:1;
  61:1;62:1;63:1;64:1;
  65:1,5;66:1,10
**must (1)**
  20:2
**myself (5)**
  39:8,11;42:11;53:4;
  55:23

## N

**name (6)**
  5:18;6:15;15:18;24:7;
  51:18;57:14
**names (3)**
  8:9;15:8,14
**necessary (1)**
  55:4
**need (2)**
  8:23;33:5
**needed (5)**
  28:20,25;34:20;44:8;
  55:3
**nervous (1)**
  32:19
**New (5)**
  3:6,6;6:16;21:12;
  63:23
**next (2)**
  51:18;57:16
**Nobody (2)**
  51:11;59:23
**non-disqualified (1)**
  52:14
**none (3)**
  47:6,7,9
**non-Fletcher (1)**
  60:13
**non-voting (2)**
  21:16,17
**Nor (1)**
  14:21

**not-already-filled-in (1)**
  40:23
**note (2)**
  23:23;24:6
**Noted (3)**
  65:3,24;66:15
**noticed (2)**
  13:2;32:7
**notify (1)**
  32:21
**number (4)**
  13:12;22:6;44:17;
  54:17
**numbers (7)**
  45:21;46:2,13;47:24;
  48:7;61:7,11

## O

**oath (5)**
  9:7,10,11,14,16
**object (4)**
  14:10;27:14;48:23;
  49:3
**objection (13)**
  13:8;14:20;25:4,13,
  15;27:21,22;28:4;31:12,
  21;50:22;52:21;63:3
**objections (3)**
  14:13,18;65:24
**obligations (1)**
  63:15
**observation (1)**
  60:18
**observers (1)**
  14:8
**occur (1)**
  18:16
**occurred (1)**
  15:25
**off (8)**
  22:4;34:12;40:20;
  44:13;61:11;64:5,6,8
**offered (1)**
  55:7
**office (9)**
  18:12,23;19:16;20:11;
  28:21,25;29:2,4;42:7
**officer (2)**
  13:20;30:17
**once (2)**
  54:15,22
**one (22)**
  6:11;10:23;12:20,21;
  13:2;15:18;19:14;20:9,
  19;21:4,5,24;26:12;
  31:11;41:9;43:20;45:22;
  46:20;47:15;53:12;
  54:20;56:10
**ones (1)**
  54:21
**only (5)**
  56:13;39:8,11;41:15;

52:13
**opinion (2)**
  36:21;53:24
**opinions (1)**
  49:21
**opportunity (1)**
  65:21
**Optima (1)**
  6:21
**order (6)**
  19:19;20:21;42:10,11;
  65:23;66:9
**organized (1)**
  54:19
**original (2)**
  33:8;44:7
**originally (2)**
  21:19;45:2
**originated (1)**
  22:11
**others (1)**
  60:16
**out (5)**
  29:11;55:24;56:6;
  60:25;63:23
**outside (2)**
  63:12,19
**over (10)**
  15:8,25;32:25;36:21,
  22;47:4,13;53:4;60:6,7
**owed (1)**
  44:12
**own (2)**
  21:14;29:3
**owned (2)**
  20:25;37:18
**owns (1)**
  21:2

## P

**page (13)**
  16:14;17:5;24:6;34:4,
  6;43:14;44:20;46:4;
  51:9,18;55:10,11;57:5
**pages (3)**
  23:7;40:21;55:15
**paper (1)**
  55:6
**papers (1)**
  56:6
**paperwork (1)**
  13:3
**Pardon (1)**
  52:11
**parent (6)**
  20:24,24,25;23:2;
  38:7,8
**part (5)**
  9:21;12:3;24:21;
  37:15;52:7
**participation (1)**
  13:18

**particular (1)**
58:3
**Partner (1)**
39:9
**Partners (5)**
38:11,13;39:5,6,15
**Partnership (5)**
38:12,14,14,16;39:6
**party (1)**
27:20
**passes (1)**
20:20
**pass-through (1)**
36:6
**pen (2)**
16:25;43:9
**pending (1)**
9:2
**people (4)**
20:10;27:17;28:18;
45:18
**permit (1)**
61:5
**permitting (1)**
14:6
**person (4)**
6:11;29:24;45:18;
59:12
**personal (8)**
29:3;32:8,8,22;40:14,
14,14;60:8
**personally (1)**
53:17
**PHONE (8)**
3:8;32:15,25,25;33:3;
35:2,25;60:8
**photocopies (1)**
55:8
**photocopy (3)**
30:3;55:9,10
**piece (1)**
42:3
**pin (2)**
19:20;42:11
**Pitagora (3)**
21:5,7,8
**place (4)**
54:24;60:21,22;66:9
**please (14)**
6:5;8:2,22,24;12:8;
16:10;35:2,23;41:4;
43:6;49:8;56:18;61:18;
62:7
**plenty (1)**
25:9
**pm (10)**
18:17;24:22;29:2,4;
32:7,7,10;64:9;65:3;
66:15
**point (4)**
15:20;55:24;58:19;
65:12
**points (1)**

14:9
**position (5)**
7:23;14:6;30:12;
31:18;36:20
**positive (1)**
18:14
**post-graduate (1)**
10:9
**pre-filled (2)**
40:18,19
**Premium (2)**
6:18,20
**prepare (5)**
16:19;17:2;40:25;
41:2,25
**prepared (3)**
18:25;20:10,13
**presence (1)**
13:18
**present (1)**
6:5
**presented (1)**
45:22
**pretty (1)**
13:8
**previous (1)**
49:11
**previously (3)**
9:14;30:9;48:11
**primarily (2)**
43:21;44:3
**primary (1)**
42:19
**prior (2)**
14:14;63:8
**priority (1)**
47:18
**privilege (9)**
13:22,24;14:11,19;
28:3;41:10,24;49:14;
65:24
**privileged (4)**
28:13;41:12,16,18
**Professional (1)**
10:21
**Proof (21)**
5:1,3,5,7,9;16:8;18:7;
20:6;21:24;23:8;41:5;
48:21;50:2;54:12;56:18;
58:4,7,10,14;62:8;64:3
**proofs (15)**
19:7;21:22;26:17,23,
25;27:4,11;28:19;29:17;
31:8;34:25;55:14,18,20;
61:3
**protect (1)**
44:4
**protective (2)**
65:23;66:8
**provided (4)**
22:8;48:17;63:13;66:6
**purchased (1)**
56:12

**purchasing (1)**
39:18
**purpose (6)**
11:7;39:7,8,16,18;
56:4
**purposes (2)**
21:19;58:25
**pursuant (2)**
65:23;66:8
**put (9)**
7:8;32:15;35:2,25;
42:3;43:9,20;45:24;
57:13

## Q

**Qualified (4)**
36:9,12,13;53:24
**question-by-question (1)**
12:6
**quickly (3)**
19:5,6;55:7
**quite (2)**
35:6;50:19

## R

**raise (1)**
14:19
**raised (1)**
9:17
**read (6)**
18:23,24;23:14;34:19;
35:11;42:15
**reading (1)**
36:21
**reads (1)**
44:2
**Really (1)**
11:4
**reason (4)**
36:3;39:8,11;58:23
**reasons (3)**
53:9,13,19
**recall (14)**
12:11;15:13,17;18:20,
22;19:8,16;20:6;35:5;
36:3,5;42:13;43:11;44:9
**receive (12)**
17:10,15,19;35:12;
46:15,21;47:12;58:6,9,
12;60:9,10
**received (12)**
20:12;23:5;47:5,9;
60:13,15,19,21,22;61:4;
62:25;63:9
**recently (1)**
63:8
**recess (1)**
64:9
**record (12)**
7:8,19;23:23;26:18;
28:23;43:12;64:5,7,8;

65:9,10,25
**recount (2)**
28:6,8
**refer (5)**
5:22;8:15;11:14;
39:10;61:14
**reference (1)**
29:3
**referred (4)**
8:11,12;21:20;39:21
**referring (9)**
8:13,16;11:15;17:4;
20:18;43:25;44:20;
59:18,21
**reflect (4)**
27:18;38:18,21;65:10
**reflected (4)**
18:19;20:15;45:16;
54:13
**reflects (3)**
31:13;34:7;63:4
**Regarding (2)**
35:14;63:10
**regardless (1)**
53:23
**related (1)**
11:16
**relating (1)**
47:5
**relation (1)**
29:18
**relationship (10)**
22:18,19;37:24;38:22;
52:2,4,5;59:4,8,16
**relevant (2)**
48:20;49:25
**reliance (1)**
45:18
**relied (1)**
45:20
**remain (2)**
36:16;52:10
**remaining (1)**
47:20
**remember (3)**
10:23;43:10;63:22
**rephrase (1)**
60:3
**report (1)**
7:15
**REPORTER (2)**
25:19,24
**represent (3)**
5:20;8:5;41:9
**represented (3)**
5:24;7:19;41:22
**represents (2)**
45:19;56:22
**request (4)**
11:6;14:12;45:9;65:22
**requested (1)**
33:10
**require (1)**

24:20
**required (3)**
11:25;12:22,23
**requirement (1)**
9:10
**re-signed (1)**
17:21
**resigning (1)**
24:18
**respect (16)**
11:22;13:13,15;17:16;
22:6;33:18,22;41:15,17;
42:8,13;44:19;46:4;
49:17;57:21;61:2
**respond (1)**
30:24
**restate (1)**
8:23
**restructuring (1)**
50:5
**resumed (1)**
65:5
**retain (1)**
65:12
**retrace (1)**
32:20
**return (1)**
21:18
**Returns (1)**
6:21
**review (11)**
34:17,20;41:7;55:25;
56:17,24,25;62:7;64:3;
65:21;66:7
**reviewed (2)**
19:10;57:4
**rewriting (1)**
24:18
**RF (2)**
15:9,18
**RFS (3)**
15:16,18;29:15
**Richard (1)**
5:20
**Richcourt (75)**
6:8,15,22,23,24,24;
7:19;14:7;15:15,19;
16:9;20:3,3,16,19,21,22,
23;21:2,10;22:7,19,20,
24;23:3,4,8;24:3;25:16;
26:8,19,20,22;29:19,20;
33:10,23;35:15,20,21;
36:5,7;37:6,9,10,12,14,
15,16,16,25;38:5,9,10,
11,13;39:4,5,9,15,17,19;
41:20,21;45:20;47:6,10,
13,19;50:18;52:6,7;
60:14;61:11,12
**right (9)**
12:4;14:20,22;22:10,
17,28:15;35:6;54:20;
66:2
**rights (3)**

IN RE: CHAPTER 11           CONFIDENTIAL           GERTI MUHO
FLETCHER INTERNATIONAL, LTD.                          May 20, 2013

21:3;63:11,15
**Robert (1)**
  6:6
**rough (1)**
  16:2
**round (1)**
  44:17
**RPLP (2)**
  39:10,12
**run (1)**
  29:24
**rush (1)**
  55:22

## S

**same (20)**
  12:17;14:24,25;19:2;
  22:22;25:4,4,13,15;
  27:21,21,22;31:12,21;
  57:3,7;60:21,22;62:11;
  66:3
**Saunders (2)**
  31:9,18
**save (1)**
  62:10
**saw (4)**
  29:4;40:7;42:7;53:8
**saying (3)**
  30:20;31:10;49:20
**SBC (2)**
  6:16;63:24
**School (1)**
  10:14
**schools (1)**
  10:10
**second (5)**
  16:13;17:5;52:17,18;
  57:5
**secretary (8)**
  30:16,21;57:15;59:6,
  13;62:14,15,18
**Security (1)**
  10:22
**self-interested (1)**
  37:3
**sell (1)**
  53:21
**send (1)**
  32:14
**sends (1)**
  31:9
**sent (1)**
  30:19
**sentence (1)**
  43:25
**series (6)**
  8:19;44:21;47:16,21;
  50:6,7
**serve (1)**
  53:11
**servers (1)**
  40:5

**service (1)**
  20:12
**Services (8)**
  15:10,16,16,19;56:19;
  59:5,10,17
**serving (1)**
  53:10
**set (8)**
  8:8;35:9;46:16,22;
  47:24;48:3;58:13;62:21
**share (1)**
  16:12
**shares (7)**
  21:3,15,16,17;47:22;
  50:9,10
**SHER (2)**
  3:3;8:4
**S-H-E-R (1)**
  8:5
**short (2)**
  22:14;24:14
**shortcut (2)**
  24:17,20
**show (5)**
  16:7;41:3;56:16;62:6;
  63:25
**showed (1)**
  19:18
**side (1)**
  43:9
**sides (1)**
  51:2
**Siedlecki (8)**
  19:17;29:5,20;33:9;
  42:7;45:19;46:9,13
**sign (27)**
  17:25;18:2,3,7,13,13,
  18;19:22,24;23:5;30:10,
  19,20;31:10,25;32:14;
  33:5;51:3;57:24;58:11;
  59:11,15,23;60:2,4;62:5,
  13
**signatory (3)**
  24:15,19;32:2
**signature (14)**
  16:13,15,18;17:23;
  34:5;51:10,13,15;57:6,9,
  13;62:4,12,13
**signatures (1)**
  57:21
**signed (41)**
  12:25;17:22,23;18:17,
  21;19:3,6,13;22:21;
  23:17,24;24:3,10;25:2;
  26:6;30:22;32:9,12,12,
  22;34:25;50:16,25;51:7,
  7,11,11;54:16,21,21;
  55:18,19;56:2,11;57:11,
  12;59:3;60:10;61:16;
  62:3,12
**signing (11)**
  17:19;18:14;19:5,25;
  24:13,14,21;30:23;

34:18;55:25;62:23
**similar (4)**
  18:25;19:14,15;40:20
**simplest (1)**
  30:22
**sold (1)**
  48:18
**sole (4)**
  39:7,7,16,18
**solution (2)**
  55:6,7
**someone (1)**
  17:14
**Sometime (2)**
  16:3;35:7
**sometimes (2)**
  8:11,12
**sorry (15)**
  21:7;22:3;32:8,17;
  35:3,24;38:20,25;39:2;
  41:13,18;42:23;43:8;
  58:8;60:3
**sort (4)**
  42:25;58:19,19,20
**Soundview (9)**
  6:16,17,18,18;21:5,6,
  9;48:18;51:8
**speak (2)**
  6:2;25:11
**special (3)**
  58:15,16,16
**specific (13)**
  11:13,22;19:25;21:23;
  33:14,16,17,18;43:5,17;
  45:13;47:24;59:9
**specifically (5)**
  11:23;19:8;33:23;
  42:13;48:14
**specificity (1)**
  33:25
**specify (3)**
  11:9,10;15:24
**speculation (2)**
  56:20,21
**spending (1)**
  30:3
**spoke (1)**
  28:18
**St (1)**
  10:4
**stake (1)**
  39:19
**stamp (2)**
  55:2,5
**stamped (3)**
  55:15;56:4,11
**standing (1)**
  28:4
**Star (2)**
  6:18,19
**start (2)**
  16:3;40:10
**started (2)**

12:12,17;15:4,12
**starting (1)**
  12:14
**state (2)**
  6:5;39:5
**stated (8)**
  6:10;7:3,18;24:2;
  28:21,23;41:20;45:15
**statement (4)**
  23:14;43:22,23;44:7
**statements (6)**
  9:7;23:12;42:12;43:3,
  5;65:17
**stating (1)**
  7:25;49:5,9,21
**step (1)**
  20:23
**Stern (1)**
  5:20
**Steward (1)**
  55:12
**Stewart (8)**
  19:16;29:5,6;42:6;
  45:24;46:2,7,8
**still (1)**
  38:5
**stored (2)**
  40:12,13
**Street (1)**
  20:11
**structure (3)**
  37:10;38:19,22
**submit (2)**
  30:2;55:21
**submitted (1)**
  54:18
**submitting (1)**
  54:19
**subordinated (4)**
  47:14,17,20,21
**subscriptions (1)**
  38:25
**substitute (1)**
  25:23
**sufficient (2)**
  45:12,14
**sufficiently (2)**
  42:21;43:23
**suggest (1)**
  58:3
**suggested (2)**
  19:2,19
**suggestion (3)**
  12:5;42:3;49:4
**suggestions (2)**
  42:5,8
**Sullivan (1)**
  7:21
**supporting (1)**
  46:16
**sure (8)**
  9:14;25:24;29:11;
  30:18;31:17;46:12;55:4,

14
**swear (1)**
  5:14
**swore (1)**
  9:17
**sworn (1)**
  5:12

## T

**talked (1)**
  61:9
**talking (1)**
  9:8
**technicalities (1)**
  43:24
**technicality (1)**
  55:16
**tend (1)**
  43:24
**tends (1)**
  46:9
**terms (1)**
  8:9
**testified (14)**
  5:12;9:3;19:10,12;
  25:7;26:5;34:4,22;
  35:19;37:9;48:12;49:25;
  61:21;65:5
**testify (3)**
  9:4,5,6
**testifying (1)**
  32:16
**testimony (8)**
  9:9;22:7;41:11,12,14,
  16,18;49:11
**texts (1)**
  34:24
**thinking (1)**
  14:20
**though (2)**
  54:10;56:8
**thought (2)**
  35:5;56:7,9,10
**three (1)**
  61:22
**three-month (1)**
  12:15
**thus (1)**
  36:20
**today (6)**
  5:24;8:20;11:14;14:8;
  22:22;65:13
**today's (1)**
  65:22
**together (3)**
  42:3;45:25;61:6
**told (11)**
  18:6,8;28:20,22,24;
  32:13;54:24;58:11;
  59:11,14;60:4
**took (5)**
  19:4;44:13;53:3;

IN RE: CHAPTER 11
FLETCHER INTERNATIONAL, LTD.

CONFIDENTIAL

GERTI MUHO
May 20, 2013

55:19;61:11
**top (2)**
  37:14;44:19
**touch (1)**
  34:2
**touched (1)**
  61:10
**transacted (1)**
  30:14
**transaction (7)**
  37:3;49:25;50:24,25;
  53:14,16,20
**transactions (1)**
  30:15
**transcript (2)**
  65:21;66:7
**transferred (1)**
  50:17
**TREMONTE (24)**
  3:3,7;7:25;8:3,4,4;
  11:6;13:7,12;14:16;
  23:18;24:6;25:4,14;
  27:14;31:12,22;48:23;
  49:2,8;50:22;52:21;
  63:3;65:18
**trouble (1)**
  62:10
**true (3)**
  43:4,6;60:4
**trustee (7)**
  5:21;16:7;29:6;41:4;
  56:17;62:6;64:2
**Trustee's (6)**
  5:1,3,5,7,9;14:5
**truth (4)**
  9:17;13:11;49:21,23
**try (2)**
  11:22;14:22
**trying (3)**
  29:10;55:23,24
**turn (1)**
  21:14
**Turner (9)**
  19:17;29:5,6;33:9;
  42:6;45:24;46:2,7;55:12
**two (7)**
  24:7;34:4,6;40:21;
  51:9,18;56:14
**type (3)**
  17:2;40:19;60:14
**typing (1)**
  17:7

**U**

**ultimately (3)**
  31:2;43:21;44:3
**uncertain (1)**
  42:22
**uncertainty (1)**
  42:21
**unclear (1)**
  12:7

**under (11)**
  9:7,10,11,14,16;24:7;
  37:21,22;42:24,24;56:5
**underlying (4)**
  35:13;44:2;58:10,13
**understood (2)**
  52:16,17
**unique (2)**
  56:7,10
**university (2)**
  10:2,4
**unknown (1)**
  11:4
**unsure (1)**
  30:9
**untrue (3)**
  42:11,17,22
**up (2)**
  6:2;63:16
**upon (4)**
  24:17;53:4;55:13;
  61:10
**use (3)**
  21:18;51:20;58:17
**used (2)**
  17:22;24:19
**using (3)**
  16:25;29:3;52:24
**usually (1)**
  30:21

**V**

**vacated (1)**
  36:20
**vague (1)**
  43:23
**various (4)**
  19:13;30:13;36:21;
  37:10
**vehicles (2)**
  20:20;50:5
**veracity (1)**
  23:12
**version (3)**
  15:9;51:13,14
**via (1)**
  60:13
**Virgin (2)**
  21:10;53:7
**voting (2)**
  21:15,15

**W**

**walked (1)**
  42:7
**Wall (1)**
  20:11
**warned (1)**
  32:11
**wasting (1)**
  18:11

**Wave (3)**
  6:16;21:12;63:23
**way (2)**
  27:18;30:22
**Weil (1)**
  6:7
**what's (6)**
  16:7;35:9;41:3;56:16;
  62:6;63:25
**whenever (1)**
  28:7
**whereas (4)**
  20:11;50:7,8;61:9
**whew (1)**
  36:25
**whose (4)**
  37:18,18,21,21
**wired (1)**
  63:22
**wish (2)**
  14:9;65:17
**wished (4)**
  17:21,23;18:23;19:2
**wishes (2)**
  44:4;65:11
**withdrawal (1)**
  12:25
**withdrawn (2)**
  12:2,23
**within (1)**
  11:20
**without (4)**
  19:24;27:6;49:10;
  53:14
**witness (36)**
  5:11,14;6:9;7:2,10,15,
  18;11:10,19;13:9,11,21,
  23,24;14:4;15:2;23:19;
  24:5,12;25:17;27:15,23;
  28:6;31:17;41:19;46:20;
  48:24;49:4,6,18,19;53:2;
  63:6;64:5;65:11;66:12
**word (2)**
  44:18;61:10
**wording (2)**
  46:3,8
**words (2)**
  17:3;58:17
**worked (2)**
  7:11;12:13
**working (7)**
  10:25;11:10;12:12,17;
  15:4,12;20:11
**works (1)**
  45:19
**worrying (1)**
  19:24
**write (5)**
  25:21;40:16,17,24;
  43:6
**writing (3)**
  25:20;55:6;61:8
**written (3)**

16:25;24:9;34:7
**wrong (1)**
  7:3
**wrote (3)**
  18:21;49:6;50:25

**Y**

**year (1)**
  16:5
**years (1)**
  15:9
**York (2)**
  3:6,6

**Z**

**zero (1)**
  44:16

**Plaintiff Deposition in Fletcher Fund Bankruptcy**

**Muho v. Fletcher et al.**